

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

PEOPLE OF THE STATE
OF MICHIGAN,                                    File No. 03-1759-FH

-VS-

JOSEPH HENDRIX,

        Defendant.
_____/

JURY TRIAL

BEFORE THE HONORABLE MATTHEW S. SWITALSKI

Mount Clemens, Michigan - March 21, 2007

APPEARANCES:

For the People:          MR. STEVEN M. KAPLAN, P33036
                         Assistant Prosecuting Attorney
                         1 South Main Street
                         Mount Clemens, Michigan 48043
                         (586) 469-5350

For the Defendant:       MR. AZHAR H. SHEIKH, P52365
                         47 Crocker Boulevard
                         Mount Clemens, Michigan 48043
                         (586) 463-1160

Also present:            Detective Terrance Hogan

Reported by:             Linda Brazzel, (CSR-4704)
                         Official Court Reporter
                         (586) 469-5410

2013 JAN 14 PM 4: 23
COURT OF APPEALS
TROY OFFICE
LARRY S. ROYSTER
CHIEF CLERK
RECEIVED

2

TABLE OF CONTENTS

PAGE

WITNESSES:
OFFICER DAN KAMMERZELL
      Direct Examination by Mr. Kaplan................4

OFFICER MATTHEW LASHBROOK
      Direct Examination by Mr. Kaplan................7

OFFICER RUFUS STEWART
      Direct Examination by Mr. Kaplan..............13
      Cross Examination by Mr. Sheikh..............17

DR. BRETT TODD
      Direct Examination by Mr. Kaplan..............19
      Cross Examination by Mr. Sheikh..............26

OFFICER ANDREW GAMMICCHIA
      Direct Examination by Mr. Kaplan..............28
      Cross Examination by Mr. Sheikh..............36

LIEUTENANT DAN HEYTHALER
      Direct Examination by Mr. Kaplan..............37
      Cross Examination by Mr. Sheikh..............43
      Redirect Examination by Mr. Kaplan............54
      Recross Examination by Mr. Sheikh..............57

DR. BERNARDINO PACRIS
      Direct Examination by Mr. Kaplan..............60
      Cross Examination by Mr. Sheikh..............66

SERGEANT BRAD FERGUSON
      Direct Examination by Mr. Kaplan..............73
      Cross Examination by Mr. Sheikh..............78

DETECTIVE TERRENCE HOGAN
      Direct Examination by Mr. Kaplan..............84
      Cross Examination by Mr. Sheikh..............102
      Redirect Examination by Mr. Kaplan...........116
      Recross Examination by Mr. Sheikh.............121

People rest.......................................126
Defense rest......................................132
Closing argument by Mr. Kaplan....................132
Closing argument by Mr. Sheikh....................147
Rebuttal argument by Mr. Kaplan...................161

3

<u>EXHIBITS</u>

|  | <u>Marked</u> | <u>Admitted</u> |
|---|---|---|
| Proposed Exhibit 7...................................99 | | |
| Proposed Exhibit 25..................................85 | | |
| Proposed Exhibit 26..................................98 | | |
| Proposed Exhibit 27..................................60 | | |
| Proposed Exhibit 28..................................89 | | |
| Proposed Exhibit 36.................................132 | | |

4

1          Mount Clemens, Michigan

2          March 21, 2007

3          At 10:00 a.m.

4                *    *    *

5          (Jury present in the courtroom.)

6          COURT OFFICER:  Please be seated.

7          THE COURT:  Mr. Kaplan, your next witness.

8          MR. KAPLAN:  Thank you, your Honor.  Calling

9     Officer Dan Kammerzell.

10          COURT OFFICER:  Officer.

11          (At 10:00 a.m., witness sworn in.)

12          OFFICER DAN KAMMERZELL,

13     was thereupon called as a witness herein, and after having

14     first been duly sworn to testify to the truth, the whole

15     truth and nothing but the truth, was examined and testified

16     as follows:

17          THE COURT:  Have a seat.  Spell your last

18     name, please.

19          THE WITNESS:  K-a-m-m-e-r-z-e-l-l.

20          THE COURT:  All right.

21          MR. KAPLAN:  Thank you, your Honor.

22          DIRECT EXAMINATION

23     BY MR. KAPLAN:

24     Q    Good morning, officer.

25     A    Good morning.

5

1    Q    Sir, how may years have you been a police officer?

2    A    I've been with Shelby Township just over two years.

3    Q    Sir, did you have any involvement in taking a report

4         regarding a Ford Explorer owned by Maureen Scott allegedly

5         stolen in front of a Little Caesars pizzeria on August 31,

6         2006?

7    A    Yes.  On 9/1 of '06, I was at the front desk and received

8         information from our dispatch that the vehicle was

9         recovered in the City of Detroit.  At that point in time,

10        I did a report on recovery of the vehicle.

11   Q    What does that mean you prepared a report on recovery?

12   A    I took information where the vehicle was recovered from,

13        just in the area of Woodward and Grinnell, the city, and

14        any information we had.  I believe there was front-end

15        damage, undercarriage damage, in the information we

16        received.

17   Q    Officer, when a vehicle is stolen in Shelby Township and

18        recovered in another county such as Wayne County, what

19        efforts does your department take to retrieve that vehicle?

20   A    We'll go down and get the vehicle, and normally, our

21        evidence techs will go down and check the vehicle out.

22        Also, check for any evidence, fingerprints, things of that

23        nature.

24   Q    And if personal property is left behind in the vehicle by

25        the alleged thief, is that type of evidence collected by

6

1      police?

2   A  Yes.

3   Q  Did you have any other involvement with respect to the

4      investigation of Maureen Scott's stolen car?

5   A  No, I didn't.

6                   MR. KAPLAN:  Thank you, sir.  Thank you,

7      Judge.

8                   MR. SHEIKH:  Nothing of this witness, your

9      Honor.  Thank you.

10                  THE COURT:  Any questions for this witness?

11                  (Jurors had no questions.)

12                  THE COURT:  You're all set, sir.

13                  THE WITNESS:  Thank you, sir.

14                  (At 10:02 a.m., witness excused.)

15                  (At 10:03 a.m., witness sworn in.)

16                  OFFICER MATTHEW LASHBROOK,

17     was thereupon called as a witness herein, and after having

18     first been duly sworn to testify to the truth, the whole

19     truth and nothing but the truth, was examined and testified

20     as follows:

21                  THE COURT:  Have a seat.  What is your name?

22                  THE WITNESS:  Matthew Lashbrook.

23                  THE COURT:  Spell the last name.

24                  THE WITNESS:  L-a-s-h-b-r-o-o-k.

25                  THE COURT:  Go ahead, Mr. Kaplan.

1              MR. KAPLAN:  Thank you, your Honor.

2                  DIRECT EXAMINATION

3    BY MR. KAPLAN:

4    Q    Good morning, Officer Lashbrook.

5    A    Good morning.

6    Q    Where are you employed, sir?

7    A    Detroit police department.

8    Q    How many years have you been a Detroit police officer?

9    A    Nine.

10   Q    Officer, were you working on -- strike that.

11              Were you involved in the recovery of a

12        stolen vehicle taken out of Shelby on August 31, 2006?

13   A    Yes.

14   Q    Now, the vehicle involved here was a Ford Explorer?

15   A    Yes, it was.

16   Q    Can you tell the jurors and Judge when you noticed that

17        vehicle?

18   A    We had a run to the area, and as soon as we got there, I

19        noticed it.  It was at Erwin, south of Grinnell.

20   Q    In Detroit?

21   A    In Detroit.

22   Q    What caused you to notice the Ford Explorer?

23   A    Well, we had a police run to go to the area, and when we

24        got there, which you would observe is it crashed into a

25        telephone pole.

8

1    Q    When you say we, Officer Lashbrook, did you have a partner

2         with you?

3    A    Yes, I did.

4    Q    Who was driving, you or your partner, if you recall?

5    A    I believe my partner was, but I'm not sure.

6    Q    Officer Lashbrook, what is the date and time that you were

7         sent on that run for the damaged Ford Explorer?

8    A    Can I refer to the report to refresh my memory?  I could

9         tell you that I start at midnight, so it was very early in

10        the shift, so it was probably 12:15, 12:30.

11   Q    Would that be September 1?

12   A    September 1st for us, yes, September 1st.

13   Q    Sir, when you arrived at the scene where the stolen vehicle

14        might have been located, what did you do?

15   A    There was extensive damage to the telephone pole, I think

16        it was cracked in half, there was a downed wire, and we

17        could not go up to the vehicle and try to deal with it

18        ourselves, we had to have public lighting come out to

19        secure the area.  So, all we could do was stay there until

20        they did so.

21   Q    Officer, you didn't have any involvement in the

22        investigation of this vehicle taken from the Little Caesars

23        on August 31, 2006?

24   A    No.

25   Q    Now, sir, what, if anything, did you do with respect to

9

1       that vehicle?  Is the vehicle recovered, or taken into --

2       placed in custody, what happens to it?

3    A   It was eventually towed to a lot, and we notified our

4       telephone crime reporter unit of it, and they put it in the

5       system as impounded, and later on, the owner would be

6       notified so that he can come and get it.

7    Q   When you made the report or when you actually arrived at

8       the scene, did you know that the vehicle had been stolen?

9    A   Well, we went there --

10   Q   Prior to arriving there.  You arrived because there's

11      vehicle damaged because of a telephone pole?

12   A   I can't recall, we may or may not have.

13   Q   Did you at some point, though, verify that the vehicle had

14      been stolen out of Shelby Township?

15   A   Yes.

16   Q   The vehicle is then impounded, what happens to it after

17      that, in a general sense?

18   A   In general, our department, our auto recovery unit will

19      find out who the owner is and notify them that we have

20      their vehicle, and they'll tell them which lot it's at.

21   Q   Sir, does DPD, Detroit Police Department, keep the car, or

22      does the city where the car was taken, does that police

23      department recover the vehicle?

24   A   Well, the vehicle itself is going to go to a local tow yard

25      that we use, which is the company that anyone can use, but

10

1      we happen to use, and our auto recovery unit is going to

2      notify the owner, and beyond that, I really couldn't tell

3      you.

4   Q   But, at that point, it's up to the other police department

5      to recoup the vehicle and do what is necessary, would that

6      be correct?

7   A   They would have to take it out of their LEIN system, yes.

8                  MR. KAPLAN:  Your Honor, do we have

9      permission to have Officer Lashbrook step off the stand and

10     point to the chart, or map?

11                 THE COURT:  Yes.

12                 MR. KAPLAN:  Your Honor, would you mind

13     asking the jurors if they all can see the chart, I can't

14     tell.

15                 THE COURT:  Can everybody see?

16  BY MR. KAPLAN:

17  Q   Officer Lashbrook, can you, with this marker, indicate

18     where you recovered the vehicle?

19  A   The vehicle traveled either eastbound on Grinnell or

20     southbound on Erwin, he was traveling at a high rate of

21     speed, he got to this point and was going southbound, lost

22     control, and hit a telephone pole right here (indicating).

23     We recovered it from this area right here (indicating),

24     south of Grinnell on the east side of the street.  It had

25     heavy accident damage, and it uprooted the telephone pole.

11

1    Q    Officer, would you mind just writing 8-31, so the jurors

2         know which vehicle we're talking about.  Even though we

3         know you recovered it on 9-1.

4                        Now, Officer Lashbrook, can you indicate for

5         the jurors how far this area is where you recovered the

6         Ford Explorer from where the Caravan was recovered or

7         stopped on the 6th of September.

8    A    This is about two blocks, and I would say this is about the

9         same distance.  You can get from Erwin and Grinnell to this

10        point right here in sixty seconds, maybe even less

11        (indicating).

12   Q    And in conjunction with the vehicle allegedly stopped by

13        Detroit police on September 3, 2006, at Forest Lawn and

14        Van Dyke, how far is Forest Lawn and Van Dyke from where

15        you made the recovery of the Ford Explorer?

16   A    Well, if you can go from -- do you want to know where it is

17        from Grinnell or from here (indicating)?

18   Q    From Grinnell.

19   A    Grinnell, again, you could get to this part right here in

20        six seconds or less, so this is only going to take another

21        minute, minute and a half to get up there.

22   Q    Thanks, officer.  You can have a seat.

23                        The last question, after you're seated, as a

24        Detroit police officer, are you familiar with the character

25        of the neighborhood where these three vehicles were found

12

1        or stopped?

2    A    Yes, I am.

3    Q    How would you characterize, if you can, that neighborhood?

4    A    Housing is poor, and there are a lot of vacant lots, and a

5         lot of drug houses.

6                    MR. KAPLAN:  Thank you, Officer Lashbrook.

7         Thanks, Judge.

8                    THE COURT:  Mr. Sheikh?

9                    MR. SHEIKH:  Nothing of this witness, your

10        Honor.  Thank you.

11                   THE COURT:  Any questions for this witness?

12                   (Jurors had no questions.)

13                   THE COURT:  You may step down, sir.  Thank

14        you.

15                   THE WITNESS:  Thank you.

16                        (At 10:10 a.m., witness excused.)

17                        (At 10:10 a.m., witness sworn in.)

18                   OFFICER RUFUS STEWART,

19        was thereupon called as a witness herein, and after having

20        first been duly sworn to testify to the truth, the whole

21        truth and nothing but the truth, was examined and testified

22        as follows:

23                   THE COURT:  Have a seat.  What is your name,

24        sir?

25                   THE WITNESS:  Rufus Stewart.

13

```
1                      THE COURT:  Stewart?

2                      THE WITNESS:  Yes.

3                      THE COURT:  Go ahead.

4                      MR. KAPLAN:  Thanks, your Honor.

5                      DIRECT EXAMINATION

6    BY MR. KAPLAN:

7    Q    Spelled S-t-e-w-a-r-t?

8    A    Correct.

9    Q    As in the baseball pitcher, Stewart?

10   A    Correct.

11   Q    Now, Officer Stewart, how many years have you been a police

12        officer?

13   A    Four years now.

14   Q    Detroit police department?

15   A    Correct.

16   Q    Sir, were you working on September 3 or September 4 of

17        2006?

18   A    September 3rd, 2006.

19   Q    Yes.  Did you have the occasion, sir, to make a traffic

20        stop of a burgundy Dodge Ram in the City of Detroit?

21   A    Yes.

22   Q    Were you alone or with a partner?

23   A    Two other partners.

24   Q    Were you in a marked or unmarked vehicle?

25   A    Fully-marked vehicle.
```

14

1   Q    Sir, tell the jurors what caused you to notice the 2003
2        Dodge Ram?
3   A    The vehicle was illegally parked in front of the gas
4        station door blocking the pedestrian vehicle traffic to and
5        from the establishment.
6   Q    As a result of what you observed, did you take any action?
7   A    Yes, I effected a traffic stop on the vehicle.
8   Q    How many people in the vehicle?
9   A    One person.
10  Q    Female or male?
11  A    Male.
12  Q    A white gentleman or black gentleman?
13  A    White male.
14  Q    Sir, did you take any action after stopping this white
15       male?
16  A    Yes.
17  Q    What did you do?
18  A    We entered the license plate into the computer system, the
19       computer system stated the vehicle was a stolen vehicle, at
20       which time, we exit the vehicle, ask the driver of the
21       vehicle to step out of the vehicle and placed him in
22       custody.
23  Q    Do you remember the intersection where you first saw the
24       vehicle?
25  A    When we first noticed him, he was sitting in front of the

1    gas station the whole time.

2 Q And where did you actually stop the vehicle?

3 A At the gas station where we observed him.

4 Q Sir, did you have any involvement in the investigation of

5    that car theft that occurred September 3, 2006, in the

6    morning outside of a 7-Eleven in Shelby Township?

7 A No, I didn't.

8 Q That's not your jurisdiction?

9 A No.

10 Q Did you arrest the driver?

11 A Yes, I did.

12 Q If you saw him again, would you recognize him?

13 A Yes.

14 Q Point him out for the jurors.

15 A The gentleman in the gray suit with the blue shirt, black

16    tie (indicating).

17 Q Thank you.

18       MR. KAPLAN:  Your Honor, may the record so

19   reflect?

20       THE COURT:  Yes.

21       MR. KAPLAN:  Thank you, your Honor.  Your

22   Honor, may I approach the witness?

23       THE COURT:  Yes.

24 BY MR. KAPLAN:

25 Q I'm showing you Exhibit 32, a photograph of Joseph Hendrix

16

1       as of September 6, 2006.  Is that essentially how he looked

2       when you saw him on September 3?

3  A   Yes.

4  Q   Now, Officer Stewart, what happened to the Defendant after

5       you arrested him?

6  A   He was conveyed to northeast district for processing and

7       housing, at which time, it's out of my hands.

8  Q   Did you have any involvement with the owner of the vehicle,

9       Louis George?

10  A   No, I did not.

11  Q   Sir, I'd like you to look at this map, it's marked 36, does

12       this show you where you stopped the vehicle on

13       September 3rd?

14  A   Yes, it does.

15            MR. KAPLAN:  Do I have permission to have

16       him step off the stand, Judge?

17            THE COURT:  Yes.

18  BY MR. KAPLAN:

19  Q   Officer, can you show the jurors where you made that

20       traffic stop?

21  A   Right here (indicating), Forest Lawn and Van Dyke.

22  Q   How far is that from the August 31 vehicle, Erwin and

23       Grinnell?

24  A   Approximately two miles.

25  Q   Do you mean blocks?

17

1    A    It's about two miles.

2    Q    I'm talking about Morgan Street and --

3    A    Oh, Morgan Street, yes.  Two blocks.

4    Q    Two blocks.

5                    Thanks, have a seat.  Now, what happened to

6         the Dodge after you arrest the Defendant?

7    A    It was towed from the location by Javion Towing and placed

8         in evidence and, essentially, wait for the owner to come

9         pick up the vehicle.

10   Q    What do you know about the area where the Defendant was

11        stopped and arrested?

12   A    It's a known narcotics area.

13                   MR. KAPLAN:  Thank you, sir, and thank you,

14        Judge.

15                   THE COURT:  Mr. Sheikh?

16                   MR. SHEIKH:  Very briefly.

17                       CROSS EXAMINATION

18    BY MR. SHEIKH:

19   Q    Officer Stewart, have you ever worked in narcotics?

20   A    No.

21   Q    You're familiar with this particular area and its

22        proclivity to its drug sites, is that correct?

23   A    Correct.

24   Q    And have you dealt with other individuals that are addicted

25        to crack and also have been arrested in that area?

18

1    A    Correct.

2    Q    Is it common for people in that area to exchange cars for

3         sex, drugs, and other things?

4    A    It's been known to happen.

5    Q    All right.  And you've known of cars been exchanged by

6         people addicted to crack for sex?

7    A    Not personally, I've heard it has happened.

8    Q    Also for drugs, of course?

9    A    Yes.

10   Q    And also sharing and then giving needles to each other,

11        correct?

12   A    Correct.

13   Q    In exchange for drugs.

14                     Thank you.  Do you have any involvement at

15        all with a 2003 Dodge Caravan that is the subject matter of

16        this litigation today?

17   A    No, I do not.

18                     MR. SHEIKH:  Thank you for your time,

19        officer.

20                     MR. KAPLAN:  Thank you, your Honor.  No

21        questions.

22                     THE COURT:  Any questions?

23                     (Jurors had no questions.)

24                     (At 10:16 a.m., witness excused.)

25                     (At 10:16 a.m., witness sworn in.)

19

```
 1                        DR. BRETT TODD,

 2        was thereupon called as a witness herein, and after having

 3        first been duly sworn to testify to the truth, the whole

 4        truth and nothing but the truth, was examined and testified

 5        as follows:

 6                        THE COURT:  Please have a seat.  Your name,

 7        sir.

 8                        THE WITNESS:  Brett Todd.

 9                        THE COURT:  Spell your name.

10                        THE WITNESS:  B-r-e-t-t.  Last name is

11        T-o-d-d.

12                        MR. KAPLAN:  Thank you, your Honor.

13                        DIRECT EXAMINATION

14    BY MR. KAPLAN:

15    Q    Good morning, Dr. Todd.

16    A    Good morning.

17    Q    Nice to see you.  I'm Steve Kaplan, the prosecutor.

18    A    Okay.

19    Q    Dr. Todd, tell us about your occupation, where you work.

20    A    I work at Beaumont Hospital in Troy.

21    Q    How many years have you been a medical doctor?

22    A    Since 1999, so coming on eight years, basically.  It will

23        be eight years this summer.

24    Q    From which medical school did you graduate?

25    A    Wayne State.
```

20

1    Q    Dr. Todd, were you working at Beaumont Hospital between

2         September 5 and September 15 of last year?

3    A    Yes.

4    Q    Is that the Royal Oak branch or Troy?

5    A    The Troy branch.

6    Q    Now, did you have any involvement in treating a patient by

7         the name of Evangeline Doen?

8    A    Yes, I did.  I was the treating emergency physician.

9                   MR. KAPLAN:  Your Honor, may I approach the

10        witness?

11                  THE COURT:  Yes.

12   BY MR. KAPLAN:

13   Q    I'm showing you Exhibit 6, Dr. Todd.  Does that appear to

14        be a picture of the patient while heavily sedated and being

15        treated?

16   A    Yes, it does.

17   Q    Thanks, Dr. Todd.

18                  Now, we appreciate your being here today,

19        and we know you're busy.  Do you remember what injuries she

20        had suffered?

21   A    Yeah, I do remember that she had suffered a head injury,

22        and that ultimately, she had had a subdural hematoma.

23   Q    What is a subdural hematoma?

24   A    It's basically bleeding within the skull around the brain,

25        and it can be a dangerous injury from increasing cranial

21

```
1           pressure.
2    Q      And excuse my asking an elementary question, why is that
3           type of injury dangerous to health?
4    A      Well, essentially, if there's blood occupying the skull
5           instead of brain tissue, it's going to push on the brain.
6           It can cause neurological deficits.  It can ultimately, I
7           mean, if there's enough bleeding, it can cause death from
8           what we call brain herniation.  If there's too much
9           pressure on the brain, the brain actually shifts its
10          position.
11   Q      Were you her treating physician beyond treating her in the
12          emergency room?
13   A      No.
14   Q      Dr. Todd, after a physician such as you treats a patient in
15          the emergency room, and if the patient is then admitted to
16          the hospital, who takes over his or her care?
17   A      That would be the attending physician of whatever specialty
18          that that patient is admitted under.
19   Q      As a physician treating Mrs. Doen in the emergency room,
20          was it important for you to know how she suffered that
21          injury?
22   A      Yeah.  I thought that was important information, yes.
23   Q      What information did you have, if any, concerning how she
24          suffered a head injury?
25   A      We had information basically just from what the paramedics
```

22

1          had given us, and I believe that the intern working with me

2          that day was able to speak with the -- I believe, if I'm

3          remembering the medical record correctly, speak to the

4          patient's daughter, and the information that we had was

5          that the patient had been somehow hit on the head.  We

6          didn't know, you know, with what type of instrument or, you

7          know, if she had taken a fall.  But the story we had

8          received was that she had been hit on the head.

9     Q    There was evidence in the case that she informed a nurse

10         that she was pushed out of a moving vehicle and hit her

11         head on the pavement.  The injury that you observed, is

12         that consistent or inconsistent with the nurse's

13         description?

14    A    That would be consistent.

15    Q    Sir, as an emergency room physician, do you have discretion

16         determining whether a patient should be admitted or whether

17         the patient could be released?

18    A    Yes.

19    Q    In this case, what decision did you make?

20    A    We made the decision that the patient needed to be admitted

21         to the hospital and that she needed a higher level of care,

22         that she needed to be at Royal Oak Beaumont and not at Troy

23         where she could be managed by trauma physicians.

24    Q    Is that an easy decision for a physician to make, or should

25         I say is that a light decision where it's just let's send

23

1        her over to Royal Oak, or is there some discretion involved

2        in it?  Is there a protocol?

3    A   Well, it's more based on clinical judgment rather than a

4        specific protocol.  But, if the patient has serious enough

5        injuries that I'm worried about her stability or the

6        patient's stability, that's when I'm going to transfer the

7        patient.

8    Q   Sir, I know you're not a forensic scientist, but tell me

9        whether you have an opinion in this regard.  The farther a

10       person falls, is there a correlation between a more serious

11       injury?

12   A   Yeah, I think that's pretty clear.  I mean, the farther you

13       fall, the higher energy injury you are going to sustain and

14       the more likely that you're going to sustain a serious

15       injury.

16   Q   What about a person hitting her head on grass versus

17       hitting her head on pavement?

18   A   I would expect pavement to be a more serious injury.

19   Q   What about a patient being pushed out of a moving vehicle

20       versus being pushed out of a stationary vehicle, is there a

21       distinction?

22   A   Yeah, broadly speaking, you would expect, again, with

23       leaving a moving vehicle, you have a higher energy injury

24       because of the velocity of the vehicle, so you would expect

25       a more serious injury there as well.

24

1    Q    Is there a correlation between youth and agedness if you

2          have say a 25-year-old athlete versus a 65-year-old woman.

3          Is the 65-year-old woman more likely or less likely or

4          equally likely to suffer serious head injury?

5    A    Yeah.  Generally, with age, what happens, is the brain

6          shrinks down and that allows for more movement of the

7          brain.  So, while both head injuries in both age patients

8          can be severe, generally, there is more -- actually, for an

9          elderly patient, there's more room to accommodate that

10         blood, so it would take more blood to cause the pressure to

11         go up in the brain.  So, both patients are at risk for

12         bleeding, but in terms of prognosis, one way or the other,

13         you can't really say.  I don't think.

14    Q    In terms of recovery, is a younger person in good health

15         more likely to recover than a 65-year-old woman?

16    A    In terms of recovery, yes.  Generally, the younger person's

17         going to do better.

18    Q    Why is that?

19    A    Well, they've got a more healthy brain tissue.  They also

20         have the benefit of having less wear and tear on the body

21         in terms of other diseases.  The elderly are more at risk

22         for diabetes, heart disease, and so you can assume that in

23         the elderly, they're going to have these other

24         comorbidities that make recovery a lot more difficult.

25    Q    Dr. Todd, do you know what happened to Mrs. Doen after she

25

1       was transferred to Royal Oak Beaumont?

2   A   Well, I'm aware that ultimately that she died, yeah.

3   Q   Dr. Todd, in this photograph, it appears she has a

4       tracheotomy tube, does she have some tube which is helping

5       her breathe?

6   A   Yes, she does.

7   Q   What is a tracheotomy tube?

8   A   It's a air-way incision made into the trachea, in the neck,

9       that's used for patients who are going to be on a

10      ventilator for a long period of time to help assist their

11      breathing.

12  Q   When a physician such as you with your training decides

13      that a ventilator and tracheotomy tube are necessary, is

14      that a light decision to make or is that one that causes

15      you to pause?

16  A   No, that's a serious decision.  As an emergency physician,

17      I don't make the decision to place a tracheotomy.  Now, I

18      do make the decision to place an air-way and intubate a

19      patient.  But, the tracheotomy is generally used for

20      patients who are anticipated to be on a ventilator for

21      longer periods of time.  So the admitting physician or

22      treating trauma surgeon will be the one to make that

23      decision.

24              MR. KAPLAN:  Thank you, Dr. Todd.  Thank

25      you, your Honor.

```
 1                    THE COURT:  Mr. Sheikh?

 2                    MR. SHEIKH:  Thank you, your Honor.

 3                       CROSS EXAMINATION

 4    BY MR. SHEIKH:

 5    Q    Good afternoon, Dr. Todd.

 6    A    Good afternoon.

 7    Q    First of all, when you examined Ms. Doen, you looked for

 8         injuries over the whole body, correct?

 9    A    Correct.

10    Q    Not just the most obvious one?

11    A    That's correct.

12    Q    And do you recall how many injuries you found?

13    A    The only injury that I can recall was the head injury.

14    Q    So, it was a single, lone concussion or whatever?

15    A    There was a laceration to the scalp, and I don't recall any

16         other injuries, no.

17    Q    All right.  And additionally, from anything that you saw of

18         the injury, you could not -- could you tell to a medical

19         certainty whether or not she jumped out of the vehicle,

20         whether she was pushed, or whether she fell accidently?

21    A    I couldn't tell that.

22    Q    There's no way to determine that, correct?

23    A    Not from my examination, no.

24    Q    Okay.  And the injuries would be consistent with either of

25         those scenarios, either being pushed, accidently falling,
```

27

1        or jumping out, correct?

2   A    I believe so.

3   Q    And there was one injury to the head, and that caused all

4        the multiple problems because of her age, and as you

5        indicated, multi-morbidity, correct?

6   A    I believe so, yes.

7                   MR. SHEIKH:  Thank you for your time,

8        Doctor.

9                   Nothing further, your Honor.

10                   MR. KAPLAN:  Thank you, your Honor.

11                   THE COURT:  Questions?

12                   (Jurors had no questions.)

13                   THE COURT:  You may step down, Doctor.

14        Thank you.

15                   THE WITNESS:  Thank you.

16                   (At 10:27 a.m., witness excused.)

17                   (At 10:27 a.m., witness sworn in.)

18                   OFFICER ANDREW GAMMICCHIA,

19        was thereupon called as a witness herein, and after having

20        first been duly sworn to testify to the truth, the whole

21        truth and nothing but the truth, was examined and testified

22        as follows:

23                   THE COURT:  What's your name?

24                   THE WITNESS:  Andrew Gammicchia.

25                   THE COURT:  Go ahead.

28

1                    MR. KAPLAN:  Thank you, your Honor.

2                    DIRECT EXAMINATION

3    BY MR. KAPLAN:

4    Q    Good morning, Officer Gammicchia.

5    A    Good morning.

6    Q    Sir, how do you spell your last name?

7    A    G-a-m-m-i-c-c-h-i-a.

8    Q    How many years have you been on the police force?

9    A    In Shelby Township, 11 years.

10   Q    Sir, isn't there another Officer Gammicchia who works for

11        Shelby?

12   A    Yes, there is.

13   Q    Better looking one, right?

14   A    Yes.  She thinks so.

15   Q    Who is she?

16   A    My wife.

17   Q    How do you enjoy working with your wife?

18   A    I'm under oath?  No, it's great.

19   Q    Now, Officer Gammicchia, the reason I called you is with

20        respect to a vehicle allegedly stolen on December 3, 2002,

21        outside a Gathering Place restaurant and bar?

22   A    Yes.

23   Q    Where is the Gathering Place located?

24   A    It's on Van Dyke, halfway between 21 and 22 Mile Roads.

25   Q    Now, sir, with respect to that vehicle allegedly stolen

29

1       from the Gathering Place, what involvement did you have?

2 A    I was pulling out of a side street just across the street

3       from the Gathering Place.  Observed a brown GMC pickup

4       truck pull out of the parking lot onto Van Dyke at a high

5       rate of speed, making a left turn.

6 Q    Did you know it had been stolen at that point?

7 A    No.

8 Q    How would you characterize the driving in terms of safety?

9 A    Very reckless, just pulled out without stopping and, like I

10      said, a high rate of speed, and then I turned to follow,

11      and it was going fast and then did a quick turn onto a side

12      street, continuing at a high rate of speed.

13 Q    Sir, do you remember the approximate time on December 3,

14      2002 that you noticed a vehicle?

15 A    It was 5:50 in the evening.

16 Q    Light out or dark out?

17 A    It was dusk.

18 Q    At that point, did you know it had been stolen?

19 A    No.

20 Q    At some point, did you learn it had been stolen?

21 A    Yes.

22 Q    When did you discover that it had been stolen?

23 A    Well, I continued to follow the vehicle down the side

24      street, and it continued on past where it could turn off

25      anywhere else and went down a dead-end street.  At that

30

1    point, I activated my overhead lights and contacted

2    dispatch that I was following this vehicle, and they

3    advised me that a vehicle was just stolen -- or a vehicle

4    fitting the same description was stolen from the Gathering

5    Place.

6  Q  And an elementary question, what conclusion did you derive

7    after hearing that information from dispatch and noticing a

8    similar looking vehicle?

9  A  That that was a stolen vehicle.

10  Q  You indicated you activated overhead lights?

11  A  Yes.

12  Q  What about the siren?

13  A  No.

14  Q  Now, your overhead lights, how visible are they to other

15    motorists?

16  A  Very visible, especially when darker conditions.

17  Q  How far were you from the stolen vehicle when you activated

18    your overhead lights?

19  A  I'd say about four or five houses away.

20  Q  Did the driver of the stolen vehicle then stop his car and

21    submit to an arrest?

22  A  No.

23  Q  What did he do instead?

24  A  He continued to the very end of the street, where there's a

25    turnaround, he turned back around and came right at my

31

1       vehicle.

2   Q   In person or with the vehicle?

3   A   Went with the vehicle.

4   Q   How fast was he traveling at that point?

5   A   Continuing to go at a high rate of speed again,

6       accelerating back up.

7   Q   How many lanes is the street when he's coming at you?

8   A   Well, I'd say, there's no curves on the street, so it's a

9       very narrow street, with, what do you call, ditches on both

10      sides.  And I mean just narrow enough for two cars to get

11      by.

12   Q   Can you estimate his speed at that point?

13   A   Estimating I would say, well, he's accelerating at the

14      time, so I'd say getting up to close to 40.

15   Q   Were you able to see the driver, could you determine

16      whether it was a female or male?

17   A   I could determine it was a male.

18   Q   Could you determine whether a white male or black male?

19   A   A white male.

20   Q   What were you thinking when this vehicle is coming at you

21      at a high rate of speed?

22   A   I was thinking that he was coming at me at a high rate of

23      speed, and I needed to either get out of his way or take a

24      direct hit.

25   Q   Were you concerned for your safety?

32

1    A    Yes.

2    Q    Officer Gammicchia, what happened after you took evasive

3         action?

4    A    The vehicle continued past me.  I turned around, and at

5         that point we started to approach Van Dyke again.  I turned

6         my overhead lights off, because I was hoping that the

7         person would not continue into Van Dyke the way he pulled

8         out of the parking lot to begin with, and cause an

9         accident.  But, at that point, prior to getting to

10        Van Dyke, the vehicle stopped and the person jumped out of

11        the vehicle, ran north between the houses.

12   Q    What street?  What's the name of the street where he

13        stopped the vehicle?

14   A    It was on Speedway.

15   Q    Speeding on Speedway?

16   A    Yes.

17   Q    Now, Officer Gammicchia, did the driver then approach you

18        and say, hey, sorry I stole a car, you know, take me in?

19   A    No, sir.

20   Q    What did he do instead?

21   A    He fled northbound between houses, unfenced yards.  It's

22        all open.

23   Q    Sir, were you able to determine which house he traveled

24        toward?

25   A    Yes.  There was fresh snow there that night, and I observed

33

1          a set of -- the only set of footprints leaving from the

2          vehicle, and they went to a house on Paxton Street.

3   Q   Do you know who lived in that house?

4   A   At the time, I didn't realize which house it was.

5   Q   Now, do you know whose house?

6   A   Yes.

7   Q   Whose house?

8   A   Joseph Hendrix.

9   Q   So, did you make any effort to capture Joseph Hendrix as a

10         result of the stolen car chase, his fleeing and eluding,

11         his bailing out, and running toward that house?

12   A   At this point, I went up to the house, I was advised by his

13         mother that he wasn't there, and from there I went, secured

14         the vehicle with other officers, and talked to the victim

15         of the car theft.

16   Q   How did he feel about his vehicle being stolen?

17   A   He was not happy about it.

18   Q   Now, sir, have we shown you the map of the various car

19         thefts?  Have you seen this?

20   A   Yes.

21             MR. KAPLAN:  Judge, does he have permission

22         to step off the witness stand?

23             THE COURT:  Yes.

24  BY MR. KAPLAN:

25   Q   Officer Gammicchia, can you show the jury where the

34

1      Gathering Place restaurant and bar is?

2   A  It's this yellow box right here (indicating).

3   Q  So you're pointing to the right side of the map, Van Dyke

4      Avenue, between 21 Mile and 22 Mile Road?

5   A  Yes.

6   Q  Closer to 21 Mile?

7   A  Yes.

8   Q  And show the jury where the driver drove at you on Speedway

9      Street.

10  A  That would be right underneath the apartment sign.  There's

11     like a dead-end and a little round area where you can turn

12     around.

13  Q  How far did Joseph Hendrix on December 3, 2002, live from

14     the Gathering Place bar?

15  A  Well, just right around the block.  This is where his

16     residence was and that is where the bar is (indicating).

17  Q  How many feet is that?

18  A  Estimating maybe a hundred, hundred fifty feet.

19  Q  Would you expect a gentleman living here on Paxton Street

20     to know where the Gathering Place bar is on a main street?

21  A  Yes.

22  Q  Now, sir, how far from Joseph Hendrix car did the thief

23     bail out?

24  A  From the stolen car?

25  Q  Yeah.  I'm sorry, how far from his house, from Joseph

35

1       Hendrix house, was the car abandoned?

2   A   I believe it was directly behind it on Speedway Street, if

3       not, it was one house over.

4   Q   If Joseph Hendrix lived on Paxton Street on December 3,

5       2002, would you expect him to be familiar with Speedway

6       Street?

7   A   Yes.

8   Q   Have a seat, thanks, officer.

9               Now, what were you thinking when this

10      vehicle is failing to stop for you after you've activated

11      your overhead lights?

12  A   Basically, that he had no -- not really caring about, you

13      know, the safety and the laws and all that, and he was

14      going to continue to try to avoid being captured.

15  Q   Had you not evaded contact with the stolen vehicle, do you

16      think you would have suffered an injury?

17  A   I definitely would have -- I mean the vehicle was coming

18      right at me and there was no slowing down or swerving one

19      way or the other by that vehicle.

20  Q   Now, in your opinion, could other people have been injured

21      the way he was driving?

22  A   Yes, definitely.

23  Q   Did you have any involvement in the ultimate arrest of

24      Joseph Hendrix, his being charged with stealing the

25      vehicle, and then pleading guilty before Judge Matthew

36

1       Switalski?

2   A   No, sir.

3   Q   What happens to the case after that?

4   A   It was turned over to the Detective Bureau.

5                   MR. KAPLAN:  Thank you, sir.  Thank you,

6       Judge.

7                   THE WITNESS:  Okay.

8                       CROSS EXAMINATION

9   BY MR. SHEIKH:

10  Q   Officer, did you have any involvement with the theft of

11      2003 Dodge Caravan that is the subject matter of this

12      litigation?

13  A   No, sir.

14                  MR. SHEIKH:  Thank you.  Nothing of this

15      witness, your Honor.

16                  THE COURT:  Questions?

17                  (Jurors had no questions.)

18                  THE COURT:  You're all set, sir.

19                  THE WITNESS:  Okay.  Thank you, sir.

20                  (At 10:37 a.m., witness excused.)

21                  (At 10:38 a.m., witness sworn in.)

22                  LIEUTENANT DAN HEYTHALER,

23      was thereupon called as a witness herein, and after having

24      first been duly sworn to testify to the truth, the whole

25      truth and nothing but the truth, was examined and testified

37

1      as follows:

2                          THE COURT:  Have a seat.  State your name,

3      please?

4                          THE WITNESS:  Dan Heythaler, H-e-y-t-h-a-l-

5      e-r.

6                          DIRECT EXAMINATION

7   BY MR. KAPLAN:

8   Q    Good morning, Lieutenant, nice to see you again.

9   A    Good morning, Steven.

10  Q    Sir, where are you employed?

11  A    Macomb County Sheriff's Office.

12  Q    For how many years?

13  A    I'm in my 29th year.

14  Q    Sir, when were you promoted to the position of lieutenant?

15  A    January, 2001.

16  Q    I'm not going to ask you your wedding date.

17  A    Thank you.  Thank you.

18  Q    Have you had the experience in the drug enforcement unit of

19       the Sheriff's Department?

20  A    Yes, I have.  I was an undercover officer for two years,

21       '85 and '86.  I worked surveillance for a year.  I was

22       assistant team leader of the narcotics unit for a year, and

23       I just finished a two-year stint in charge of the narcotics

24       unit in 2005-2006.

25  Q    Can you estimate, and I know you don't have a log with you,

38

1      but the number of narcotics arrests you have been involved

2      in either as investigator or as a patrolman?

3  A   (No response.)

4  Q   Are we talking four figures, three figures?

5  A   I would say since the '80s when I was first put on the

6      road, early '80s, I would say three figures, probably

7      between four and five hundred easily.

8  Q   Lieutenant Heythaler, do you have any experience in the

9      area of auto theft?

10 A   I have some training in auto theft, I have not been an

11     investigator in auto theft.

12         MR. KAPLAN:  Your Honor, we move to qualify

13     Lieutenant Heythaler as an expert in narcotics enforcement

14     and apprehension.

15         MR. SHEIKH:  Your Honor, we have no

16     objection, we are familiar with his reputation.

17         THE COURT:  All right.

18         MR. KAPLAN:  Thank you, your Honor.

19 BY MR. KAPLAN:

20 Q   Lieutenant Heythaler, do you have any knowledge or

21     experience with respect to people stealing vehicles in

22     order to drive to drug houses miles away?

23 A   Yes.

24 Q   I would like you to assume that a particular individual,

25     male individual, has a suspended driver's license, has a

39

```
 1        drug addiction, and does not own a car.  And there are
 2        crack houses in Detroit on Van Dyke Avenue and Six Mile
 3        Road.  Now, sir, in your opinion, would such a person be
 4        able to steal a car or want to steal a car in order to
 5        purchase the drugs?
 6   A    Yes.
 7   Q    Why is that?
 8   A    Well, there's actually a couple reasons.  It's a crime of
 9        opportunity the majority of time, because they don't have a
10        car because they probably sold it or given it away for
11        narcotics.  They need transportation down there.  No one
12        that they know trusts them to use their car because they're
13        probably going to exchange it for drugs, or they're going
14        to be caught someplace down in Detroit with drugs in it.
15        Or three, they're going to use it in a way that as they're
16        transporting, as they're going down there, they're either
17        going to get hurt -- they could get hurt, they could get
18        robbed.  They could get their car taken from them.
19   Q    Now, the area of say 22 Mile and Van Dyke, how far would
20        that be from Van Dyke, Six Mile area, approximately?
21   A    Fifteen miles.
22   Q    Now, sir, in terms of car theft.  Assuming a person is a
23        thief, veteran thief, does such a person tend to use a
24        similar modus operandi or different modus operandis?
25   A    Well, a lot of it depends, a car thief is different than
```

40

1         somebody who is stealing a car for a different opportunity.

2         A car thief takes an order, goes out looking for a car,

3         usually it's probably, they don't -- what's a good way of

4         putting it?  They don't dirty their area that they live in.

5         What they do is, they get -- let's take example, let's take

6         a Mercedes.  Someone puts in an order for a Mercedes or

7         parts to a Mercedes.  A person will not steal in their area

8         if they're doing it for profit, if they're stealing a car

9         for profit.  If they are stealing a car for something other

10        than stealing a car for profit, then they don't care where

11        they get it from, they're stealing it and dumping it, and

12        it's usually someplace close to where they live, work,

13        associate with.

14  Q   Now, if a person's part of a massive car theft ring, where

15        there are orders for particular cars like Jaguars and

16        Mercedes, is that person more likely to steal from the

17        neighborhood where he lives or would he go to a different

18        neighborhood?

19  A   Go to a different neighborhood.

20  Q   Why is that?

21  A   Again, they don't -- people know if I drive a Chrysler, and

22        I'm a car thief, and my neighbors see me driving one of my

23        neighbor's vehicles, they know it's not mine.  They know

24        that I'm a thief.  They're not going to get seen in their

25        area stealing a car, or I'm not going to be seen in my area

41

1         stealing one of my neighbor's cars, because they know I'm

2         stealing for profit.  If somebody's going to steal a car to

3         dump, they don't care where they steal it from, but it's

4         usually going to be close by.

5    Q    Lieutenant Heythaler, if a person is stealing a car simply

6         for locomotion purposes, and he needs to drive about

7         16 miles into a crack area of Detroit, does that person

8         generally care where he finds that vehicle?

9    A    Absolutely, not.  He'll probably find it close, but they

10        don't care where they find it.  The first one they come

11        across, they're going to grab.

12   Q    But in terms of -- let's take the thief who is not part of

13        organized crime, but he's a person, opportunistic thief,

14        who needs to drive the car to buy drugs, is that person

15        likely to take from the area where he's familiar or an area

16        where he's not familiar?

17   A    Sure.  An area that he's familiar.

18   Q    Why is that?

19   A    He is looking at opportunity and transportation, quick

20        transportation to get down to get the drugs.

21   Q    I would like you to assume that Joseph Hendrix allegedly

22        stole vehicles on December 3, 2002, August 31, 2006,

23        September 3, 2006, and September 5, 2006, and that the four

24        vehicles that he took were all taken from businesses,

25        parking lots, all four vehicles have keys left in the

42

1        vehicles, and doors unlocked.  Further assume that he lived

2        within a mile of these four sites, what does that tell you

3        about this person's modus operandi of stealing cars?

4  A   May I ask you if they're all the same make or are they

5        different makes?

6  Q   All different makes.

7  A   There's a pretty good chance that if someone is going to

8        steal some of different makes, they're probably not taking

9        orders, they're just -- it's there, it's easy to take.

10       It's an easy vehicle to take, the keys are in it.  It's the

11       first one they came across, it's a crime of opportunity.

12  Q   What does it tell you, if anything, that Joseph Hendrix

13       allegedly took three of those vehicles August 31,

14       September 3, and September 5, 2006, to the same area of

15       Detroit, near Six Mile and Van Dyke?

16  A   The area -- during my investigations in narcotics, the area

17       that we would relay information to our counterparts in

18       Detroit about because we had informants, a heavy drug area

19       is between Seven and Five Mile Road off the Van Dyke area,

20       a lot of drug houses in that area.

21  Q   So, what does that tell you about the alleged thief if he's

22       driving a vehicle in the same area of Detroit?

23  A   My opinion would be he's probably going down there to

24       purchase narcotics.

25             MR. KAPLAN:  Thanks, Judge.  Thanks,

43

1       Lieutenant.

2                       THE COURT:  Mr. Sheikh.

3                       MR. SHEIKH:  Thank you, Judge.

4                       CROSS EXAMINATION

5    BY MR. SHEIKH:

6    Q    Good morning, Lieutenant.

7    A    Good morning, Mr. Sheikh.

8    Q    So I take what you've indicated is that based on your

9         expertise and your personal knowledge in this area, that

10        people who are repeat pattern offenders in this sort of

11        thing, that they steal vehicles to go get crack, correct?

12   A    People get comfortable -- certain people get comfortable in

13        stealing vehicles if they don't have a vehicle available to

14        them.  They get comfortable in a certain way of stealing

15        vehicles, usually the easiest type, and one with a -- a car

16        with keys in it, extremely easy to take.

17   Q    Okay.  Now, you as an expert are allowed to give opinions,

18        you realize that?

19   A    That's correct.

20   Q    So, you don't have to limit yourself to just what you've

21        seen as related, I just want to clear that for the ladies

22        and gentlemen of the jury.

23   A    Correct.

24   Q    Now, if you have somebody who whenever they are an

25        opportunistic offender as Mr. Kaplan has indicated,

44

1          somebody that looks for a running vehicle that's parked

2          outside businesses or wherever and takes them and goes to

3          the Six Mile and Van Dyke area, that wouldn't surprise you

4          if a person did that repeatedly, correct?  Based on what

5          you've said if they became comfortable with it and they had

6          a crack addiction?

7     A    Yes.  Yes, if they had a crack addiction, yes.

8     Q    Based on your 29 years with the Macomb County Sheriff's

9          Department and your six years as a lieutenant, let me ask

10         you this:  If somebody were to have retrieved a vehicle,

11         found somebody in it, got in a confrontation with them,

12         pushed them out, they may have realized they got more than

13         what they bargained for, it would not be unfathomable to

14         abandon that vehicle, correct?

15    A    I can't necessarily say that depending on what their

16         addiction -- how strong their addiction is and what --

17    Q    We are not talking about somebody that's addicted at this

18         point, we're talking about somebody that simply for

19         whatever reason were to obtain a vehicle.

20    A    Okay.

21    Q    Let me give you a scenario, okay?  A person goes and sees a

22         vehicle parked outside a dry cleaners.  They assume maybe

23         because it's, you know, tinted glass or whatever, that

24         nobody's in it, they get in it.  Either the person gets

25         scared and jumps out, falls out, or is pushed out of the

45

```
 1          vehicle.  Now, this person realizes that it's more than
 2          what they bargained for, it would not be uncommon for them
 3          to abandon that vehicle, correct?
 4     A    I can't necessarily say that's true, no.
 5     Q    Okay.  Well, in your lengthy time as a police officer,
 6          haven't you found weapons that people have discarded after
 7          a crime or where they've abandoned crimes that became more
 8          serious, and so at that point they abandon the crime?
 9     A    That has occurred, yes.  That has occurred.
10     Q    A classic example would be a hit and run.  If somebody has
11          a stolen car or something, and they're going and they hit
12          something, they would abandon it and run, because they
13          don't care about the vehicle?
14     A    Well, that's not necessarily true.  I've actually caught
15          people with the vehicle still with fresh damage on it where
16          you don't understand why they didn't abandon the vehicle.
17          Actually, they're afraid.  They don't know what they're
18          going to do in a situation like that.  So, I can't
19          necessarily say that they would abandon it wholeheartedly.
20          Does it happen?  Absolutely.
21     Q    And as an officer of the law, even after being an officer
22          for 29 years, you're apprehensive when you approach a
23          situation where you're doing a vehicle stop or something
24          like that for officer safety reasons, et cetera, correct?
25     A    Absolutely.
```

1   Q   The adrenaline flows a little high, correct?

2   A   Sure.  Sure, it does.

3   Q   And you become more aware so you're watching to see if the

4       subject's making any movements with their hands or

5       anything, correct?

6   A   From basic academy on, yes, you're always watching.

7   Q   Always.  After 29 years still, correct?

8   A   Oh, I try to.

9   Q   And you have weapons on you?  You sometimes have protective

10      gear, correct?

11  A   Correct.

12  Q   And despite all that, you're careful, and your adrenaline

13      flows, correct?

14  A   Absolutely.

15  Q   Now, let me ask you this:  As an expert, if you have an

16      individual, he's not a sophisticated thief, we don't know

17      who that individual is.  They go in and they're thinking

18      they're going to steal a minivan.  They get into the van,

19      they notice that there's a lady there, and either she, you

20      know, let's herself be known, or they see her, and as I

21      indicated, we don't know if she fell out, jumped out, or

22      was pushed out.  She falls.  They realize now that this is

23      more than what they bargained for.  Would you expect that

24      person to panic?

25  A   I agree that they probably think they got more than what

| | | |
|---|---|---|
| 1 | | they expected.  I think a lot of how the person reacts is |
| 2 | | if they know if that person is injured or what the extent |
| 3 | | of the injuries are. |
| 4 | Q | Well, just basically, if you have somebody that's a run-of- |
| 5 | | the-mill, you know, just taking a vehicle, they jump in |
| 6 | | there, they notice the lady, as I indicated, somehow she |
| 7 | | ends up on the seat there, and at that point, there would |
| 8 | | be nothing inconsistent with that person abandoning the |
| 9 | | vehicle, right?  I mean, it would make sense. |
| 10 | A | I don't think they would.  If they get in there, obviously, |
| 11 | | it's more than what they expected with the person in there, |
| 12 | | but are they going to automatically just abandon the |
| 13 | | vehicle right away?  I don't think so. |
| 14 | Q | But if they see that the person hit their head, is not |
| 15 | | moving, or something to that effect, that would alert them, |
| 16 | | correct? |
| 17 | | MR. KAPLAN:  Your Honor, we would object to |
| 18 | | that question, because no facts in evidence what he |
| 19 | | observed. |
| 20 | | MR. SHEIKH:  Your Honor, Mr. Kaplan just |
| 21 | | went through this whole litany to have him qualified as an |
| 22 | | expert, now that I ask him questions, now, all of a sudden, |
| 23 | | he wants to withdraw that expertise. |
| 24 | | THE COURT:  He asked him a hypothetical, |
| 25 | | I'll overrule the objection. |

48

1            MR. SHEIKH:  Thank you, your Honor.

2     BY MR. SHEIKH:

3     Q    So, basically in that situation, Lieutenant, it would not

4          be unheard of, right?  I know we are going to go back and

5          forth for a long time, but bottom line is it would not be

6          unheard of for a person to abandon a vehicle at that point,

7          correct?

8     A    As soon as they see the person, absolutely, right away, is

9          that what you're saying?

10    Q    Well --

11    A    They get out of the car as soon as they see the person?

12    Q    A person gets in a minivan that they see running.

13    A    Okay.

14    Q    You know, with the keys in or whatever, I don't know, maybe

15         they see the smoke or somehow they conclude that the

16         vehicle's running.

17    A    Sure.

18    Q    They get in it, and then they see that there's a lady in

19         the back seat.

20    A    Okay.

21    Q    And she says, what are you doing here or something to that

22         effect.  You don't know whether they pushed her out or she

23         fell or jumped out.

24    A    Okay.

25    Q    And they see that she's fallen, you know, she's on the

1       ground, she's not getting up.

2  A   Okay.

3  Q   It would not be a stretch of the imagination to think that

4       that person would then abandon that vehicle that they have

5       nothing vested in, correct?

6  A   Actually, I think just the opposite.  They want to flee the

7       scene as quickly as possible.  They're going to take that

8       vehicle and get the hell out of there.

9  Q   And then they're going to abandon it, right, wouldn't that

10      be --

11  A   Not always, though, no, because, again, it depends on what

12      they are stealing the van for and what they're going to do

13      with it afterwards.

14  Q   So, you're saying you can't find any scenario in which a

15      person that did not bargain for that under their panic and

16      with their adrenalin --

17  A   No, I didn't say that.  What I said is, is it possible?  I

18      think the majority of times, they're going to get out of

19      there, and it depends on why they are stealing that

20      vehicle.  If they're stealing that vehicle just to steal

21      the vehicle for the parts, they're going to abandon that

22      vehicle.  If they're using it just for transportation to

23      get someplace, they're going to go to that place.  They're

24      going to leave.

25  Q   All right.  So, let's assume, and I appreciate your

50

1        clearing that up, that makes a lot of sense.  If a person

2        were stealing for parts, because they see a nice 2003

3        minivan that looks very nice, which we have pictures of it,

4        they get more than what they bargain for.  They realize now

5        it's too hot, and they abandon it, nothing from which you

6        have testified to would be inconsistent with another person

7        that has a crack addiction seeing this vehicle and taking

8        it and going to a crack town, would it?  That would not be

9        inconsistent, would it?

10  A    I think any crack person -- anybody who's got a crack

11       addiction that finds a car running, would probably take it.

12  Q    Okay.  And would probably go right to where they buy their

13       crack, right?

14  A    I would probably think they would go to the area that they

15       feel most comfortable in buying their crack or dope, okay?

16  Q    And, I know that you are a law enforcement officer, but I

17       don't know if you have had any experience with fire safety

18       and stuff, and I'm just going to ask you a hypothetical.

19       Tell me if you are in agreement with this or not.

20  A    Okay.

21  Q    A lot of times that the reason that problems occur in

22       exiting a fire is that people are creatures of habit, and

23       they walk in a particular room and if panic breaks out,

24       they tend to try to go out that door, and they bottleneck

25       as opposed to realizing that there's other exits, correct?

51

1    A    Actually, it's usually from what I understand that they

2         don't have a clear sight of it, they don't understand they

3         should get down low and go out.  But, the majority of times

4         they will go back to where they know their safety is, just

5         like as if you're drowning.  If you're -- if I may expound?

6    Q    Yes, sir.

7    A    I'm also on our dive team, and we train by swimming in a

8         pool with air tanks down there.  Now, part of our training

9         was we'd have three air tanks down there and one of them

10        would be turned off.  As you swim around you would come

11        upon that air tank and go to take a breath of air in and

12        there wouldn't be any air in there.  What does a person

13        think about doing is reactionary going up to where you know

14        it's going to be safe.  Same thing with a fire.  But all

15        you have to do is turn that valve and you've got all the

16        air you want.  You don't think, you panic you go back to

17        where you come from.

18   Q    Okay.

19   A    If that makes sense.

20   Q    So, just -- not to beat a dead horse, but I just want to

21        make sure that I understand.  You have a person steals the

22        van for parts or whatever, realizes that they got more than

23        what they bargain for, abandons the vehicle, crack head

24        comes along, sees the vehicle abandoned with the keys in

25        it, takes it, and goes to crack town, there's nothing

52

1        inconsistent with that, correct?

2    A   I can't say it's impossible.

3    Q   Okay.

4    A   Far reaching.  Is it impossible?  Absolutely, not.

5    Q   Does it stretch the imagination if you look at this piece

6        by piece.  If you're having difficulty with our scenario,

7        let's look at it piece by piece.

8                    A person comes in to steal a vehicle for

9        parts, okay?  They are intending to do what might be

10       considered otherwise a low priority crime.

11   A   Okay.

12   Q   They come in, they end up with more than what they bargain

13       for.  They notice this lady, now fallen down and she can't

14       get up, and they may have seen the blood or whatever.  As

15       the doctor that just testified there was blood and it was a

16       pretty severe injury.  I don't think you saw that because

17       you were sequestered.  At that point, could you see that

18       person's adrenaline running high, and that person thinking,

19       wow?

20   A   Sure.  They're going to panic and want to leave.

21   Q   Okay.  And then they may want to abandon the vehicle.  They

22       know that that's what's next, it's the police looking for

23       that vehicle.  Wouldn't that make sense that that person,

24       especially if they're looking for parts, if they stole it

25       as a property crime?

53

1    A    If they stole it as a property crime, they're probably not

2         going to drive very far with it.  They're going to go

3         around the corner and abandon it and leave.  They're not

4         going to drive 15 miles in it.

5    Q    Exactly.  And then in addition to which, Lieutenant,

6         they're not going to give a darn about leaving the keys, or

7         not leaving the keys, or anything else?  They're not going

8         to bother trying to take the keys with them, or park it

9         real nice, or most likely they're going to abandon it the

10        quickest way that they can, correct?

11   A    I would probably have to -- I probably would have to agree.

12        I don't know if they would take the keys or not, though.

13   Q    And then a neighborhood crack head comes along and sees the

14        vehicle, it looks abandoned.  He thinks he hit the lotto,

15        right?  It wouldn't be inconsistent then for the crack head

16        to jump in the vehicle and go to crack town and gets some

17        crack, correct?

18   A    If that's what they need to get down there, yeah, again,

19        the crime of opportunity.  If there's a vehicle there,

20        they'll take it.

21   Q    So this sequence if you break it down is viable, correct?

22   A    It's viable.

23              MR. SHEIKH:  Thank you very much, I

24        appreciate it.

25              THE WITNESS:  You're welcome.

54

```
1                MR. SHEIKH:  Have a good day, Lieutenant.
2         Congratulations on your promotion.
3                        REDIRECT EXAMINATION
4    BY MR. KAPLAN:
5    Q    Lieutenant, if Joseph Hendrix is a known car thief in
6         Shelby Township, and if he is the carjacker in this case,
7         would you expect him to drive to his house in Shelby
8         Township?
9    A    If he's going to steal the cars and going to drive to his
10        house?
11   Q    After this incident, after the woman is pushed out of the
12        minivan, would you expect him then to go home?
13   A    No.
14   Q    Now, Lieutenant, say a car thief, part of a ring, who's
15        stealing vehicles in order for parts to be taken or maybe
16        the vehicle being shipped out of the state, would you
17        expect him to do that during daylight hours?
18   A    No, no.  No.  People don't steal cars in broad daylight for
19        pieces.
20   Q    Sir, I would like you to assume that there were two other
21        vehicles allegedly stolen by Joseph Hendrix on August 31
22        and September 3 just before our September 5 carjacking, and
23        both of those vehicles were driven to Detroit, same area,
24        the crack area.  One, he's driving the vehicle stolen on
25        September 3, he's driving about 18 hours after the theft
```

55

1   and he's stopped for speeding, the other vehicle's found

2   abandoned with all the parts in it on a side street.  Now,

3   in that case is the thief taking these vehicles in order to

4   sell them?

5   A   No.

6   Q   Or to take to a chop shop?

7   A   No, because you wouldn't find them.  You wouldn't find them

8   driving around in it, not 18 hours afterwards, and you

9   wouldn't find them in one piece just sitting there.

10  Q   And would you expect that person to leave behind in one of

11  the stolen vehicles all kinds of paperwork pointing to him,

12  including jail house bars and bracelets?

13  A   What people leave in the vehicle when they leave, I guess

14  the best way of putting it is because of the way people

15  react, I guess it's job security for myself.

16  Q   Lieutenant, if a person is high on drugs and commits a

17  carjacking, pushes a woman out of a vehicle, would you

18  expect that person to act as rationally as the court

19  reporter or the clerk?

20  A   No.

21  Q   Would his drug use affect his reasoning at the time?

22  A   Absolutely.

23  Q   And what about that insatiable immediate quest for drugs,

24  does that affect one's reasoning ability?

25  A   Sure.  It overrules everything else in their life.

56

1    Q    Now, sir, I know you are not involved in this case as

2         investigating officer or officer in charge of the case, but

3         is there any evidence in this universe to your knowledge

4         that the person who stole that Caravan and pushed Mrs. Doen

5         out of the Caravan actually stopped and examined her head

6         injuries?

7    A    No.  Very rarely does anybody stop and examine when

8         somebody else gets hurt.

9    Q    I would like you to assume that the victim's daughter

10        emerges very soon after the incident to see her mother

11        gravely injured on the pavement and there's nobody around.

12        The person who took the Caravan isn't there, he didn't call

13        911.  Does that tell you that the person knew what type of

14        injury was inflicted?

15   A    If it happens the way you and Mr. Sheikh have stated, I

16        would presume that the person that was involved did not

17        know the extent of the injuries.

18   Q    If you push somebody out of a motor vehicle, what does that

19        tell you about the vehicle?  Is it moving or is it

20        stationary?

21   A    The majority of times, someone's going to sustain injuries

22        because they don't have footing, it's probably moving.

23   Q    I understand that, but if the vehicle is moving when the

24        woman is pushed out of the vehicle --

25   A    Right.

57

1   Q    What is likely to happen to the vehicle, is it likely to

2         stop or keep moving?

3   A    No, it's going to keep moving.

4                MR. KAPLAN:  Thank you, sir.

5                MR. SHEIKH:  Very briefly, your Honor.

6              RECROSS EXAMINATION

7  BY MR. SHEIKH:

8   Q    Once again, Lieutenant, as far as if somebody is, let's say

9         that somebody is fleeing, you know, which is their --

10        they've got this drive to get their crack cocaine.

11  A    Okay.

12  Q    Once they go to Detroit and they get it, they'll calm down,

13        right?  Like any addiction, once you get the substance of

14        your addiction in your system you tend to mellow out,

15        correct?

16  A    That's what I've been told, correct.

17  Q    And at that point, if somebody knew that there had been a

18        serious personal injury or some sort of personal injury

19        with the vehicle, and let's assume that this individual is

20        so obsessed with getting crack, they go down, they want to

21        get it, then they think a little, I guess if you want to

22        call it clearer, because if a crack head, once they get

23        crack, they think clearer, in their way of thinking, then

24        they would think a little bit differently, correct?  They

25        wouldn't have that drive to --

58

1    A    Yeah.  There's not that addiction, thinking clearly,

2         though.

3    Q    And I say that with all due respect, within the box that

4         we're talking about, for somebody that --

5    A    Has an addiction.

6    Q    Has an addiction.  For instance, if any of the ladies and

7         gentlemen of the jury smoke, you know, they may be at the

8         time when they feel that nicotine urge, they may be

9         thinking about that, and once they're having a cigarette,

10        they'd be more relaxed and be able to think about other

11        things, and one or more of them maybe no matter what's

12        going on in this case here, they'd be thinking, when do I

13        get that darn cigarette.

14   A    Sure.

15   Q    Correct.  And once they get it, then they can, okay,

16        concentrate on a case.  So, in that sense, clearer

17        thinking.

18   A    In that respect, clearer thinking, not that I want to

19        compare smoking addiction to drug addiction, but is there

20        that aiding that addiction, yes.  Clearer thinking, I don't

21        want to mislead the jury into thinking that.

22   Q    Now, let me ask you this:  Would you find it unusual that

23        if here's a vehicle that's been owned by a person for

24        approximately a month -- well, let me ask you this.

25                        Do you have any familiarity with

59

1          fingerprints, Lieutenant?

2                        MR. KAPLAN:  Your Honor, this is outside the

3          scope of very limited redirect.  He can call him if he

4          wants to ask him that.

5                        THE COURT:  I'll sustain the objection.

6                        MR. SHEIKH:  Thank you, your Honor, nothing

7          further.  Thank you.

8                        THE COURT:  Any questions for this witness?

9                        (Jurors had no questions.)

10                       THE COURT:  You may step down.

11                       THE WITNESS:  Thank you, Judge.

12                       THE COURT:  We're going to take a break.  I

13         will do whatever I need to do, be back ready to go at

14         11:20.  Please do not discuss the case amongst yourselves

15         or with anybody else.

16                       COURT OFFICER:  All rise for the jury.

17                       (At 11:04 a.m., court recessed.)

18                       (At 11:29 a.m., court reconvened.)

19                       (At 11:29 a.m., witness sworn in.)

20                       DR. BERNARDINO PACRIS,

21         was thereupon called as a witness herein, and after having

22         first been duly sworn to testify to the truth, the whole

23         truth and nothing but the truth, was examined and testified

24         as follows:

25                       THE COURT:  Please have a seat.  Spell your

60

1          last name, sir.

2                              THE WITNESS:  P-a-c-r-i-s.

3                              THE COURT:  Go ahead, Mr. Kaplan.

4                              MR. KAPLAN:  Thank you, your Honor.  By

5          stipulation, we move to admit Proposed Exhibit 27, the

6          autopsy report.

7                              MR. SHEIKH:  There are no objections.

8                              THE COURT:  All right.  So admitted.

9                              (Proposed Exhibit 27 was admitted.)

10                             MR. KAPLAN:  Thank you, your Honor.

11                             DIRECT EXAMINATION

12     BY MR. KAPLAN:

13     Q    Dr. Pacris, good morning.

14     A    Good morning.

15     Q    Where are you employed, sir?

16     A    I'm employed as a deputy and medical examiner at the

17          Oakland County Medical Examiner Office, and also a forensic

18          pathologist and consultant in Jackson County.

19     Q    Doctor, how many years have you been a medical examiner?

20     A    My eleventh year.

21     Q    Do you have a medical degree?

22     A    Yes, I do.

23     Q    Do you need to be board certified at all?

24     A    Not necessarily.  I have a license to practice medicine

25          here in the State of Michigan.  I have a training of

61

1    anatomic and clinical pathology at University of Winthrop

2    in Long Island, New York.  I did my subspecialty training

3    in anatomic pathology at the University of Medicine and

4    Dentistry.

5  Q   Dr. Pacris, can you estimate how many autopsies you've

6    performed in your career?

7  A   Six, seven thousand.

8  Q   Doctor, have you testified as an expert witness in any

9    courtroom regarding cause of death?

10 A   Yes, I did.

11 Q   Approximately how many times?

12 A   Hundreds of times.

13            MR. KAPLAN:  Judge, we move to qualify the

14   gentlemen as an expert in determining cause of death.

15            MR. SHEIKH:  Your Honor, we so stipulate.

16            THE COURT:  All right.

17            MR. KAPLAN:  Thank you, your Honor.

18 BY MR. KAPLAN:

19 Q   Dr. Pacris, did you perform an autopsy on a sixty-five year

20   old woman, name of Evangeline Doen on September 15, 2006?

21 A   Yes, I did.

22 Q   Where did the autopsy take place?

23 A   It took place at the Oakland County Medical Examiner

24   office.

25 Q   Dr. Pacris, were you able to determine the cause of her

62

1        death?

2    A    Yes, I did.

3    Q    Why did she die?

4    A    The cause of death is blunt force head trauma with

5         complications, contributory to the cause of death is

6         hypertensive and arteriosclerotic cardiovascular disease.

7    Q    What is blunt force trauma?

8    A    Blunt force trauma is any injury, it could be a blunt

9         force, a sharp force, stab wound, a bullet.  These are the

10        different types of trauma.  What I observed with Eva is a

11        healing laceration on the back of her head, and some

12        bruises on the right jaw.

13   Q    Doctor, there's evidence in the case that she remained in

14        intensive care for ten days and then she passed away.

15        Based on the injuries that you saw, is it surprising to you

16        that she never left intensive car?

17   A    Well, when I got introduced to Eva, obviously, she's dead,

18        so the clinician is taking care of Eva at Beaumont, and the

19        fact of the matter is, prior to this incident or event, I

20        presume Eva was a normal, healthy girl -- woman, and after

21        the accident, the thing is when I reviewed the medical

22        record, Eva didn't leave the hospital.  After the incident,

23        she went down hill.

24   Q    I know you're not clairvoyant, and you don't have a crystal

25        ball, if you did you'd buy the winning lottery ticket.

63

1       But, can you estimate how long you think Mrs. Doen would

2       have lived had she not been injured on September 5?

3  A   She's a sixty-five year old woman.  We see people who have

4       heart problem like hypertension or diabetes, being

5       controlled.  In fact, my mom has diabetes and high blood

6       pressure, and she's 84 years old.  So people are living up

7       to 80s or 90 years old, if their medical problems are

8       controlled.

9  Q   Dr. Pacris, the injury to Mrs. Doen, what part of her body?

10  A   The major injury is the head, as I said, there's an old

11       abrasion on the back of the head.

12  Q   The back of the head.  Are we talking direct back or one

13       side or the other?

14  A   It's more on the -- if you will, it's more on the right

15       side of the head, about one-and-a-quarter inch in diameter.

16  Q   What amount of force would be required to inflict that

17       serious of an injury?  Well, you said blunt force trauma,

18       but how forceful?

19  A   It should be forceful to inflict an injury to the

20       subcutaneous tissue of the skull.  It has to be a decent

21       fall like from the back of your head with the concrete or

22       unyielding surface can cause this type of injuries.

23  Q   Are her injuries consistent or inconsistent with being

24       pushed out of a motor vehicle?

25  A   It could be push out or he might slip, and hitting the head

64

1        on an unyielding surface, these are the possibilities of

2        the abrasion on the back of the head.

3  Q  I understand that, but are the injuries consistent with

4        being pushed out of a moving vehicle?

5  A  If she was pushed, yes, but it is consistent with those

6        kind of scenarios.

7  Q  Sir, as a medical examiner, do you have an opinion as to

8        whether the greater the fall, the greater the injury?

9  A  Oh, absolutely.  It is the velocity of the impact that

10       determine the severity of the head injury.

11  Q  Would the impact be more, less, or the same if the vehicle

12       is moving versus not moving?

13  A  Most probably if the vehicle is moving, there would be more

14       impact, because when you fall from a car, it's -- you are

15       unbalanced, so there might be some impact whereas if  the

16       vehicle is not moving, at least you might control balance

17       if somebody pushes you.

18  Q  Is the age of the person who suffers the injury significant

19       in any way?

20  A  Yes, well, if you are pretty much younger, probably, you

21       might, you know, have your balance more than the middle-

22       aged like me or old guy like me, so --

23  Q  You're not old, you're just born early.

24  A  The state of the health will play a part too.

25  Q  Dr. Pacris, would you say a twenty-five year old athlete,

65

```
 1              female and male, would that person be more likely to
 2              survive such an injury than a sixty-five year old woman?
 3      A       Depending on how fast the vehicle is moving.  If the
 4              vehicle is moving fast, you know, I see some thirty-
 5              five year old, fifty year old, they are not immune to have
 6              this kind of injuries if your head impacted to a hard
 7              object, like concrete.
 8      Q       Well, all other factors being equal, in your opinion, is
 9              the older person more likely to suffer more serious injury
10              than a younger person?
11      A       Yes, I do.
12      Q       Do you think that type of information is common knowledge,
13              or is that specialized knowledge.
14      A       I think it's a common knowledge.  If you're in better
15              shape, you might, as I said, control your balance.
16      Q       Let's say a man is in a bar and he's been drinking, maybe
17              he's been insulted by another person and that other person
18              is his age, twenty, twenty-five years.  But then the next
19              person who insults him is a sixty-five year old person.  Do
20              you think the average individual knows that an older person
21              is more likely to suffer a serious injury, that's sort of
22              common sense?
23      A       Probably, yes.
24                      MR. KAPLAN:  Thank you, sir.  Thank you,
25              Judge.
```

66

1                        CROSS EXAMINATION

2    BY MR. SHEIKH:

3    Q    Good afternoon, Doctor.

4    A    Good afternoon.

5    Q    Would you be so kind as to tell the ladies and gentlemen of

6         the jury what a cause of death is?

7    A    The cause of death is blunt force head trauma with

8         complications.

9    Q    I mean, in general, what is cause of death.  What is the

10        definition of cause of death?

11   A    The cause of death is the initial injury or disease process

12        that produces initial derangement culminating in death.

13   Q    All right.  Now would you also tell the ladies and

14        gentlemen of the jury what the manner of death is.

15   A    The definition of the manner of death is how the cause of

16        death is brought about.  Normally, we have five different

17        types of manner of death.  We have the natural death.

18        People die of heart attack or bronchial pneumonia.  We have

19        suicide.  People who shoot themselves.  We have accidental

20        death.  Death occurring when we have an unforeseen motor

21        vehicle accident.  We have undeterminable causes of death.

22        These are deaths usually due to drug-related deaths, and we

23        have the last category which is homicide, which is somebody

24        who intends to do harm to another individual.

25   Q    So, basically, a cause of death is the injury or disease

67

1          that causes the person to die, correct?

2     A    Exactly.

3     Q    And the manner of death is more a legal definition of

4          whether it's homicide at the hands of another individual,

5          correct?

6     A    That's correct.

7

8     Q    Suicide, at your own -- because of your own actions,

9          correct?

10    A    That's correct.

11    Q    Accidental or natural, correct?

12    A    Correct.

13    Q    And then there's undetermined for people like Anna Nicole,

14         and things like that, right?

15    A    Exactly.

16    Q    Okay.  Now, in this particular case, Doctor, what was the

17         manner of death?

18    A    The manner of death is homicide.

19    Q    All right.  Now, when you make a determination as to manner

20         of death, do you do that by looking exclusively at the

21         body, or do you look at other factors as well?

22    A    No, if you just look at the body, you are bound to make

23         that mistake.  We look at the circumstances.  Each medical

24         examiner case, we put more emphasis on the circumstances

25         surrounding the death, and then we correlate it with the

68

1   physical findings and the toxicology, and then we formulate

2   the cause of death.

3  Q All right.  So, if I understand you correctly, in this

4   case, the cause of death was a blunt force head trauma, and

5   it was exasperated in your words, because of higher blood

6   pressure, diabetes, and some heart disease, is that

7   correct?

8  A That's correct.

9  Q Those things impacted that, right?

10  A Correct.

11  Q Now, there was only one injury, correct?

12  A Major injury, correct.

13  Q All right.  Now, that injury to the back of the head, does

14   that itself tell you whether this was a homicide, an

15   accident --

16  A Not necessarily.  People, as I said, if you're walking down

17   the street, you slip, hit your head on a road, that's

18   considered an accident.  Somebody intentionally pushes you,

19   that is a homicide.

20  Q But, in this particular case, you were provided information

21   that led you to conclude that the manner of death was

22   homicide, correct?

23  A That's correct.

24  Q Now, if you were provided information that Ms. Doen had

25   passed away while she was either putting up or taking down

69

```
 1        Christmas lights from a ladder, your determination with the
 2        exact same physical review and medical would have been
 3        probably accidental, correct?
 4    A   Absolutely.
 5    Q   And if you saw that she had jumped off a high building,
 6        being depressed, you might have concluded suicide from that
 7        exact same injury from physical findings, correct?
 8    A   Exactly.
 9    Q   So part of the factors that went into your considering this
10        manner of death to be homicide was being told that there
11        was some indication that she may have been pushed or fell
12        out of a van, correct?
13    A   Exactly, the circumstances surrounding her death.
14    Q   I just wanted to clear that up for the ladies and gentlemen
15        of the jury.
16                  Now, one other thing, you indicated that an
17        older person would be more susceptible to injury because
18        just by the fact that they are older, they're probably
19        multisymptomatic, correct?
20    A   Exactly.
21    Q   All right.  In addition to which the severity of hitting --
22        the surface that you hit would make a difference, right?
23        This is a well-padded carpeting, it would be not as severe
24        as hitting concrete, correct?
25    A   Correct.
```

70

1    Q    All right.  Now, as far as the person falling and hitting
2         their head, you can't tell just by the injury whether it
3         was during motion or not, necessarily, correct?
4    A    Well, if you fall, there is an unyielding object there,
5         which is either a road, or wood, and the impact or the
6         velocity when you fall down produces that impact, which
7         produces abrasion, and at the same token in this case, she
8         did have some subdural hemorrhage based on the injury.  So,
9         any object that strikes the head, somebody hitting you with
10        a hammer, or 4 x 4 can produce this type of injuries.
11   Q    All right.  So, just so that, just so that I'm clear, you
12        said she had a subdural hematoma, correct?
13   A    That's correct.
14   Q    And that is bleeding of the brain, correct?
15   A    That's correct.  Bleeding of the bridge and veins.
16   Q    All right.  Now, most of the time when people suffer
17        because of brain injury, it's because of the swelling,
18        correct?
19   A    That's correct.
20   Q    Not necessarily because of the bleeding, right?  Not
21        necessarily because of the pain, right?
22   A    Usually due to the subdural bleed, and the brain is
23        enclosed in a skull, and the problem in the brain is, once
24        we have some inflammation or injury on it, it cannot
25        expand.  So, once it cannot expand because it's enclosed in

71

```
 1         a skull or a cranium, if you will, then a lot of signs and
 2         symptoms will ensue due to the compression of what you call
 3         the mid-brain or tonsils, which render people comatose or a
 4         vegetable, paralysis, and then ultimately death ensues.
 5    Q    So the bottom line is when the brain swells, it's got
 6         nowhere to go because the skull is a hard object, correct?
 7    A    That's correct.
 8    Q    And that's what starts causing damage because the pressure
 9         causes certain functions to drop, correct?
10    A    Correct.
11    Q    Now, did some of the -- you indicated in your testimony
12         that you found one major injury.  What were the other
13         injuries that you found?  Did you find some minor injuries?
14    A    I found some minor injuries, I found some abrasion on her
15         back, and some abrasion on the forearm and on the upper
16         arm.
17    Q    Now, if there's a sixty-five year old lady that's been in
18         the hospital ten days, has had a tracheotomy, and has been
19         taken between two different hospitals, has been in ICU, and
20         they have attempted every heroic effort to revive her,
21         would you not expect that all those medical procedures
22         caused bruising as well, correct?
23    A    Well, absolutely.  Given a transport, meaning to say a dead
24         body being transported to our office can produce these
25         injuries.
```

72

1    Q    And also there's bed sores from laying in bed because

2         you're immobile, correct?

3    A    That's correct.

4    Q    And your contact with Ms. Doen was strictly post-mortem,

5         correct?

6    A    That's correct.

7                   MR. SHEIKH:   Just one second, your Honor.

8         Thank you for your time, Doctor.

9                   THE WITNESS:   You're welcome.

10                  MR. KAPLAN:   Thank you, Judge.

11                  THE COURT:   Any questions?

12                  (Juror Number 205 had a question.)

13                  THE COURT:   Doctor, if you know the answer.

14        Do you know, was the patient taking any medications, such

15        as blood thinners?

16                  THE WITNESS:   Again, I don't know the

17        deceased personally, so I don't know about her medication,

18        but if I understand, when awaiting the circumstances of her

19        death, she did have a history of hypertension,

20        hypothyroidism, and I believe diabetes.   Now, blood thinner

21        or Coumadin and heparin, these are usually given to people

22        who have mitral valves, so that they will prevent clotting

23        of the blood.   Some people, I don't know if you consider

24        aspirin, which is a thinner, but these are the medication

25        that will prevent thrombosis or flattening of the coronary

73

1          arteries.  Again, I don't know Evangeline beforehand, we

2          just met in the autopsy room, and I don't know if she was

3          taking medication or not.

4                          THE COURT:  You're all set.  You may step

5          down.

6                          THE WITNESS:  Thank you, your Honor.

7                          (At 11:48, witness excused.)

8                          MR. KAPLAN:  Your Honor, my next witness, if

9          I may?  Sergeant Ferguson.  Judge, we have two witnesses

10         left, Sergeant Ferguson and Detective Hogan.

11                         (At 11:48, witness sworn in.)

12                          SERGEANT BRAD FERGUSON,

13         was thereupon called as a witness herein, and after having

14         first been duly sworn to testify to the truth, the whole

15         truth and nothing but the truth, was examined and testified

16         as follows:

17                         THE COURT:  Please have a seat.  What's your

18         name?

19                         THE WITNESS:  Sergeant Brad Ferguson.

20                         THE COURT:  Go ahead.

21                         MR. KAPLAN:  Thank you, your Honor.

22                         DIRECT EXAMINATION

23    BY MR. KAPLAN:

24    Q    Sergeant Ferguson, where are you employed?

25    A    Charter Township of Shelby Police Department.

74

1  Q   For how many years?

2  A   This is my 17th year of service.

3  Q   When were you promoted to the position of sergeant?

4  A   2001.

5  Q   Taking you back to September 6 of 2006, did you have any

6      involvement in the transportation back from Detroit to

7      Shelby of Joseph Hendrix?

8  A   Yes, I did.

9  Q   Do you remember -- am I correct about the date?  What date

10     was it?

11 A   September 6th of 2006.

12 Q   Do you remember what time?

13 A   It was sometime after four a.m.

14 Q   Who traveled to Detroit to retrieve Joseph Hendrix?

15 A   Myself, along with Detective Sergeant Muszynski.

16 Q   If you saw Joseph Hendrix again, do you think you would

17     recognize him?

18 A   Yes.

19 Q   Can you point him out to His Honor and the jury.

20 A   The gentleman here (indicating).

21 Q   The gentlemen next to Mr. Sheikh?

22 A   Yes.

23              MR. KAPLAN:  May the record so reflect, your

24     Honor?

25              THE COURT:  Yes, it will.

1                 MR. KAPLAN:  Thank you, your Honor.

2  BY MR. KAPLAN:

3  Q    Sir, why did you and Sergeant Stan Muszynski travel to

4       Detroit?

5  A    We were contacted by Detroit Police that they recovered one

6       of our stolen vehicles and had someone in custody.

7  Q    He was in custody for what?

8  A    Being in possession of a stolen vehicle.

9  Q    Sir, do you remember where you first saw Joseph Hendrix?

10  A    Yes.

11  Q    Where was it?

12  A    At the Detroit Police Department.

13  Q    Do you remember which precinct?

14  A    It was the old 11th Precinct, which is the Nevada and Ryan

15       area.

16  Q    What physically happens now to Joseph Hendrix once you and

17       Sergeant Stan Muszynski arrive at Precinct 11?

18  A    He was turned over to us by Detroit officers, we secured

19       him, and took him into custody.

20  Q    Where did you take him, if anywhere?

21  A    We transported him in a scout car and drove him back to the

22       Shelby Township Police Department.

23  Q    Sergeant Ferguson, in your presence -- strike that.

24               Did you or Sergeant Muszynski, in your

25       presence, advise the Defendant of his so-called

76

1         Miranda Rights?

2    A    That is correct.

3    Q    And who did that?

4    A    Sergeant Muszynski.

5    Q    Did Defendant ask for a lawyer, or what did he say in

6         response?

7    A    He acknowledged he understood his rights.

8    Q    Didn't say I want a lawyer at that point?

9    A    No.

10   Q    Now, Sergeant Ferguson, did either you or Sergeant

11        Muszynski ask the Defendant how he gained possession of the

12        2003 Dodge Caravan owned by Gina Doen?

13   A    Yes.

14   Q    Who asked him that question?

15   A    Sergeant Muszynski.

16   Q    Where did he ask him that question?

17   A    While he was in the scout car.

18   Q    Where were you?

19   A    Driving.

20   Q    Were you having any difficulty hearing the conversation?

21   A    No.

22   Q    What, if anything, did Joseph Hendrix say in response to

23        that question of Sergeant Muszynski as to how Defendant

24        gained possession of Gina Doen's 2003 Dodge Caravan?

25   A    He stated he didn't know how he got it.

77

1    Q    Did anybody ask him to elaborate?

2    A    He just stated that he didn't know how he obtained the

3         vehicle, and he didn't know what he should say.

4    Q    What were his exact words along those lines?

5    A    Those were his exact words.  I don't know how I got the

6         car, and I don't know what I should say.

7    Q    Did he say to you, hey, I'm not the guy who took it, I got

8         it from some crack addict in Detroit?

9    A    No.

10   Q    Did he say to you, I found it abandoned somewhere on a side

11        street of Detroit?

12   A    No.

13   Q    Did he say he found it abandoned anywhere?

14   A    No.

15   Q    Did he give you any explanation other than his being the

16        thief?

17   A    No.

18   Q    Would you expect him in that position, Sergeant Ferguson,

19        based on your 17 years of experience, to account for how he

20        gained possession of the vehicle?

21   A    Yes.

22   Q    Why?

23   A    Typically, someone would explain how they came into

24        possession of the vehicle.

25   Q    If a person legitimately gains possession of a vehicle,

78

1    whether it's a gift or whether he purchased it for money,

2    or exchanged drugs for it, wouldn't, in that instance, it

3    might not be a crime?

4  A   Correct.

5  Q   But in this case, he was arrested for at least what?

6  A   Possession of a stolen vehicle.

7  Q   And if he had an explanation as to how he gained

8    possession, would you as a sergeant, expect him to provide

9    that to you?

10 A   Yes.

11 Q   And did he?

12 A   No.

13 Q   What else struck you -- anything strike you about his

14    demeanor?

15 A   He appeared very nervous.

16 Q   Now, would you expect a man who -- strike that.

17                    MR. KAPLAN:  No other questions, Judge.

18                    MR. SHEIKH:  Very briefly, your Honor.

19                    CROSS EXAMINATION

20 BY MR. SHEIKH:

21 Q   Good morning.

22 A   Good morning, Counselor.

23 Q   First of all, at the time that you went at 4:00 a.m. on

24    September 6, 2006, to retrieve Mr. Hendrix, were you

25    informed anything of the condition of Ms. Evangeline Doen?

79

1    A    Briefly.

2    Q    And what were you told?  What was your knowledge of her

3         condition?

4    A    That she had been injured.

5    Q    Did you know whether the injuries were serious, or life-

6         threatening, or anything of that nature?

7    A    Just what was provided to me by one of the officers that it

8         was critical.

9    Q    That it was what?

10   A    Critical.

11   Q    Did you know which hospital she was at?

12   A    Initially, yes.

13   Q    And which hospital was that at?

14   A    Troy Beaumont Hospital.

15   Q    All right.  Now, during the ride, did Mr. Hendrix also

16        indicate to you that he didn't know what to say because the

17        Detroit Police had been telling him different stories and

18        there might be other charges, do you recall him saying that

19        to you?

20   A    I don't recall.

21              MR. SHEIKH:  Your Honor, may I approach the

22        witness?

23              THE COURT:  Sure.

24   BY MR. SHEIKH:

25   Q    If I showed you your police report, would that help refresh

80

1       your recollection?

2   A   Perhaps.

3   Q   Are you familiar with the report that Officer Muszynski

4       filed in this matter?

5   A   Basically.

6   Q   Because you two were working as a team, correct?  You were

7       driving and he was talking to Mr. Hendrix, and you were

8       there during the conversation, correct?

9   A   Correct.

10  Q   And you testified to some of the things you heard in that

11      conversation, correct?

12  A   That is correct.

13  Q   And you would have no reason to believe that

14      Officer Muszynski would have falsified his report or tried

15      to make it inaccurate?

16              MR. KAPLAN:  Your Honor, that's an improper

17      way to refresh his memory.  If his memory can be refreshed

18      by reading the report, that would be the procedure.

19              MR. SHEIKH:  All right.

20  BY MR. SHEIKH:

21  Q   Would it refresh your memory --

22              MR. SHEIKH:  I'm sorry, Judge.

23              THE COURT:  Sustained.

24  BY MR. SHEIKH:

25  Q   Would it refresh your memory if I showed you the report?

81

1   A   Perhaps.

2   Q   Does that refresh your recollection?

3   A   I have no reason to believe that that did not occur, I just

4       don't recall that part of the conversation.

5   Q   Okay.  So now, after refreshing yourself, do you recall

6       that a conversation took place where he indicated that

7       Detroit Police had been telling him different things and he

8       didn't know what to say?

9               Sir, you don't have to look at Mr. Kaplan.

10  A   I just answered the question.

11              MR. KAPLAN:  Judge, he doesn't need my help

12      for sure.  I might need his help.

13              MR. SHEIKH:  Your Honor, I'm not trying to

14      be silly.

15              THE COURT:  Answer his question again.

16              MR. SHEIKH:  Okay.

17              THE WITNESS:  As I said sir, I don't have

18      any reason to believe that that part of the conversation

19      took place, I don't recall it.

20  BY MR. SHEIKH:

21  Q   But after seeing this, it still doesn't refresh your

22      memory.  Is that what you're saying?

23  A   Not every part of the conversation, no.

24  Q   Not even the pertinent part about Detroit Police having

25      told him different scenarios and that's why he said he

82

1      didn't know what to say?  That is still not coming back to

2      you after --

3 A   Not totally.  I wasn't focused on that part of the

4      conversation while driving.

5 Q   What part of the conversation were you focused on?

6 A   The fact that he said he didn't remember how he got the

7      vehicle.

8 Q   Okay.  And you don't remember what preceded that or what

9      followed that, correct?

10 A   Not entirely.

11 Q   Okay.  Now, I'm going to ask you one other thing.

12            MR. SHEIKH:  Your Honor, may I approach the

13      witness again?

14            THE COURT:  Yes.

15 BY MR. SHEIKH:

16 Q   Now, I approach you with People's Exhibit 32.  Do you

17      recognize that?

18 A   Yes.

19 Q   Is that a picture of Joseph Hendrix?

20 A   Yes.

21 Q   Is that a picture of him at four a.m. on that date to the

22      best of your knowledge, or the approximate time when you

23      arrested him, is that the way he looked?

24 A   Yes.  I don't know if that was the exact date that photo

25      was taken though.

83

1   Q   Okay.  Is that the clothing that he had on to the best of

2       your recollection?

3   A   Possibly, I don't recall.

4   Q   All right.  Would you just state for the record, what color

5       that shirt is that he's wearing.

6   A   It appears to be blue with red trim.

7   Q   All right.  And what color does his hair seem to be?

8   A   It's hard to tell by the photo, but possibly brown.

9   Q   All right.  And is he wearing glasses?

10   A   No.

11   Q   And did he at any time during the ride back from Detroit to

12      Shelby Township, ask for, or wear glasses, or have glasses

13      in his possession to the best of your knowledge?

14   A   Not to the best of my knowledge.

15            MR. SHEIKH:  Just one second, your Honor.

16      Thank you, Officer, nothing further at this time.

17            THE WITNESS:  Thank you.

18            MR. KAPLAN:  Thank you.  No questions.

19            THE COURT:  Any questions for this witness?

20            (Jurors had no questions.)

21            THE COURT:  You're all set.

22            THE WITNESS:  Thank you, your Honor.

23            (At 11:59 a.m., witness excused.)

24            MR. KAPLAN:  Calling Detective Hogan, Judge.

25            (At 11:59 a.m., witness sworn in.)

84

1                    DETECTIVE TERRENCE HOGAN,

2          was thereupon called as a witness herein, and after having

3          first been duly sworn to testify to the truth, the whole

4          truth and nothing but the truth, was examined and testified

5          as follows:

6                        THE COURT:  Have a seat.

7                        DIRECT EXAMINATION

8    BY MR. KAPLAN:

9    Q    Good morning, Detective Hogan.

10   A    Good morning.

11   Q    Detective Hogan, you're with Shelby Township Police

12        Department, how many years have you worked for that force?

13   A    With Shelby, going on eight.

14   Q    Did you work for a different police department earlier?

15   A    I worked for Detroit about six and a half years, and

16        Port Huron for a short period of time also.

17   Q    When were you promoted to the position of detective?

18   A    I eventually got transferred to detective in 2002.

19   Q    Are you married or single?

20   A    Married.

21   Q    Any children?

22   A    Yes.

23   Q    What ages?

24   A    Twenty, almost twenty-one, and four.

25   Q    Detective Hogan, regarding this case, have you determined

85

1       that the status of Defendant's driving record or -- strike

2       that.

3                       Have you determined his driving license

4       status on December 3, 2002, the first car theft involved?

5   A   In 2002?

6   Q   Yes.

7   A   I don't know what his status was in 2002.

8   Q   I'm handing you a map.

9                       MR. KAPLAN:  May I approach, your Honor?

10                      THE COURT:  Yes.

11  BY MR. KAPLAN:

12  Q   I'm showing you Proposed Exhibit 25.  Is that the certified

13      copy of driving record that you obtained?

14  A   Yes, it is.

15                      MR. KAPLAN:  Move to admit 25, your Honor.

16                      MR. SHEIKH:  Your Honor, we have no

17      objection.

18                      THE COURT:  It is so admitted.

19                      (Proposed Exhibit 25 was admitted.)

20  BY MR. KAPLAN:

21  Q   All right.  You've seen it, and I know you haven't analyzed

22      it, but did he have a driver's license, a valid driver's

23      license August 31, 2006?

24  A   From this document, Mr. Kaplan, I'm not able to tell.  His

25      license expired in 2004.  He had numerous suspensions in --

86

1   Q   I'm asking from -- may I see it for a moment (indicating)?

2   A   Yes.

3   Q   See this date on 5/23/2005, on the left-hand side?  What

4       does that indicate about his license status.  Had it been

5       suspended, and if so, through when?

6   A   You're talking about from 2002, you said.

7   Q   No, I am simply directing you now to the 2006 instance.

8   A   Oh, he had a suspended license also.

9   Q   Yes.

10  A   Yes.

11  Q   Through what date?

12  A   Through 9/16/2005.

13  Q   And aren't their subsequent suspensions?

14  A   There are.

15  Q   Going all the way what, to 2012?

16  A   9/9/2006.

17  Q   Go to the next page.

18  A   2007.  Yes, this license is definitely suspended.

19  Q   All right.  The point is, here's what I would like to ask

20      you.  Did he have a valid license on August 31, 2006,

21      September 3, 2006, and September 5, 2006?

22  A   No, he did not.

23  Q   The reason I ask you is, can a person purchase a car

24      legally if he has a suspended driver's license?

25  A   No, I don't believe so.  They can't title it, no.

87

1   Q    If a person went to an automobile dealer, wants to purchase

2        a car, does that person have to present a valid driver's

3        license?

4   A    I believe so, yes.

5   Q    Now, Detective, did you attempt to determine in this case

6        whether the Defendant owned a motor vehicle in the year

7        2006?

8   A    I did.

9   Q    What did you discover?

10  A    Through various means, one by talking to his --

11  Q    I don't want to go --

12  A    Okay.  I was able to determine he did not own a motor

13       vehicle.

14  Q    So, sir, then he didn't have four or five cars in his

15       driveway that he could have driven to Detroit for crack if

16       he wanted?

17  A    No.

18  Q    Detective Hogan, in this case, were you interested in

19       learning from the Defendant about his whereabouts when the

20       crime occurred?

21  A    Yes.

22  Q    Namely, September 5, 2006 around 6:45, 6:50 p.m.?

23  A    Yes.

24  Q    Why is that important to you to learn the whereabouts of

25       the Defendant Joseph Hendrix?

88

1    A    I wanted to know if he was even in the area when the crime

2         occurred.

3    Q    If Joseph Hendrix had an alibi, a substantiated alibi for

4         that date and time, for instance, he was in the hospital,

5         he was in Chicago, he was fighting in Afghanistan for our

6         country, he was an astronaut, would that rule him out from

7         being the carjacker?

8    A    Yes.

9    Q    So, did you try to determine from Joseph Hendrix whether he

10        could tell you where he was on September 5?

11   A    I did, yes.

12   Q    And when did that conversation occur?

13   A    On the 8th of September, 2006.

14   Q    Where did you meet with Joseph Hendrix?

15   A    At the Macomb County Jail.

16   Q    Is Joseph Hendrix in the courtroom?

17   A    Yes.

18   Q    Point him out to His Honor and the jury.

19   A    Sitting at the defense table in a gray suit, blue shirt and

20        black tie.

21                    MR. KAPLAN:  May the record so reflect, your

22        Honor?

23                    THE COURT:  It will.

24                    MR. KAPLAN:  May I approach the witness?

25                    THE COURT:  Yes.

89

1    BY MR. KAPLAN:

2    Q    I'm handing you Proposed Exhibit 28, the Miranda form.

3    A    Yes.

4              MR. KAPLAN:  Mr. Sheik, do you want to --

5         move to admit 28, your Honor.

6              MR. SHEIKH:  We stipulate, your Honor.

7              THE COURT:  It is so admitted.

8              (Proposed Exhibit 28 was admitted.)

9    BY MR. KAPLAN:

10   Q    Well, what is that form?  Twenty-eight has been admitted by

11        Judge Switalski.

12   A    This is a Miranda form, dated September 8, 2006, at

13        10:15 a.m.  This is the form that I would have read to

14        Joseph Hendrix advising him of his Constitutional Rights.

15   Q    Did he agree to talk to you?

16   A    He agreed to talk to me, yes.

17   Q    Now, did he sign this document?

18   A    No.  He refused to sign the document.

19   Q    But he still agreed to talk to you?

20   A    That's correct.

21   Q    Now, the rights that you read to him, we won't bore the

22        jury by having you recite them, but when you advised him of

23        his rights, did you read from that form, or did you do so

24        from your memory?

25   A    Verbatim, right off of that form.

90

1   Q   Did you read them accurately?

2   A   Yes.

3   Q   Did you skip a few?

4   A   No.

5   Q   Did he seem to understand you?

6   A   Yes.

7   Q   Did you understand him?

8   A   Yes.

9   Q   What did you want to learn from Joseph Hendrix in the

10      ensuing conversation?

11  A   I wanted to know where he got the cars, the car.

12  Q   The Caravan?

13  A   The Caravan.

14  Q   Did you inquire of him where he was on September 5, 2006,

15      at about 6:50 p.m.?

16  A   I did.

17  Q   What did he say?

18  A   He would not tell me.

19  Q   What words did he use?

20  A   That he didn't want to tell me.  He did, at some point,

21      admit that he was in Sterling Heights and made a phone call

22      from a 7-Eleven restaurant, but any other questions about

23      his location or the time of the call, he refused to tell

24      me.

25  Q   Sir, when you talked to him on September 8th, three days

91

1        after the incident, did he know that a woman was seriously
2        injured in the incident?
3    A   Oh, yes.
4    Q   How do you know he knew?
5    A   Because I told him on the 6th.
6    Q   What did you tell him on the 6th.
7    A   I told him that, you know, if this woman dies, he wasn't --
8        didn't want to cooperate.  If the woman dies, we have no, I
9        mean, he's the person.  He's not cooperating, and he
10       wouldn't tell us, you know, where he got the car.
11   Q   Were you fixated on this man in terms of his being the one
12       charged for the carjacking?
13   A   No.
14   Q   On September 6th, when you first became involved in this
15       case, what were you trying to determine?
16   A   One, how he got the car, and who pushed Ms. Doen out of the
17       vehicle.
18   Q   Now, on the 8th, any conversation between you and him
19       regarding the seriousness of Mrs. Doen's injuries?
20   A   Yes, he did ask me if he was going to be charged with
21       murder or homicide.
22   Q   Did you indicate to him the condition of Mrs. Doen,
23       intensive care, not doing well?
24   A   I told him that she was still alive, but still in critical
25       condition, and you know, there's always a chance that she

92

1          could still die.

2     Q    Now, as a detective, would you expect such a suspect

3          knowing that the victim might die, to explain how he gained

4          possession of the vehicle, if he's not the thief?

5     A    Okay.  If he's not the thief, yes.

6     Q    Why would you expect him to tell you how he gained the

7          vehicle if he's not the thief?

8     A    If he's not the thief, then he's not the one that pushed

9          the woman out of the car, he doesn't want to be blamed for

10         the assault.

11    Q    Do you find it noteworthy in any way that he refused to

12         tell you where he was on September 5, 2006, at 6:45 p.m. or

13         thereabouts?

14    A    Yes.

15    Q    Why is it noteworthy?

16    A    Because I think he's afraid to admit that he's the one that

17         actually pushed Mrs. Doen out of the vehicle.

18    Q    But, in a more general sense, if he had an alibi, somebody

19         who could say he was with me at a restaurant and here are

20         the receipts, would you expect him to tell you that?

21    A    Yes.  He would want me to know that.

22    Q    If he had been with his mother, grandmother, would you

23         expect him to tell you that?

24    A    I would expect that.

25    Q    So, what does it tell you as a detective that he didn't

93

 1         give you any information about his whereabouts at the time

 2         of the carjacking?

 3    A    He does not want me to know where he was.

 4    Q    Now, sir, did he explain to you how he gained possession of

 5         the Caravan?

 6    A    No.

 7    Q    Did he say he bought it from a crack addict?

 8    A    No.

 9    Q    Did he say he found it abandoned on the street?

10    A    No.

11    Q    Did he say he found it abandoned on a highway?

12    A    No.

13    Q    Did he say it was a gift?

14    A    No.

15    Q    Any explanation other than being the thief?

16    A    No.

17    Q    If he's not the thief, would you expect him to tell you

18         that?

19    A    Yes.

20    Q    Why?

21    A    If he's not the thief, he's not going to want to be charged

22         with a crime of that type of nature.

23    Q    Sir, in this case, we heard the opening statement of the

24         very capable Mr. Sheikh about exterior video cameras.  Tell

25         us the status of video cameras on the date of September 5?

94

1    A    Were they in the Vineyards parking lot?

2    Q    Yes.

3    A    There are no exterior video cameras.

4    Q    If there aren't any exterior video cameras, would you

5         expect there to be a video tape of the incident?

6    A    There is not, and I would not expect it also.

7    Q    Now, what about the interior video camera at Vineyards, was

8         it working or nonworking?

9    A    It was working, but during the time frame that we were

10        looking at, when the assault occurred, it was not working.

11        Probably about two hours before, roughly two, three hours

12        before, it had been shut off.

13   Q    From your knowledge, are there any exterior video cameras

14        anywhere that patrol that area where the incident occurred?

15   A    There are not.

16   Q    Had there been one, and had it been operating, and had it

17        been able to focus on the area of the carjacking, is that

18        information that you want, would want?

19   A    Absolutely.

20   Q    Why?

21   A    Because it would help us determine who actually pushed

22        Ms. Doen out of the vehicle, it would give us evidence that

23        we would use at court.

24   Q    In this case, do you have knowledge of what happened to

25        latent fingerprints that were lifted from the Dodge Caravan

95

1        by Officer Jason Zuk and sent to the Michigan Crime Lab?

2   A   Yes.

3   Q   And tell us about the findings.  Were there other prints,

4        or other smudged areas, what do you know?

5   A   There were, I believe, five prints lifted out of the Dodge

6        Caravan.  Two of them were identified as being made by the

7        Defendant, and three of them were -- one of them is a palm

8        print, which cannot be put into the AFIS system, which is a

9        data base of fingerprints.  Palm prints can't be identified

10       in that manner, and then the other two were not suitable to

11       be entered into the AFIS system, so we don't know if, you

12       know, whose they are.

13  Q   Well, they could be yours, they could be mine, they could

14       be Defendant's, they could be anybody's?

15  A   That's correct.  And even with the palm print that we have

16       that's not suitable, and when I checked on this, palm

17       prints aren't always -- it depends how you take them.  If

18       you don't get a real good palm print, it's very difficult

19       to read.  So, they can't even rule Mr. Hendrix out of that

20       one palm print.

21  Q   Were any elimination prints of the granddaughter, Gina

22       Doen, or Mrs. Evangeline Doen sent to the crime lab?

23  A   No.

24  Q   Why not?

25  A   Just didn't believe that it was necessary at this point in

96

1    time.  If those prints were suitable for the AFIS system

2    and put in there, and we couldn't have got a match that way

3    then we would have probably got some in the initial prints.

4 Q Now, sir, this incident happened about 196 days ago, and in

5    the 196 days, have you received any information in the

6    world, in the universe, providing him with an alibi for

7    Joseph Hendrix?

8 A Only during opening statements by Mr. Sheikh, that was the

9    first time I ever heard anything about the possibility of

10    how he got the car, I never heard anything like that.

11 Q Now, Detective Hogan, how many car thefts occurred in

12    Shelby Township between August 31 and September 5, in that

13    six-day period?

14 A I really don't know that, Mr. Kaplan.  And with the same

15    modus operandi --

16 Q That's what I'm asking.  How many car thefts occurred in

17    that six-day period, August 31 through September 5, with

18    vehicle left running, unattended?

19 A Three.

20 Q Did anymore of that type of car theft occur in the month of

21    September of 2006?

22 A No, and we've never had another one like it since.

23 Q And has Joseph Hendrix been free during that period?

24 A He has not.

25 Q As a detective, do you draw any inference from that fact?

97

1    A    The crimes that were done in that similar way, have never

2         occurred again.

3    Q    Detective Hogan, do you have any experience in car theft

4         cases?

5    A    Yes.

6    Q    What inferences, if any, do you draw regarding the four car

7         thefts at issue here?

8    A    They're all done in a very similar way.  I would say the

9         same person did them.

10    Q    What are the similarities?

11    A    All vehicles left in a parking lot, the keys were in the

12         vehicle, they appear to be crimes of opportunity.  They

13         were all also committed within a very close distance of the

14         Defendant's old home or the Defendant's new home.

15    Q    Sir, what inference, do you draw, if any, that all three

16         vehicles, meaning August 31, September 3, and September 5,

17         were found in the same area of Detroit?

18    A    It's very rare for three cars to be stolen out of Shelby

19         and three cars to be located in the same area of the City

20         of Detroit, all connecting to the same person.

21    Q    Through your investigation, without giving us a source, did

22         you attempt to determine whether Defendant was familiar

23         with the Vineyards location on West Utica Road and Mound

24         Road?

25    A    Yes.

98

1    Q    What did you discover?

2    A    I discovered he was familiar with it.

3    Q    How familiar?

4    A    Very familiar.  His address was half a mile from the scene,

5         and I found out that he had been to that location.

6                        MR. KAPLAN:  Your Honor, at this point, I

7         would move to admit certified copy of Exhibit 26, which

8         needs to be redacted somewhat.  It shows Defendant did

9         plead guilty in the Wayne County Circuit Court on

10        November 15, 2006, for stealing that vehicle -- strike

11        that.  For being in possession of a stolen vehicle, the one

12        taken on August 31, 2006 from Little Caesars.

13                        MR. SHEIKH:  Your Honor, we stipulate with

14        the appropriate retractions.

15                        THE COURT:  All right.

16                        (Proposed Exhibit 26 was admitted.)

17                        MR. KAPLAN:  Judge, also I need to re-edit,

18        but we move to admit Exhibit 7, which is a certified copy

19        of the plea.

20                        MR. SHEIKH:  Excuse me, what number?

21                        MR. KAPLAN:  Number 7.  The guilty plea

22        transcript, where Defendant pleaded guilty on November 15,

23        2006, for being in possession of the stolen car of

24        August 31, 2006.

25                        MR. SHEIKH:  Your Honor, we will so

99

1          stipulate with the appropriate retractions.

2                          THE COURT:  I will admit that as well.

3                          (Proposed Exhibit 7 was admitted.)

4                          MR. KAPLAN:  Thank you, your Honor.

5                          THE COURT:  Mr. Sheikh.

6                          MR. SHEIKH:  Your Honor, I would prefer, if

7          I could, to conduct my cross examination of Detective Hogan

8          after lunch, it's going to be lengthy, he's the officer in

9          charge.

10                         THE COURT:  We are going to break for lunch

11         now, and I will have you come back at 1:45.

12                         (At 12:17 p.m., court recessed.)

13                         (At 1:55 p.m., court reconvened.)

14                         THE COURT:  Please be seated.

15                         MR. SHEIKH:  Your Honor, one brief matter

16         before we bring the jury back?

17                         THE COURT:  Yes, sir.

18                         MR. SHEIKH:  Your Honor, on the direct

19         examination of the officer in charge, Terrence Hogan,

20         Mr. Kaplan elicited from him a response, question in

21         response regarding my client having been in custody since

22         the 6th.  I don't know if you recall him saying that, but

23         something to the effect that since Mr. Hendrix has been

24         locked up, there have been no more thefts.  I think that

25         violates my client's right to the protection clause to have

100

1       his case moving forward on the same basis as somebody's

2       who's not in custody.  It's for the very reason why we have

3       our client dressed, to have him here, on time, to have him

4       seated so that the jury doesn't get that impression.  And

5       that's totally been obliterated by an affirmative action,

6       not by a slip of the tongue or anything like that.

7       Therefore, your Honor, I'd like to make a motion for

8       mistrial on that basis.

9                    THE COURT:  Mr. Kaplan.

10                   MR. KAPLAN:  Your Honor, the Defendant was

11      in jail on September 8th, and the jury now knows that.

12      There was no motion in limine to prevent that from being

13      admitted.  It's not prejudicial.  It is important because

14      the jury needs to know where the interview occurred, and

15      how would I address Miranda warnings being given if he's

16      not in custody.  I don't think it's prejudicial in any way.

17                   MR. SHEIKH:  Your Honor, it is prejudicial,

18      because most jurors, you know, even a lot of lay people who

19      have not been through the system and not very well versed

20      on the fact that Miranda means custodial interrogation.

21      Unless the jurors are learned in law, most would never

22      realize that they didn't give them their Miranda Rights,

23      because they weren't in custody.  So that's a fine line

24      that, I think, and unless someone is learned in law, they

25      wouldn't necessarily know that.  And it's only defeating

101

1      the purpose.  Your Honor, I would not be making any big

2      deal of it, if it happened inadvertently.  But it seems

3      like there was -- I'm not attributing any fault to

4      Mr. Kaplan, but I have to look out for the rights of my

5      client.

6                  THE COURT:  Are you -- is it the fact

7      that -- are you saying there's a question:  And, another

8      question, Detective, is it true that since he's been locked

9      up, there haven't been anymore cars stolen in Shelby?  Are

10     you saying something like that was said or what?

11                 MR. SHEIKH:  Right.  Something to that

12     effect was stated that, maybe Mr. Kaplan would have a

13     better recollection of the exact phrase.

14                 THE COURT:  That would not be great if that

15     was said.  Maybe I was sleeping up here, I didn't catch

16     anything either.  That would have jumped out at me I would

17     think, if I would have heard it in that fashion.  The fact

18     that he was -- well, in opening statements, he's got a

19     photo of him.  Now, I didn't see it, I assume it may have

20     been cleaned up a little bit, but's it's essentially a mug

21     shot, correct?

22                 MR. SHEIKH:  Yes, sir.

23                 THE COURT:  Okay.  They're not morons.  They

24     can figure that out, that he was locked up, in custody.

25     It's not a frivolous motion.  I'm going to deny it at this

102

1          time.  If he is unfortunate enough to be convicted,

2          potentially it gives him something to argue about in the

3          Court of Appeals.

4                    MR. SHEIKH:  Your Honor, thank you for

5          taking the time to allow me to address the motion.  I

6          appreciate it.  We're ready to go.

7                    THE COURT:  All right.

8                    COURT OFFICER:  All rise for the jury.

9                    (At 2:38 p.m., jury entered the courtroom.)

10                    THE COURT:  Please be seated.  Detective,

11          you're still under oath.

12                    Mr. Sheikh, you may cross examine.

13                    MR. SHEIKH:  Thank you, your Honor.

14                         CROSS EXAMINATION

15     BY MR. SHEIKH:

16     Q     Good afternoon, Detective Hogan.

17     A     Good afternoon, Mr. Sheikh.

18     Q     You already testified that you are a detective with Shelby

19          Township police department.  And prior to that you were

20          with Port Huron for awhile, and then Detroit for awhile,

21          correct?

22     A     Correct.

23     Q     And you are what would be called the OIC in this case,

24          correct?

25     A     Yes.

103

1    Q    Would you let the ladies and gentlemen of the jury know

2         what OIC stands for?

3    A    An OIC is the officer in charge.  I would be in charge of

4         the case.

5    Q    So you, basically, would be privy to all the reports,

6         medical, fingerprint reports, lab reports, police reports

7         of other officers, and things of that nature, correct?

8    A    Yes.

9    Q    And you'd be responsible for putting them together and

10        helping Mr. Kaplan secure the presence of witnesses as

11        needed, correct?

12   A    Yes, that's true.

13   Q    And the witness cooperation or police discussion of the

14        witnesses, correct?

15   A    Yes.

16   Q    Now, as far as your training as a police officer, did you

17        ever obtain any training in the field of interrogation?

18   A    Yes.

19   Q    All right.  And where was that training conducted?

20   A    There was several different ones.  I had one that was held

21        in the City of Detroit, the community colleges, Macomb and

22        St. Clair.  There has been other small trainings in the

23        area.

24   Q    And as part of that training you were also taught some law

25        as it pertains to interrogation tactics, correct?

1    A    Yes.

2    Q    And within that law are the principles that the United

3         States and the Michigan Constitution allow you to lie to

4         the subject, is that correct?

5    A    That's true.

6    Q    And that lie can include out and out lies, it can be an

7         exaggeration of evidence, it can be a misstatement of

8         evidence, correct?

9    A    That's true.

10   Q    And that is the interview technique that I'm sure you have

11        used, correct?

12   A    Yes.

13   Q    Now, instead of rehashing a whole lot of things that I'm

14        sure the jury is sick of hearing, I'm going to try to make

15        some points with you, if that's okay.  So excuse me if I

16        seem to jump around, all right?

17   A    Okay.

18   Q    First of all, Detective Hogan, did the Defendant indicate

19        to you several times that the video would clear him, did he

20        make reference to a video?

21   A    Yes.

22   Q    And he indicated that that would clear him, correct?

23   A    Yes.

24   Q    Do you know how he came about that information that there

25        was a video?

105

1    A    I have no idea.

2    Q    All right.  Now, in response to Mr. Kaplan's questions,

3         where you said that the Defendant failed to provide any

4         information as to how he obtained custody over the van, did

5         he provide any information as to where he was going at the

6         time that he was arrested?

7    A    No.

8    Q    Did he indicate what he was doing in the neighborhood where

9         he was arrested?

10   A    No.

11   Q    Did he give any indication or any information as to where

12        he was residing at that time?

13   A    No.

14   Q    So, basically, it wasn't just a denial of how he got the

15        van, it was pretty much denial of several things, or lack

16        of providing information on several things, correct?

17   A    Yes.

18   Q    Now, as part of this case, you know that certain personal

19        belongings were retrieved from the 2003 van, that is the

20        subject matter of this case, correct?

21   A    That's true, yes.

22   Q    And amongst those, if my recollection is correct, is a

23        beige and white cap, black knit hat, a white do-rag, and a

24        makeup bag, which is referred to as a watermelon style

25        makeup bag with makeup in it, correct?

106

1   A   Correct.

2   Q   And do you know if those belongings were sent for

3       fingerprinting and/or DNA analysis?

4   A   Yes.

5   Q   And do you have a report, or did you ever receive a report

6       back?

7   A   The first three items, the hat, the do-rag, those were sent

8       to the Michigan State Police Crime Lab.

9   Q   Okay.

10   A   There is a report on that, as far as the watermelon purse

11       goes, if I remember correctly, we dusted that, or we

12       processed that.  I don't remember which method was used,

13       but we processed that for latent fingerprints, and it was

14       negative.

15   Q   It was negative.  All right.  And if you recall, the

16       results found on the first three items, the baseball cap,

17       the knit hat, and the do-rag?

18   A   There have been no results.

19   Q   There have been no results.  Is that the same as negative

20       results?

21   A   Just, I haven't got those results back yet.

22   Q   Now, also as part of your training, are you also trained in

23       fingerprints to some extent?

24   A   I've had some training in fingerprints, yes.

25   Q   We've had some testimony from other officers, that that's a

107

1          rather complex procedure, because it's bifurcated as well,

2          because you have the evidence technicians that come in and

3          actually search and lift for prints, and then you have

4          people that do comparisons.  Is that basically a correct

5          recitation of the testimony?

6     A    Yes.  The officers in Shelby Township would collect the

7          evidence and send it down where somebody would identify it,

8          or try to identify it, to match it to someone else.

9     Q    All right.  And we also had testimony from one police

10         officer that sometimes fingerprints erode with time or

11         denigrate, is that your understanding?

12    A    I think that's a fair statement.  There's a lot of things

13         that can --

14    Q    Do you have any idea about approximately how much time it

15         would take for fingerprints to be denigrated?

16    A    No.  A lot of different things, I mean, weather, for

17         example.  Cold weather.  You may not even leave a

18         fingerprint.  It all depends on the person.  Some people

19         don't even secrete body oils to even leave a fingerprint,

20         so there's a lot of factors when it comes to how long it

21         will last, who will leave them.

22    Q    All right.  Now, does the Shelby Township police department

23         have a cold case file or some other --

24    A    No.

25    Q    Have you ever worked on what would be called cold cases?

108

1    A    Yes.

2    Q    Have you found fingerprints that were past more than a

3         couple years old?

4    A    No, I don't think I have.

5    Q    Has that ever come up in a case?

6    A    Not one that I can think of that I worked on.

7    Q    Have you heard of cases where fingerprints from perhaps

8         several years ago have helped to resolve a case?

9    A    I really don't know, Mr. Sheikh.

10   Q    Now, you referred in direct examination, conducted by

11        Mr. Kaplan, to something called AFIS?

12   A    Yes.

13   Q    Could you please let the ladies and gentlemen of the jury

14        know what AFIS is?

15   A    It's an Automatic Fingerprint System.  If I was to leave a

16        fingerprint on this surface, and they were to lift it, they

17        could somehow, and I don't know how they do it, but they

18        somehow put it into this computer system that searches a

19        very large -- all the fingerprints that have been put into

20        the AFIS system.

21   Q    And let me know if I'm misstating this.  Isn't it true that

22        at one time you had to have a subject to compare the prints

23        to, and now you could put the prints on the AFIS system,

24        and it can give you a prospective subject or some probable

25        suspects, correct?

109

1  A   I think even before the AFIS system I think there was other

2      ways, I mean, they would just match them, try to match

3      them, from fingerprint card classifications.  So, I mean,

4      technically, they may not have thought Mr. Sheikh committed

5      this crime, but they just would have looked in a

6      classification file.  I'm not an expert at this, but I do

7      have some experience with it.

8  Q   And is it your understand that one of the benefits or

9      advantages of the AFIS system is to put a fingerprint in it

10     and it could match it without having any other criteria,

11     rather than you having to come up with classifications

12     where you put it in, you put it in like raw data, and then

13     it would process it, correct?

14 A   Yes.  If a person's in that system, it could process it and

15     it could get a match.

16 Q   As far as your investigation in this case, did you have

17     occasion to solicit or subpoena telephone records from pay

18     phones in and around the Vineyards market?

19 A   Yes.

20 Q   And did any of those records indicate telephone calls to

21     the Defendant's grandmother's house?

22 A   No.

23 Q   Did there come a time where you got some records pertaining

24     to the 7-Eleven pay phone at Ryan and Auburn?

25 A   Yes.

110

1   Q   And were there some calls there that were made from there

2       that were made, collect calls from his grandmother's house?

3   A   If there were, I can't prove it.

4   Q   But what led you to that?  In your reports, you indicate

5       some reference to that.  What led you to conclude that and

6       to investigate that avenue?

7   A   I spoke with the Defendant's grandmother.  She told me that

8       she believed that the Defendant had made a collect call to

9       her on the day that this crime had occurred, when Mrs. Doen

10      was pushed out of the vehicle that same day.

11   Q   Do you recall the times of those calls approximately?

12   A   She estimated that it was probably between three and

13      six o'clock.  She said there was a problem with the time on

14      the answering machine, so she really didn't know the exact

15      time.

16   Q   And are you familiar at all with the 7-Eleven at Auburn

17      Road and Ryan Road?

18   A   Yes.

19   Q   Is this the same one that one of the alleged other vehicles

20      was stolen from?

21   A   Yes.

22   Q   It is the same.  Now, do you recall the initial statement

23      by Ms. Evangeline Doen indicating that the gentleman that

24      assaulted her or --

25              MR. KAPLAN:  Your Honor, we would object to

111

1          that because that's hearsay, he didn't take it.

2          Officer Osterland did testify, he has personal knowledge.

3          All this detective would be doing is repeating what

4          somebody else supposedly heard, that's double hearsay.  So,

5          he should ask Officer Osterland, which he already did.

6                    THE COURT:  Well, I don't think he's trying

7          to admit it.  I'll overrule the objection.  He's not trying

8          to admit it for hearsay purposes.  He's trying to ask a

9          question, so, go ahead.

10                   MR. SHEIKH:  Thank you, your Honor.

11   BY MR. SHEIKH:

12   Q    Were you privy to the fact that the original description

13        was a blonde-haired gentleman with glasses --

14                   MR. KAPLAN:  We object to the form of the

15        question, because it was never specified as that.  In fact,

16        the officer said if the description was given it was very

17        vague.  So I object to the form of the question where he

18        recites it as a fact.  It's not a fact.

19                   MR. SHEIKH:  Your Honor, if I may respond?

20                   THE COURT:  Rephrase the question.

21   BY MR. SHEIKH:

22   Q    Do you recall when you were reading the reports that at one

23        time a description was given by Ms. Doen indicating that

24        the last perpetrator was a tall, thin, blonde gentleman

25        with glasses and a brown shirt?

112

1  A    I do recall that the description was a tall, thin, white

2       male with possible glasses, and I believe, possible blonde

3       hair.

4  Q    And possible brown shirt?

5  A    There was some mention about a brown shirt, yes.

6  Q    Now, as part of this investigation, did you ever do an

7       entire inventory of Ms. Gina Doen's entire vehicle upon its

8       recovery?  Or were you privy to all the things that were

9       obtained from that inventory?

10 A    Yes.  Whatever Officer Zuk collected and photographed, I

11      would have --

12 Q    Do you know if any glasses were found in the vehicle, in

13      the van?

14 A    They were not.

15 Q    Were any gloves found?

16 A    I'm sorry, any?

17 Q    Any gloves.

18 A    Gloves?

19 Q    Yes.

20 A    No.

21 Q    Did you have occasion to call Defendant's grandmother and

22      ask her if the Defendant wore glasses, and if he now or at

23      some time recently had had blonde hair?

24 A    No.

25 Q    You don't recall that or --

113

1    A    No.  I did not ask her that, no.

2    Q    Do you know if another officer from Shelby Township may

3         have called her to inquire --

4                   MR. KAPLAN:  Objection.  How would he know?

5         It's hearsay.  It's double hearsay.

6                   THE COURT:  Sustain that objection.

7                   MR. SHEIKH:  Thank you.

8    BY MR. SHEIKH:

9    Q    Now, during your conversations with Mr. Hendrix, did you

10        indicate to him at various times that perhaps Ms. Doen was

11        injured, perhaps she was dead, or that she was dying?  In

12        other words, were there some things that you recall telling

13        him one statement as to her condition?

14   A    I think I told him that she was in very serious condition,

15        and that she could die.

16   Q    At any time, did he indicate to you that he was the person

17        that had stolen this vehicle?

18   A    No.

19   Q    Now, in your experience as a police officer, do most people

20        come forward and if they were engaging in some other

21        criminal activity or thinking about engaging in criminal

22        activity, that's not alibi that they would normally divulge

23        to you, correct?

24   A    I'm sorry.  Could you repeat that?

25   Q    In other words, if a person was hanging around a 7-Eleven

114

1          looking for a vehicle, they wouldn't normally give that as

2          an alibi, would they?  As to explain their whereabouts?

3     A    No.  A person that committed a crime, are you saying they

4          wouldn't just come out and tell me?

5     Q    Yes.

6     A    Yeah, that doesn't happen real fast.

7     Q    Usually they tell you I was at church, or I was with

8          grandma, correct?

9     A    Tom did it, or something else.

10                    MR. SHEIKH:  One moment, please.  Can I have

11         some latitude to ask Detective Hogan a hypothetical, your

12         Honor?

13                    MR. KAPLAN:  Your Honor, if it's based on

14         evidence in the case, of course, he can; otherwise, we

15         object.  It can't be based on stray facts not in evidence,

16         because that's not a hypothetical.  It has to be based on

17         facts in the case.

18                    THE COURT:  Let's try asking the question

19         and see what happens.

20                    MR. SHEIKH:  All right.

21    BY MR. SHEIKH:

22    Q    Is it inconceivable that once somebody stole the vehicle

23         from Vineyards, and abandoned it at or near that 7-Eleven,

24         that Mr. Hendrix could have obtained it there, and did like

25         he normally did, which is go down to Detroit to get crack,

115

1          is that inconceivable to you?

2     A    Just in one case, is that what you're talking about?

3     Q    I'm talking about in this particular situation.

4     A    That is possible.

5                    MR. SHEIKH:  Just one brief second.

6     BY MR. SHEIKH:

7     Q    One last question, it's a little bit repetitive.  But, on

8          several occasions, he indicated to you, with some

9          confidence, did he not, that the video will clear me?

10    A    He didn't say the video would clear him.  What he said was,

11         just check with DPD, they know the truth.  Well, that would

12         be impossible because the crime didn't happen in Detroit,

13         so.  When he said the video, he was referring to Detroit's

14         video, so.  He didn't say it would clear him, he would just

15         say the video will show, or the video -- DPD knows, check

16         their video.

17    Q    How would he have known about the importance and existence

18         of a potential video unless in fact that information had

19         been conveyed to him?

20                   MR. KAPLAN:  Your Honor, we object.  That's

21         an impossible question for him to answer, because he can't

22         read another person's mind.

23                   THE COURT:  I'll allow the question.

24                   THE WITNESS:  I have no idea how he would

25         have come up with that, Mr. Sheikh.

116

1    BY MR. SHEIKH:

2    Q    And you are telling the ladies and the gentlemen of the

3         jury here that at no time, despite your training, despite

4         your knowledge, that you can lie and mislead a Defendant,

5         that at no time you told him anything about the existence

6         of a video and what it purportedly showed, is that your

7         testimony?

8    A    That's correct.  I never mentioned a video tape.

9                   MR. SHEIKH:  Thank you, your Honor.  I have

10        nothing further of this witness.

11                   THE COURT:  Redirect.

12                   REDIRECT EXAMINATION

13   BY MR. KAPLAN:

14   Q    When you interviewed the Defendant, telling him that the

15        woman was seriously injured, do you remember him saying I

16        don't think I'm going to say anymore?

17   A    Yes.

18   Q    What was the conclusion or the completion of that sentence?

19   A    When he said I don't think I'm going to say anymore?

20   Q    Yes.

21   A    Eventually, you mean, at the end?

22   Q    Yeah.

23   A    Where he just walked out of the interview room?

24   Q    I want to know the completion of his sentence.

25   A    I'm sorry.  What was your question, again, Mr. Kaplan,

117

```
 1        maybe I'm --
 2   Q    Near the end of the interview where he said, I don't think
 3        I'm going to say anymore, because -- the rest of his
 4        sentence.
 5   A    I think it was something to the effect, I don't want to get
 6        into anymore trouble or something like that.
 7   Q    Now, sir, did you inquire of the Defendant whether he
 8        made any pay phone calls that day, September 5, from the
 9        7-Eleven?
10   A    Yes.
11   Q    And what did he say?
12   A    He said he did.
13   Q    Did he tell you which 7-Eleven?
14   A    He said the one in Sterling Heights.  He wouldn't give
15        me -- from a Sterling Heights 7-Eleven, he wouldn't provide
16        me with any additional location, time frame, anything.
17   Q    Did you ask him to be more specific?
18   A    Oh, yes, I did.
19   Q    Now, Sterling Heights is 36 square miles, six miles by
20        six miles?
21   A    Yes.
22   Q    Do you know how many 7-Elevens there are?
23   A    No, I don't.  I know there's a few of them.
24   Q    There's one on Dodge Park and Maple?
25   A    Yep, there's one on Mound and -- there's several of them.
```

118

1    Q    There's one on Van Dyke near Utica Road.

2    A    Yep, Van Dyke, correct.

3    Q    How many others?

4    A    I don't even know.  There's probably six, seven of them, I

5         would imagine.

6    Q    Oh, do you find it surprising that he wouldn't tell you

7         which phone he used?

8    A    Yes.

9    Q    Because if he told you which phone he used, you would

10        have --

11   A    I'd be able to follow up with that and -- oh, because I

12        would know that he was in the area if he told me which

13        7-Eleven.  And that's what I was trying to determine, if he

14        was in the area.

15   Q    But if he did use a phone in Sterling Heights, and you knew

16        which phone, would that enable you to learn whom he called?

17   A    Yes.

18   Q    And would that enable you to talk to that person about what

19        Defendant said?

20   A    Possibly, yes.

21   Q    And what time he said it?

22   A    Yes.

23   Q    And what his intentions were?

24   A    Correct.

25   Q    And who he was with, if anybody?

119

1    A    Correct.

2    Q    Or whether he intended to go to Detroit, steal a car first?

3    A    Correct.

4    Q    But, he didn't help you, did he?

5    A    No.

6    Q    Now, as a man who knows that a woman has been seriously

7         injured and might die, based on what a car thief did, do

8         you find it surprising that he wouldn't share this

9         information about the people with you?

10   A    For an innocent person, no.

11   Q    Yeah.

12   A    Or, yes, if he was innocent, I'd find it -- I'm surprised

13        that he would not provide me with that information.

14   Q    The prints found by Officer Zook, Zook or Zuk?

15   A    Zuk.

16   Q    Zuk.  Are those palm prints or fingerprints?

17   A    Both.

18   Q    Does AFIS provide information of palm prints or

19        fingerprints or both?

20   A    No, palm prints cannot be entered into the AFIS system.

21   Q    Did you attempt to determine the height of the van in terms

22        of a person walking onto or leaving the van compared to

23        regular-size cars?

24   A    Yes.

25   Q    Is there a distinction?

120

1    A    Yes.

2    Q    What's the distinction?

3    A    I compared them to the height of the floor board and the

4         seat of Ms. Doen's 2003 Caravan, and I compared it to one

5         of our police cars, which is a Crown Victoria.  The floor

6         board is about four inches higher on the van than on the

7         police car, and about ten and a half inches higher on the

8         seat area than the police cars, so about 32 inches, the van

9         seat about 32 inches off the ground.

10   Q    Now, you indicated in response to Mr. Sheikh's questions

11        that Defendant claimed the Detroit Police Department had

12        somehow cleared him?

13   A    Yes.  He just said, check with them, they have video.

14        They've been watching me.

15   Q    Well, is there any information that Detroit Police officers

16        with all their busy schedules, and the crime rate there,

17        were visiting Shelby Township that day?

18   A    No.

19   Q    I mean, is this something you think you would know if the

20        Detroit Police were in Shelby Township?

21   A    Yeah.  They weren't there in Shelby Township.

22   Q    Did you show Defendant any newspaper articles indicating

23        that Mrs. Doen had been seriously injured?

24   A    No.

25   Q    Did you tell him about the newspaper articles?

121

1    A    No.

2                        MR. KAPLAN:  Thank you, Judge.

3                        Oh, one last, I'm sorry.  One last question.

4    BY MR. KAPLAN:

5    Q    Regarding the purse, female items found in the car, did you

6         make an effort to determine identity of the person who

7         might have owned this?

8    A    Yes.

9    Q    Who did you talk to?

10   A    A lady by the name of Michelle Zalatski (phonetic).

11   Q    What's her connection to the Defendant?

12   A    Boyfriend, girlfriend.

13   Q    Did you talk to her about those items?

14   A    Yes.

15   Q    And what did she tell you?

16   A    She said the purse that was found in there was probably

17        hers, very strong likelihood that it was hers.

18                        MR. KAPLAN:  Thank you.

19                        RECROSS EXAMINATION

20   BY MR. SHEIKH:

21   Q    Detective Hogan, is there a reason that you didn't tape the

22        interview with the Defendant?

23   A    Yes.

24   Q    Why is that?

25   A    Because I interviewed him someplace else that was not set

122

1      up for video.

2  Q   You're not telling us that Macomb County Jail does not have

3      facilities to video or audiotape interviews, are you?

4  A   I would believe that they do, but I don't have access to

5      it, and I've never used it there.  So, I don't even know

6      where it would be if they have it.

7  Q   Now, at the time that you interviewed Mr. Hendrix, you knew

8      that this was potentially a very serious case, right?

9  A   Yes.

10 Q   And did you make any efforts to secure some sort of

11     recording mechanism?

12 A   No.

13 Q   Now, let's step back, a couple of things.  In terms of the

14     statement that this lady that we heard about the first time

15     yesterday, Michelle, what's her last name?

16 A   Zalatski, I believe, something like that, Mr. Sheikh.

17 Q   Okay.

18 A   It's a tough one.

19 Q   Ms. Zalatski, I apologize to her.  She didn't definitively

20     indicate that this purse was hers or not, she said it could

21     have been hers, correct?  Was that your testimony?

22 A   Well, actually, she said it was hers.  I mean, I can't sit

23     here and honestly tell you a hundred percent it was hers,

24     but the way I interviewed her, I'm very confident it was

25     hers.

123

1    Q    And when you say the way you interviewed her, what do you

2         mean by the way you interviewed her?

3    A    I didn't tell her what, I just told her that we found some

4         property of hers, and she said that she's missing certain

5         items, and I said something, I got to a point, she

6         mentioned some clothing, and stuff like that, and I said,

7         how about a purse or makeup bag?  And she said, my

8         watermelon purse, or I think she said, my watermelon

9         Clinique bag, makeup bag, and that's what it is.  That's

10        what that means.

11   Q    Were those items returned to her?

12   A    No.

13   Q    Are they still in custody as evidence?

14   A    Yes.

15   Q    Now, in terms of Mr. Kaplan just asking you on redirect, my

16        client's unwillingness to tell you what telephones in

17        Sterling Heights he was calling from, that coincides with

18        the fact that he wasn't giving information about anything,

19        correct?  About where he lived, how he got to Detroit,

20        where he was going in Detroit, or any of this, am I right?

21        Am I correct?

22   A    I never asked him where he was going in Detroit.  I just

23        asked him about the cars, you know, and he would say I

24        don't know where I got the cars, and I'd say, well, you

25        don't know or you don't want to tell me.  He would say,

124

```
 1         well, I don't going to think I'm going to say.
 2    Q    Now, when you say cars, which cars were you talking about?
 3    A    Well, at some point, I asked him about all the cars, all
 4         three of the cars.
 5    Q    So, even though on these prior vehicles, nobody was injured
 6         or hurt or in them, he also did not go into information as
 7         to how he obtained custody of those vehicles, correct?
 8    A    That's correct.
 9    Q    Was the watermelon bag, was it clear or was it some color,
10         if you recall?
11    A    I don't remember.  I think it was like a white, with
12         watermelon on it.
13    Q    And inside was a compact and some other makeup, correct?
14    A    Yes, I'm pretty sure.
15    Q    And do you know if those items were sent separately for
16         fingerprints?
17    A    They were not.  That was something we recently just
18         discovered.
19    Q    What was recently discovered?
20    A    About the bag.  It wasn't something we discovered way back
21         when, it was just fairly recent.
22    Q    Okay.  And Ms. Gina Doen, brought that to your attention
23         when she got the vehicle back, correct?
24    A    Correct.
25    Q    And you're saying that --
```

125

```
 1    A    No, the bag -- yeah, they processed that bag.  I'm sorry

 2         for -- but we didn't send it to the lab.  It was processed

 3         at the Shelby Township police department by Officer Killop.

 4         So, it was processed for prints.

 5    Q    All right.  So, what you're saying it happened semi-

 6         recently sending it out for prints?

 7    A    No.  Identifying who the purse probably belonged to.

 8    Q    All right.  And were the belongings of the watermelon

 9         makeup bag and the watermelon makeup bag sent separately

10         or --

11    A    They were never sent.  They were processed for latent

12         fingerprints at the Shelby Township police department, at

13         the department by Officer Killop, and it was negative

14         results for any kind of latent fingerprints.

15    Q    On the bag and the belongings?

16    A    Yes.  He processed the whole bag.

17                   MR. SHEIKH:  I have nothing further.  Thank

18         you for your time, Detective Hogan.

19                   MR. KAPLAN:  Thank you, your Honor.

20                   THE COURT:  Any questions for this witness?

21                   (Juror Number 175 had a question.)

22                   THE COURT:  I'll answer this one.  The

23         question is:  What is the difference between agreeing to

24         talk to the detective and signing a Miranda form?  Does it

25         change the interview process procedure?
```

126

1           Let me answer the first half.  When you are

2     placed under arrest, an officer could ask you anything, and

3     you could answer to anything, but it wouldn't be admissible

4     in court if it was prior to being Mirandized.  You're under

5     arrest, you have the right to an attorney, et cetera,

6     et cetera, et cetera.  Do you understand those rights?

7     Now, it's your decision whether to talk after that, and you

8     don't have to talk.  It doesn't mean anything if you don't.

9           Let's go to the next question:  Does it

10    change the interview process or procedure?  Essentially,

11    no, once he is Mirandized, and he agrees to talk to them or

12    not, and you go through it at that point, right?

13          THE WITNESS:  Yes.  And in this case, he

14    verbalized that he would talk to me, just not sign it, that

15    is all.

16          THE COURT:  Any followup?

17          MR. KAPLAN:  No, your Honor.

18          THE COURT:  You may step down.

19          (At 2:30 p.m., witness excused.)

20          THE COURT:  Any more witnesses, Mr. Kaplan?

21          MR. KAPLAN:  No, sir.  The People rest.

22          MR. SHEIKH:  Can I have a brief moment?

23          THE COURT:  We're going to take a ten-minute

24    break, I'll have you stay in there.  Please do not discuss

25    the case amongst yourselves or with anybody else.

127

1                    COURT OFFICER:  All rise for the jury.

2                    (At 2:30 p.m., jury exited the courtroom.)

3                    (At 2:38 p.m., jury entered the courtroom.)

4                    MR. SHEIKH:  Yes, your Honor.  I have a

5        motion for a directed verdict.  I believe that the majority

6        of the evidence that has been presented to this jury has

7        been about the other three vehicles that were allowed in

8        over our objections.  As you know, we filed opposition

9        briefs under the Criminal Code 4042B.  I assume Mr. Kaplan

10       has served it on this court, and I think that if the jury

11       were to vote strictly on the evidence in this case, they

12       would not sustain a verdict beyond a reasonable doubt,

13       there's too much conflicting testimony in our case and not

14       in the case that we have here at hand, and if they were to

15       come back with a verdict, I think they would be unduly

16       influenced by the prior acts.  We had police officers from

17       other cases, the victims, and almost ad nauseam we had

18       testimony regarding those incidents, and I think that if

19       anything it would be set up as manslaughter.  Therefore,

20       your Honor, I would respectfully ask this Court to grant us

21       a directed verdict.

22                    THE COURT:  Mr. Kaplan.

23                    MR. SHEIKH:  The case law holds in People

24       versus Hampton on a directed verdict motion the Judge

25       considers the evidence in the light most favorable to the

128

1      People based on that type of analysis, a reasonable jury

2      could convict.  I'm not sure of the second part of Mr.

3      Sheikh's motion, it's almost a motion for reconsideration

4      of the 404B ruling, and it's the law of the case right now.

5                  THE COURT:  All right.  I would say there is

6      some merit to what you're saying in terms of, if there was

7      nothing about the prior incidents, there is some possibly

8      of fatal weaknesses to Mr. Kaplan's case.  And the answer

9      to that is, that's why he filed the motion.  It's a

10     circumstantial case, and if the jury relies strongly on the

11     404B evidence, it's a strong circumstantial case.  So,

12     considering everything in there, in the light most

13     favorable to the Plaintiff, there is enough to go to the

14     jury.  They are either going to believe his argument, or

15     they are going to believe there was a middleman somewhere

16     in between him and the decedent in terms of getting in the

17     car.  So, your motion is preserved, but I will reject it.

18                 MR. SHEIKH:  Thank you, your Honor.  We also

19     thank you for giving us the accommodation to address it.

20                 THE COURT:  Okay.  Now, what are your plans

21     as far as witnesses?

22                 MR. SHEIKH:  At this point, your Honor, we

23     are going to rest as well as soon as the jury comes back.

24                 THE COURT:  Okay.  So the Defendant is not

25     going to testify?

129

1                    MR. SHEIKH:  No, Your Honor.

2                    THE COURT:  All right.  Why don't we make a

3          record right now.  Stand up, sir.  Actually, come on up

4          here.

5                    (The Defendant approached the bench.)

6                    THE COURT:  All right.  What is your name?

7                    THE DEFENDANT:  Joseph Michael Hendrix.

8                    THE COURT:  You're not a rookie in the

9          system, you've been here in front of me before.

10                   THE DEFENDANT:  Yes, your Honor.

11                   THE COURT:  You know how the court system

12         works; is that correct?

13                   THE DEFENDANT:  Yes, your Honor, I do.

14                   THE COURT:  You know that you can either

15         testify or not testify.  You know if you choose not to

16         testify, I'm going to read that in the instruction, we

17         talked about it in the jury selection that says something

18         to the effect of, every defendant has the right to testify

19         or not testify.  If he chooses not to, you cannot hold that

20         against him.

21                   THE DEFENDANT:  I do understand that, your

22         Honor.

23                   THE COURT:  You're going to get that.  What

24         they do in there, I can't vouch for them, I can only give

25         the instruction, okay?  I assume they're going to follow

130

1        their oath along with the instructions.

2                        THE DEFENDANT:  I understand.

3                        THE COURT:  Have you thought long and hard

4        about your decision?

5                        THE DEFENDANT:  Yes, I have, your Honor.

6                        THE COURT:  You understand there's pros and

7        cons to either way you go?

8                        THE DEFENDANT:  Yes, I do.

9                        THE COURT:  If you don't testify, they might

10       think you're hiding.  If you do testify, you might testify

11       brilliantly, it might get ugly out there, and you might get

12       cut to pieces.  This is why it's a good decision.  Have you

13       thought about it long and hard?

14                        THE DEFENDANT:  Yes, your Honor, I have.

15                        THE COURT:  Have you talked about it with

16       your attorney?

17                        THE DEFENDANT:  I've consulted with

18       Azar Sheikh about it also.

19                        THE COURT:  And you've made the decision

20       that you feel it's in your best interest to not testify?

21                        THE DEFENDANT:  Yes, your Honor.

22                        THE COURT:  All right.  Very good.  Are you

23       ready?  Do you want to take a few minutes to do the

24       closings?

25                        MR. KAPLAN:  I'm ready, Judge.

131

1                    MR. SHEIKH:  I believe Mr. Kaplan was born

2          ready, your Honor.

3                    THE COURT:  All right.  How long do you

4          anticipate, Mr. Kaplan?

5                    MR. KAPLAN:  No more than 20 minutes, your

6          Honor.

7                    THE COURT:  Have a seat, and we'll go right

8          into it.

9                         (The Defendant returned to the defense

10                        table.)

11                   MR. SHEIKH:  Thank you, your Honor.

12                   MR. KAPLAN:  Your Honor, I believe we have

13         an agreement on the instructions unless I hear otherwise.

14                   MR. SHEIKH:  Your Honor, that is true.

15         Mr. Kaplan did provide me jury instructions right at the

16         inception of the trial, and we have an agreement as to

17         instructions and/or if the Court should feel differently.

18                   MR. KAPLAN:  Your Honor, there are two

19         lesser included offenses for felony murder, we agree to

20         your Honor giving those.

21                        Your Honor, regarding the posters, we have

22         Exhibits 36 and 37.  I'm not sure if I moved formally to

23         introduce both 36 and 37, maybe Mr. Sheikh remembers.

24                   MR. SHEIKH:  Your Honor, if he didn't, we

25         don't object.

132

```
1              THE COURT:  We'll clean that up once they
2    get in here.
3              COURT OFFICER:  All rise for the jury,
4    please.
5              (At 2:38 p.m., jury entered the courtroom.)
6              THE COURT:  Please be seated.  All right,
7    first of all, Mr. Sheikh, do you care to call any
8    witnesses?
9              MR. SHEIKH:  No, your Honor.  At this point,
10   the Defense would rest.
11             THE COURT:  All right.  Obviously, there is
12   no rebuttal, Mr. Kaplan.  Just as a matter of housekeeping,
13   are there any issues in regard to exhibits.
14             MR. KAPLAN:  Your Honor, Exhibits 36 and 37,
15   various charts, I might have already moved formally to
16   introduce 37.  I move now to introduce 36 and 37.
17             MR. SHEIKH:  Your Honor, we have no
18   objection.  We stipulate to their admission at this time.
19             (Proposed Exhibit 36 was admitted.)
20             THE COURT:  With that, at this time,
21   Mr. Kaplan, you may give your closing argument.
22             MR. KAPLAN:  Thank you, your Honor.
23                   CLOSING ARGUMENT
24   BY MR. KAPLAN:
25             Good afternoon, Mr. Sheikh and Judge
```

133

1           Switalski, ladies and gentlemen, you've been here less than

2       two days.  We started testimony yesterday afternoon, and we

3       finished today.  It's been a brief trial, but it probably

4       seems longer.  You have a difficult job in that it's

5       passive, you're sitting here, you can tune us out if you

6       want, it's difficult to do so, and maybe both of us, or

7       maybe yours truly is only repetitive from time to time, and

8       you might be thinking, I've already heard that.  I know

9       enough about that.  Well, we're not allowed to ask you

10      midstream, I can't say, Judge Switalski, can I ask the

11      jurors whether they want to hear more on this?  I can't do

12      that.  So, you're passive, but you have been very

13      attentive, and Mr. Sheikh and I have been around a long

14      time.  We appreciate that you've been attentive, and that

15      you care.  You could have avoided jury duty possibly, but

16      you chose to be here.

17                  Well, this case all revolves around the

18      identity of a thief.  Who is it?  If Hendrix is the thief,

19      he's guilty of the three crimes.  If he's not the thief,

20      he's not guilty.  Well, how do you know who the thief is?

21      We don't have a video camera showing who did it.  And we

22      don't have a live eye witness.  If Mrs. Doen had not died,

23      and if she had not suffered a serious brain injury,

24      affecting cognitive thinking, on the witness stand, she

25      might have been able to select the Defendant, or she might

134

1    have picked him out of a line up, but we don't have that

2    benefit.  The case is what it is.  So, how do you know who

3    the thief is?  Well, there are three reasons the Defendant

4    is a thief.  The first one stems from a jury instruction

5    that the Judge will give you.  Now, this is a common sense

6    instruction, and fortunately, when juries hear cases, they

7    do not leave their common sense at home.  When you received

8    your jury summons, it didn't say please leave your common

9    sense and reasoning at home.  Come here with uncommon

10   sense, don't be reasonable.  And that's really the

11   instruction that the Judge will give you.  Because we have

12   the burden of proof, and we welcome that burden of proof as

13   prosecutors.  We have to prove to you beyond a reasonable

14   doubt that Defendant is the culprit.  But beyond a

15   reasonable doubt means a doubt based on reason, a doubt

16   based on reason and common sense.  It's not a possible

17   doubt, it's not a fanciful doubt, it's not an imaginary

18   doubt, it's not beyond a shadow of a doubt, it's beyond a

19   reasonable doubt.  And in more than 20 years as a

20   prosecutor, I never have had and never will have a case

21   where there is absolutely no doubt, because even on a case

22   where you have a video camera showing the crime and the

23   offender holding a gun against the victim's head with the

24   smoke billowing out, it's possible the video didn't capture

25   the right angle, it's possible the gun went off accidently.

135

1    So the real issue here, what is more reasonable?  Is it
2    more reasonable that the Defendant is the thief, or is it
3    more reasonable that some other guy did it?  That's a
4    defense you learn in law school, it's called SODDI, S-O-D-
5    D-I, Some Other Dude Did It.  So that's essentially what
6    he's saying.  Some other dude did it, I'm not the guy.  Is
7    that reasonable?  No, it's patently unreasonable.  Why?
8    For three reasons, number one, the Judge will read an
9    instruction to you.  And this instruction says, if you
10   determine that Defendant had possession of the Caravan, and
11   you know he did.  Approximately six hours and thirty-five
12   minutes after the carjacking, so we know he had possession,
13   and, and that the Caravan had been stolen.  Well, we know
14   it had been stolen.  Then, then you may infer that the
15   Defendant is the thief.  Now, the Judge is not going to say
16   ladies and gentlemen, because he was captured in that car,
17   six hours and forty-five minutes later, he is the thief.
18   The Judge can't tell you that.  But, the Judge will tell
19   you you can infer that he is the thief.  Now, during that
20   six hour and forty-five minutes stanza, is it possible that
21   somebody else had the car, and then turned it over to the
22   Defendant? Yes, it's possible.  Is it reasonable?  No.
23   Why?  Because of his modus operandi, his MO.  His method of
24   operation.  His pattern, scheme, and conduct.  This is
25   Joseph Hendrix.  He lives in Shelby Township.  He doesn't

136

1      have a job.  He's addicted to drugs.  He doesn't have a

2      car.  He doesn't even have a license.  He can't buy a car.

3      He can't lease a car.  And we know that at Van Dyke and

4      Six Mile Road, there are many crack houses.  That's the

5      area where he buys his crack.  He needs locomotion.  He

6      needs a vehicle.  All four vehicles, you have the dates

7      memorized by now, you don't need my help.  December 3 of

8      '02, August 31, September 3, September 5, '06.  All four

9      vehicles taken in the same way, all four left unlocked,

10     unattended, with the keys in the ignition -- strike that.

11     The last three with the keys in the ignition.  The first

12     one in '02, keys left in the  truck.  So you might say to

13     yourself, well, sure, a vehicle left unattended, unlocked,

14     with keys in the vehicle, that vehicle's more likely to be

15     stolen than one that's locked without the keys, granted,

16     that's true.  But this is his way of stealing cars.  There

17     are many ways of stealing cars, hot wiring, using a master

18     key, towing the vehicle, all kinds of ways.  Using a screw

19     driver into the ignition.  But, this is his way, this is

20     Joseph Hendrix.  He might as well sign his name on each

21     vehicle, I was here.  He doesn't have to.  Because we know

22     that's his signature crime.

23              All right.  So, all four vehicles were taken

24     in the same area, in the same way.  But who lives in that

25     area?  The Defendant lives within a mile or less than a

137

1       mile of each of the four thefts, or lived in the same area

2       as each of the four vehicles stolen.  So you say to

3       yourself, okay, you know, maybe that's a coincidence, same

4       modus operandi, he happens to live in the same

5       neighborhood.  Then, where are the three vehicles taken?

6       The fourth one, meaning the first one, December 3, 2002,

7       he's captured.  He's nabbed.  So he can't drive to Detroit

8       for crack cocaine.  By the way, all four of these thefts

9       were during the day or at least when there's some light

10      out.  Remember the one at 7-Eleven, it was 8:30 in the

11      morning?  The one outside Little Caesars, was about

12      4:00 p.m.  The one outside Gathering Place bar, it's

13      5:30 p.m.  And this one, on a September day before Labor

14      Day, it's 6:50 p.m.  He's not a professional car thief.  A

15      professional car thief is not going to take a car during

16      the day.  So, we have a guy taking the same vehicles --

17      different vehicles too, which is interesting.  Not a

18      Jaguar, not a Jeep, not a Dodge Caliber, not a Town &

19      Country minivan.  No, different cars.  It doesn't matter

20      what the car is.  It could be an old truck, it could be a

21      relatively new mini-van.  But then where does he take each

22      vehicle when not apprehended at the scene?  Into to

23      Detroit.  So, you say to yourselves, okay, Detroit's a big

24      city, it's the largest city in Michigan, it's got more than

25      a million residents, used to have two million residents.

138

1     Big city.  Yeah, it is a big city.  Van Dyke and Six Mile.

2     What is there about Van Dyke and Six Mile?  Is that where

3     Comerica Park is located?  Ford Field?  Orchestra Hall?

4     Why does anybody go to that area, unless you live there.

5     Well, these are crack houses.  So think of the

6     probabilities here that some other thief, when all

7     four vehicles are taken in the same way, from the same

8     area, right here where Defendant lived, and three of the

9     vehicles are taken into Detroit?  Wow.  What a coincidence.

10    So, if Defendant isn't the thief on September 5, it means,

11    gee, some other guy did it in the identical way that

12    Defendant is stealing cars.  And you'll notice there

13    haven't been any car thefts since like that.  Oh, some

14    other dude did it.  Well, we don't know who he is. And gee,

15    he just happened to abandon the vehicle.  That poor

16    Defendant with bad luck finds the vehicle and drives it

17    into Detroit.  Sure.  We can patch it up hunky-dory.  That

18    is very likely.

19          Now, if there's anything you know, this

20    Defendant is a survivor.  He looks out for himself.  He

21    looks out for number one.  He'll do anything to avoid

22    capture, and look what he did on December 3, 2002?  You

23    know, it's a blip on the screen in terms of the universe,

24    civilization, might not amount to much in our lifetimes,

25    but think about what happened?  He's stealing a truck

139

1          outside of Gathering Place bar, and Mr. Piontkowski

2          actually came out to his truck at that moment.  It's a

3          remarkable set of events, but it happened.  And you heard,

4          he tried to protect his truck, he didn't want his truck

5          being stolen.  Unlike this Defendant, who doesn't have a

6          job.  This guy works for a living, wants his truck.  And

7          Defendant, you heard what Defendant did, in avoiding

8          capture.  Could have injured the man badly.  The guy tried

9          to climb onto the vehicle to stop it from being taken, and

10         what does Defendant do?  Does he put the car in park and

11         run away?  No.  He could have injured Mr. Piontkowski.

12         Okay.  Then a police officer tries to stop the vehicle.

13         Well, what did the Defendant do?  Does he stop, say,

14         Officer, yeah, I stole a car, I'm a young guy, not a big

15         deal.  No.  He flees the officer.  And then he drives at

16         the officer.  He'll do anything to avoid capture.  And then

17         he bails out of the vehicle right near his house.  What a

18         coincidence.  On Speedway Street.  Speeding on Speedway

19         Street.  Runs into his house.  Officer Andy Gammicchia

20         pursues him.  Then his mother says he's not here.  Yeah,

21         what an enabler.  He's not here.  Well, thanks, mom.  The

22         point is that this Defendant, look at all the efforts he

23         made to avoid capture or detection for a simple car theft

24         of December 3, 2002.  You might ask what does this have to

25         do with this case?  Well, here's what it has to do with

140

1       this case.  On September 6, 2006, at four in the morning,

2       the Defendant is being transported back from Detroit to

3       Shelby Township by Sergeant Muszynski, Sergeant Ferguson,

4       and they asked him, where did you get the Caravan.  Now,

5       what you don't know, because it's not in evidence is

6       whether Defendant at that point knew that somebody had been

7       badly injured and might not survive.  We don't know that,

8       it's not in the case.  But assume that neither officer said

9       anything to him, which is not really reasonable.  Of

10      course, they're going to say that to him.  Whether they

11      did, whether they didn't, here's his chance to avoid

12      capture or possible charges in this case.  If he had a

13      story, if he had a reasonable explanation for how he came

14      into possession of that vehicle, he would have told

15      Sergeant Ferguson and Sergeant Muszynski.  Because this man

16      is a survivor.  He looks out for himself, he is not meek.

17      That adrenaline is flowing, and testosterone is flowing

18      when he's in danger, and he's in danger now.  And he says

19      essentially I don't owe you an explanation, I don't know

20      where I got it.  Yeah, I don't know where I got it.  Sure.

21      It's not as though somebody asked you what you had for

22      lunch 29 weeks ago, where did you get the Caravan?  Now if

23      he had a reasonable explanation, he would have given it.

24      He's not shy, he's not meek, he knows how to talk.  He

25      would have said, hey, found it on the street.  Somebody

141

1   left it abandoned.  A friend of mine named John, gave it to

2   me.  I don't know his last name.  He was helping me out, I

3   thought it was his car.  I bought it for $200.  Where's the

4   explanation?  None.  You know why?  Because he doesn't have

5   one.  If he had one, he would have given it.  Okay.  So,

6   you say to yourselves, he's in a police car, it's September

7   6, he had been stopped earlier that morning.  What's more

8   important now is Detective Hogan's interview with him on

9   September 8 at the Macomb County Jail.  Detective Hogan

10   says a woman was badly injured, pushed out of that minivan,

11   and she might die, and this is your opportunity to tell me

12   what happened.  In other words, maybe not verbalize

13   precisely as follows goes like this:  Tell me where you

14   were, give me an alibi, who were you with, and how did you

15   obtain the vehicle?  Because if you can give me that

16   information, then I can investigate it, and I can clear

17   you.  There's no question to 14 of you that if Defendant

18   had an alibi for his whereabouts say between 6:00 p.m.,

19   7:30 p.m., he wouldn't have been charged.  The alibi would

20   have been investigated, and if true, he wouldn't be charged

21   with this carjacking.  Where was he?  Ask yourselves where

22   was he?  We're not asking where he was from 3:00 a.m. to

23   5:00 a.m., where he might have been sleeping alone where

24   nobody knows.  Everybody knows where he was and where she

25   was two days earlier, or three days earlier during the

142

1     evening, everybody knows that.  Now, he's in the County

2     Jail, knows he's been arrested for a crime in connection

3     with this car theft, carjacking, yet, and he's had time to

4     think about it too, and here comes Terry Hogan.  Now, the

5     defense, not Mr. Sheikh, he's a great guy, but the

6     Defendant might be thinking well, Hogan is my enemy, Hogan

7     just wants to frame me.  But, Hogan wants to find out who

8     did this.  This is a serious case where a woman might die.

9     And she did die.  Hogan wants to know who did it.  The

10     Defendant has the alibi, and the alibi can be verified.

11     Alibis easily can be verified.  For example, what if

12     Defendant were at home and engaged in a long telephone

13     call: The telephone bills would support that, that he was

14     on the phone from home say from six to eight p.m., or if he

15     went to a restaurant, saw him use a credit card, that could

16     be verified.  If he's at a friend's house, a relative's

17     house, that all could be verified.  The point is if he had

18     an alibi, he would have told Detective Hogan.  But, there

19     is no alibi.  And you know why there's no alibi?  Because

20     there's no alibi.  He has none.  He has none.  There is no

21     doubt in this world that if had an explanation for where he

22     was at that time, on that day, we would know it.  He would

23     have told Sergeant Ferguson, and if not Sergeant Ferguson,

24     he would have told Detective Hogan.  When he can't tell him

25     where he is, what does that mean?  Because he wasn't

143

1        anywhere other than Vineyards parking lot at around

2        6:50 p.m.  Committing his thefts by his unique modus

3        operandi.  And it takes some skill.  You might say to

4        yourself, well, that's not a great car thief, but remember,

5        you have to go to hide and not be seen, conceal yourself,

6        you have to be very patient.  You've got to be patient.

7        Would it be 20, 30, 50, 100 cars before somebody

8        inadvertently leaves the keys in the ignition, and the car

9        unlocked and unattended.  That takes patience.  Do you have

10       the patience, do I have the patience?  Well, we're not car

11       thieves.  But, he has the patience, he needs his dope.  He

12       needs a car.  Well, secondly, the second part of this is if

13       Defendant acquired that car in some way other than being

14       the thief at Vineyards, he would have shared that with

15       Detective Hogan.  Whatever it might have been, I bought it

16       from John, the crack addict.  My girlfriend loaned me the

17       car.  My uncle let me use his car.  He would have offered

18       an explanation, but he didn't.  Now, here's a man who's

19       been through the criminal justice system, you know that.

20       He's not some 16-year-old kid, somebody facing his first

21       trouble with the law.  He's been around.  He knows the

22       drill.  And he has heard from Detective Hogan that the

23       woman might die.  Now, ask yourselves, would anybody with

24       any intelligence know that he's about to face a very

25       serious charge, carjacking, and felony murder if the woman

144

```
 1        dies.  If you're not the person who took the car at

 2        Vineyards, you're going to be clambering, be wailing.

 3        Detective, let me tell you what happened.  This is how I

 4        got the car, Detective.  I didn't want to say anything

 5        before, but here's how it happened.  Never.  Not one word.

 6        He says, oh, I don't want to say anymore, because it will

 7        get me into trouble.  He tells Sergeant Ferguson, I don't

 8        know how I got the minivan.  He knows, he's the thief.

 9                    So, the charges before you are carjacking,

10        felony murder, and unlawfully driving away a motor vehicle.

11        As I stated in my opening statement, and Judge Switalski

12        will elaborate, carjacking.  Did Defendant use any kind of

13        force or violence, or threaten to use any kind of force or

14        violence, or place another person in fear of suffering any

15        kind of force or violence against another person.  Well,

16        Mr. Sheikh's a great lawyer, and I don't think he's going

17        to dispute the fact that somebody did that.  He's going to

18        deny that his client is that somebody.  But, somebody did

19        that.  Somebody did that while committing a larceny of a

20        motor vehicle.  And the Judge will tell you, larceny of a

21        motor vehicle means you take away another person's vehicle

22        with the intent either to keep it, or withhold it, or to

23        dispose of it.  And, ultimately, that is what happened on

24        August 31, September 3, September 5.  Did the Defendant

25        ever call the police department and say, hey, I want to
```

145

```
1     give you some anonymous information here?  There was a car
2     stolen in Shelby Township, and they're very safe, I parked
3     them in the police lot, I parked them at the fire
4     department.  I parked it at Farmer Jack.  Are you kidding?
5     He wasn't returning any of those vehicles.  To him, they're
6     disposable, like a disposable lighter.  Steal it, drive to
7     Detroit, buy your dope, get rid of the vehicle.  Well, how
8     do you know that?  Well, look at the one from August 31.
9     Parked on a side street, left behind his belongings.
10    What's that all about?  His police bracelets from our
11    county jail, and an arraignment sheet.  It just shows that
12    the man is not -- it's all about dope.  He's not thinking.
13    Because a rational person would say, hmm, I better take my
14    stuff out of the vehicle, but he didn't.  Because he's high
15    on crack, and it might be difficult for you to relate to
16    that, because you don't use drugs.  Number 3, when the
17    Defendant attempted to drive away or take the Caravan, a
18    person lawfully was occupying the Caravan, and Mr. Sheikh,
19    I can't speak for him, but I don't think he's going to say
20    that Gina Doen, excuse me, Evangeline Doen was not lawfully
21    in the vehicle and exited the vehicle.  So that's the
22    carjacking charge.
23                On the felony murder charge, as
24    Judge Switalski will tell you, means that the Defendant --
25    strike that.
```

146

1                    He will tell you that Evangeline Doen died.
2       We have to show you she died, if she did die.  If she died
3       as a result of the carjacker's actions, we know that, that
4       the crime that she died during the commission of a felony,
5       whether it's carjacking or larceny of a motor vehicle.
6                    And then the fourth element is the Defendant
7       intended to kill -- he didn't intend to kill, wipe that
8       out.  He didn't intend to kill anyone.  Or he intended to
9       commit great bodily harm.  You push somebody out of a
10      vehicle, moving or stationary, especially a minivan,
11      especially an older woman, on the cement, you are intending
12      to cause a serious injury.  But, you might say well, maybe
13      he wasn't, maybe he didn't intend to kill anybody.  Of
14      course, he didn't.  Maybe he didn't intend to cause a
15      serious injury.  Okay, unimportant.  Why?  Because the
16      crime is also proven if the person knowingly engaged in
17      conduct likely, likely to cause serious injury.  Now, you
18      heard from the medical examiner, Dr. Pacris.  He says an
19      older person is more likely to suffer an injury when pushed
20      out of the vehicle, and that is true.  So, whoever did
21      this, didn't want to kill anybody, didn't want to cause
22      anybody's demise, but was caught in a dilemma.  That person
23      can blame the tinted windows.  If the minivan didn't have
24      tinted windows, Mrs. Doen would be alive, because the
25      carjacker would have known she was in the vehicle.  If Gina

147

1      Doen had locked the car, taken the keys, Mrs. Doen would be

2      alive.  Well, we all make mistakes.  But, this carjacker,

3      once he realized somebody was in that vehicle, he took the

4      cowardly approach.  He easily could have slammed the car

5      into park and ran away.  Mrs. Evangeline Doen was not going

6      to chase him.  Did he do that?  Wouldn't a typical car

7      thief do that?  Probably.  You know, here's an older woman.

8      I have a mother, I have a grandmother the thief is

9      thinking, I don't want to hurt this person.  I'm just going

10     to get out of here.  That's what a reasonable person would

11     do.  But this person needs his dope.  He doesn't care, the

12     hell with everybody else.  I want my drugs.  She's an old

13     lady.  He could have pulled behind the building and said,

14     ma'am, please step out.  Let me open the door for you,

15     sorry, I have to do this.  He could have done that.  No, he

16     needs his dope.  He needs it now.  And what does he do

17     instead?  We don't know for sure, because we don't have an

18     eyewitness, and we don't have a video camera.  But what you

19     do know is that Mrs. Doen told the nurse when she was

20     pushed out of the moving vehicle, and consider where

21     Mrs. Doen's body is found, that means the vehicle would

22     have been moving.  Whether moving or stationary, this older

23     woman, not feeling well, ends up on the pavement.  And both

24     doctors told you the greater the velocity, the greater the

25     fall, the greater the injury.  She deserves to be here

148

1        today.  She might have lived another 20 years.  She could

2        have provided incalculable services to her grandchildren

3        and children.  She should be loving them, and they should

4        be loving her.  But instead, this man's love for dope, for

5        drugs, caused her death.  It's not fair, it's not right,

6        and he should be held accountable.  Thank you.

7                        THE COURT:  Mr. Sheikh.

8                        MR. SHEIKH:  Yes, your Honor.

9                             CLOSING ARGUMENT

10   BY MR. SHEIKH:

11                   Good afternoon, ladies and gentlemen.

12        Throughout this case, when this case first started, the

13        first thing that I think that we both, Mr. Kaplan and I,

14        made clear to you is that we wanted you folks to be very,

15        very fair, and listen to what I say, to listen to what

16        Mr. Kaplan says, to look at all the evidence, and certainly

17        to pay attention to what His Honor tells you, especially

18        when he instructs you after Mr. Kaplan gets a chance to get

19        back up here.  At this point, I'm going to ask you to do

20        something that's a little contradictory to that which is to

21        pay extra attention to me right now.  And the reason for

22        that is because under our system of justice, Mr. Kaplan, as

23        a representative of the prosecutor, has all the burden to

24        prove every element of every offense to you beyond a

25        reasonable doubt.  For that reason, because he has the

149

1       burden, he gets two shots.  After I'm done speaking with

2       you, he will get a chance to come back up here and address

3       the things that I've said and additional things that he may

4       already have in mind to say to you, and I will not get a

5       chance to respond.  And I think you could tell from the way

6       that this trial has been going the last two days, that

7       practically most witness, other than those that have to do

8       with thefts that we're not here for, I pretty much got up

9       and at least tried to, on cross examination, clear up some

10      points that may not have been clear, when they skip over

11      certain things, et cetera.

12              Now, what we need to talk about is, first of

13      all, this is a desperation point on their end.  They have a

14      brand new prosecutor in town, we have a horrible tragedy.

15      What happened to Ms. Doen is absolutely horrible.  I've got

16      a mother that age, and even if somebody didn't have a

17      mother that age, what happened to Ms. Doen is absolutely

18      disgusting, shouldn't happen anyway.  Naturally, that upset

19      the family a lot, because it grew out of a totally innocent

20      act on their part, just stopping for a quick errand that

21      turned into a tragedy.  You know, when you have family

22      members that are in law enforcement or the military, and

23      fire fighting, somewhere in the back of your mind, you have

24      that unfortunate thought that something might happen to

25      them.  But when the family's gone out to go to the dry

1    cleaners at the end of the day, coming back and having

2    something like this happen to a member of your family, it's

3    much more devastating, because you would never expect that.

4    What happened there is absolutely horrible.  And it

5    rightfully outraged the community.  And so then they

6    started looking, but they don't find the person that they

7    go look everywhere they can.  There's a local car thief,

8    and what happened here is totally consistent.  As I told

9    you from the beginning, ladies and gentlemen, I did not

10   sugar-coat anything to you.  I told you my client had

11   issues with the law, and he had certain addictions, and

12   he's been a slave to those.  He did exactly what he always

13   does, as I've said to you from the beginning, found a car,

14   got in it, and he went down to Detroit to crack town where

15   he goes, and he stays there.  Now, you have to think about

16   a few things.  Is it more reasonable that Mr. Hendrix would

17   have went here, got in this van from this parking lot at

18   Vineyards, drove somewhere, stopped.  These belongings come

19   out of nowhere, for some of which are ladies, and I'll get

20   to that in a minute.  We'll talk about the infamous

21   Michelle in a moment, but what happens?  That he would sit

22   there and wipe all the fingerprints off the car, so that

23   there's no fingerprints of Gina Doen, who's owned the

24   vehicle for approximately a month.  She indicated that when

25   she bought it, she had to adjust the mirrors and

151

1        everything.  Perhaps her mother's fingerprints were in

2        there, perhaps her daughter Alissa's fingerprints were in

3        there, or people of other nature.  Does that make any sense

4        to you, ladies and gentlemen?  That he would wipe all those

5        prints and then he would take his hands, with no gloves,

6        and adjust the rearview mirror, touch the doors and

7        everything else, so the only prints that are found are his.

8        You need to think about that when you go back there.  The

9        only way that that would happen is if somebody else went to

10       Vineyards, got the vehicle.  We all know this happened

11       really quick.  If you look at the pictures, which I'm

12       holding, and I would like you to do, Mr. Kaplan keeps

13       talking because he wants to inflame your emotions, he's an

14       excellent attorney, and that's part of his job, but I'm

15       trying to get you to think practical, he's trying to get

16       you to think emotional.  God only knows what you're going

17       to do, but, back to thinking emotional.  He's trying to

18       tell you, okay, this car thief, Mr. Hendrix, goes back to

19       the vehicle, and he's speeding off, and pushes this lady

20       out the window.  We don't know none of those for a fact.

21       Both the doctors, Dr. -- I can't say the one guy's name,

22       Pacris, and Dr. Todd, both testified they could not tell if

23       Ms. Doen was pushed out, if she accidentally fell out, or

24       if she decided to jump.  We don't know that for a fact.

25       They did indicate that the injury was severe, that she did

152

1        his concrete, you'll see that there.  It happened right in

2        the parking lot.  There could not have been a lot of speed.

3        The reason that I'm bringing that to your attention is that

4        some of the police officers tried, I think, to quote their

5        testimony in such a way that perhaps the perpetrator didn't

6        realize that somebody had fallen.  It happened right there,

7        as soon as the person got the vehicle and backed up, or

8        whatever, evidently, that's when whatever confrontation or

9        whatever accident occurred occurred.  And she fell right

10       there, she didn't get up.  Ms. Doen indicated she ran out

11       there immediately, I'm talking about Gina Doen, and tried

12       to see what was going on.  EMS came, she's already in bad

13       shape.  So whomever would have seen this, would have

14       noticed it.  It makes more sense, and they would have

15       abandoned the vehicle the first place they could.  And what

16       would be best for this person that would abandon this

17       vehicle, to leave it, with the keys and stuff in it so

18       somebody else would grab it and take off.  We had officers

19       testify that that does, in fact, happen, abandonment of

20       instrumentalities of crime.  That's not far stretched.

21       Along comes -- and they have a chance to wipe their

22       fingerprints and stuff, somehow they forgot the back.

23       Along comes Mr. Hendrix, true to his nature, sees the

24       vehicle.  For him, as I indicated earlier, it's like

25       hitting the lotto.  Sees the vehicle, goes to the crack

153

1      house, does what he does.  It's parked in front of the

2      street, and that's where he gets arrested.  The police in

3      here, they have a lot of pressure on them.  With a new

4      prosecutor in town, it's a very bad tragedy.  With all of

5      that in mind going on, they have a lot of pressure to come

6      up with somebody with this pattern, that's why so much time

7      has been spent.  If you look at all the witnesses that you

8      have.  They dug up witnesses going back to 2002, I believe,

9      from the thefts.  They brought them.  For each prior theft

10     that Mr. Hendrix has allegedly been involved in.  In

11     addition to which they brought back witnesses that have to

12     do with the police officers of Detroit, from everywhere, to

13     try to conjure up something, to try to make him look like a

14     bad guy.  His Honor's going to instruct you that his prior

15     bad acts, under the law, if you follow the law and the

16     Judge's instructions, not my guidance, you are to not use

17     that to conclude negative things about Mr. Hendrix.  But,

18     you know what, ladies and gentlemen, where they try to pull

19     something over on you, you can ask for the witness list.

20     Nowhere is that Michelle lady on the witness list.

21     Yesterday, when we were up here, and Gina Doen testified

22     she indicated she had never heard that name before, and yet

23     today, we have Detective Hogan mention something.  Why

24     didn't they put her on the witness list.  How important

25     would she have been.  You can go back to 2002 and bring

154

1          back victims of people that say that their cars are stolen.

2          You can go and spend all the taxpayers money to bring in

3          all these police officers, one after the other from Detroit

4          and different jurisdictions.  They come in her and talk to

5          you about a theft that's got nothing to do with today that

6          we have conceded to from day one.  If you remember, I did

7          not come up here and tell you that my client is an angel,

8          and that somebody had some venom against him for no purpose

9          at all.  I came here, and I told you he's done some stupid

10         things and this, you know, this what he did here was

11         stupid.  It was totally in conforming with what they said.

12         But, they chose to bring all that other in.  You need to

13         think about that.  Why is this mysterious Michelle not on

14         the witness list?  Why was she not brought here?  And how

15         could they not know that that would be important?  I see

16         Mr. Kaplan taking notes, so he probably has some sort of

17         explanation, but you need to still think about that,

18         because that explanation is going to come after you were

19         told that.

20                    In addition to which, ladies and gentlemen,

21         both the doctors testified that the nature of the injuries

22         to Ms. Doen were, first of all, basically one injury.  We

23         all know that, we heard the doctor's testify, she hit her

24         head, it caused a concussion, or break, or whatever.  It

25         started causing swelling of the brain, that's what causes

155

1    the problem.  Now, as that happens and the brain

2    progresses, as the doctors testify you start to lose

3    different functions.  So, I think it would stand to reason

4    that you would be most active, most communicative at the

5    beginning before your brain started to swell and other

6    crevices in your brain, so whatever information you get

7    would be accurate.  What did she tell people, it's a tall,

8    thin, blonde haired gentleman with a brown shirt and

9    glasses.  Mr. Hendrix has never worn glasses, he does not

10   have brown hair, you'll see the picture when he's arrested,

11   he's clearly in a blue shirt with red trim.  That picture

12   is a part of the exhibits that you have here.  We had

13   officers testify that picture's taken at the time of his

14   arrest.  And there's other clothes in the vehicle.  It's

15   not that he changed.  There's no brown shirt found, there's

16   no glasses found, there's no gloves found.  So there's a

17   lot of doubt there.  What happened to those missing

18   fingerprints, what happened to this famous Michelle, who

19   just comes in at the last minute through Mr. Kaplan and

20   through Detective Hogan, and is an answer to explaining

21   these things that are otherwise inexplicable and give

22   credence to my client's position.  And you have the right

23   to ask for the witness list, she's not on there, so if they

24   give you some explanation as to why they didn't call her,

25   why didn't the police put her on the witness list?  You

156

1     need to think about that.  The other things that indicate

2     desperation, if you look at the charts, you notice right

3     across the top it says homicide carjacking.  That's no

4     accident.  Those are subliminal things mentioned to inflame

5     you again, emotionally, so you keep your mind off and

6     keeping thinking.  You keep seeing that over and over every

7     time they put a chart up.  There's no reason for that, they

8     could have put People V Hendrix, which is normally done,

9     which is the name of the case.  They could have just left

10    the case number, or they could have left nothing on there.

11    I want you to not allow yourself to be played.  You know,

12    it's very sad that what happened, and when things happen,

13    you tend to try to do this.  There's a lot of people that

14    are upset now because they think that perhaps we went in

15    the wrong direction with the whole 9/11 situation.  Some

16    people think we went the right way, but it's very natural

17    that when things happen, you get mad, you want to, you

18    know, go hold somebody accountable.  But, the greatest

19    injustice would be to Ms. Doen who suffered at the hands of

20    a tall, thin, blonde-haired man in a brown shirt and

21    glasses and blonde hair.  If you were to convict my client,

22    you would be doing two tragedies.  One is that the person

23    that actually did this would be getting off scot-free,

24    because they will no longer have an incentive, and they

25    would have legal impediments to bringing that person to

157

1      prosecution.  Because the minute they would arrest that

2      individual and identify that individual or individuals,

3      immediately at that point they have somebody who's already

4      been convicted of this crime itself, and basically the case

5      would fall apart, they would have no incentive.  So that

6      would be one big injustice because that would not serve the

7      memory of Ms. Doen correctly.  I'm sure that Gina Doen and

8      her family that are looking for closure, and that are

9      looking to go on with it, which I'm sure is going to be a

10     lifetime process.  But, ladies and gentlemen, misguided

11     closure is going to keep them up at night, it's going to

12     put an innocent man in prison.  And those of you that have

13     a conscience, once you get out of here and tell me the

14     verdict, and if it's improper, you go on.  But, I'm sure

15     that you would have that figured that there are too many

16     doubts in this case.  Those other incidents that occurred.

17     Yes, they did occur.  My client stepped up to the plate and

18     did what he had to do.  Why did this whole video

19     incident -- you heard Detective Hogan, a very experienced

20     officer, you don't get to be a detective, an officer in

21     charge of a murder case and sit next to a man with the

22     caliber of Mr. Kaplan without knowing what you're doing.

23     He went to training, he knows how to lie, he knows how to

24     get enough information.  Not that he did anything

25     inappropriate, I'm talking about within the confines of his

158

1      profession.  Is Mr. Hendrix so bright that he all of a

2      sudden he started mentioning a video, that the video would

3      clear him.  This is a very typical police procedure.  Feed

4      you a little information, exaggerate the facts.  He also

5      indicated to you, remember we had a hard time --

6                    COURT REPORTER:  Slow down, sir.

7                    MR. SHEIKH:  I'm sorry.

8   BY MR. SHEIKH:

9                    So, ladies and gentlemen, remember what a

10     hard time I had with other police officers too?  Trying to

11     tell you what was already in their reports, and he kept

12     telling them, the Detroit police have been telling him all

13     sorts of different things.  I don't know what to say, what

14     not to do.  These statements of indicating that someone's

15     dead, they're not dead, this is very common.  If you tell

16     somebody, look, this lady died, we don't care where you got

17     the vehicle, you tell us.  It seems to be minor in

18     comparison, so it invites a person to admit different

19     things.  Other times they understate things and say, look,

20     this is just -- this is no big deal, just tell us where you

21     got the car, we'll put you on probation and so forth.  It

22     would only make sense.  In addition, which, ladies and

23     gentlemen, they can't have their cake and eat it too.  They

24     also made a big point of the fact, through Detective Hogan,

25     that my client didn't volunteer any information.  He didn't

159

1    say exactly which 7-Eleven he called from, he didn't say

2    where exactly he lived, where he was going, or anything of

3    that nature.  They want to try to  direct your attention to

4    one thing and say well, he didn't tell us where he got the

5    vehicle, you know, and he didn't have an alibi.  Probably

6    because his alibi was he was hanging around the 7-Eleven

7    looking for a vehicle.  You know, not necessarily that's

8    the vehicle that he was staking to get, and all of a sudden

9    somebody abandons a vehicle, and he jumps in.  So, if you

10   have an alibi, as the police officer's indicated, if

11   somebody doesn't have a very honorable alibi, they're very

12   reluctant to come forward.  And that can happen to any of

13   us, especially after something happens to your ex or

14   something, because you then become suspects, if you don't

15   have some sort of corroboration.  But, a lot of people are

16   at home, or they're with their spouse, or with their

17   parents, which unfortunately don't make the best alibis.

18            So, ladies and gentlemen, what I'm asking

19   you to do is to go back and look at the evidence in this

20   case, to be patient enough, to be diligent enough, and to

21   be dedicated enough to sift the relevant from the

22   irrelevant and to sift that which is emotional.  We told

23   you from day one, we thought it was very bad what happened

24   to Ms. Doen.  We also conceded the fact that she died as a

25   result of those injuries.  We even never tried to indicate

160

1       anything different at all.  We asked for some clarification

2       once Mr. Kaplan chose to bring in two doctors to tell you

3       what we have already told you from day one, we all agreed

4       to.  He put on several family members to indicate what a

5       lovely lady Ms. Doen was.  We never said anything to the

6       contrary.  That is all meant to inflame the emotions.  What

7       they owe you is some proof, some evidence that does not

8       leave you with any reasonable doubt in order for you to

9       convict my client.

10                   May I have one moment?

11                   (Brief pause.)

12                   You know, one thing that happens as a

13      defense attorney, you know, they say death and taxes are

14      two certain things.  One thing is for sure, the minute I

15      sit there, I'm going to think about ten things that I wish

16      I had said or that I wish I had said differently.  If you

17      stay focused, and concentrate on the directions the Judge

18      is going to give you, about the burden's on them, about the

19      fact that prior evidence or prior so-called bad acts under

20      the law cannot be used to determine guilt in this

21      particular case.  That's exactly what they're trying to

22      circumvent and get you to do.  Emotion can't be a thing,

23      that's why they're putting them in real big writing on

24      there, homicide carjacking, constantly referring to

25      Ms. Doen being pushed out of a moving vehicle at great

161

1        speed.  Take those charts back there and look at them, look

2        at the circles, where it's taken.  Hey, not minimizing

3        anything, but just to tell you the attempts that are being

4        made to exploit that.  Where is this infamous Michelle, and

5        where are all these fingerprints?  Ladies and gentlemen,

6        there's more than enough doubt here, reasonable doubt to

7        find my client not guilty of the charges against him.  No

8        matter how tragic the situation is.  Hopefully, then the

9        police will concentrate in finding the tall, thin man with

10       the blonde hair and the brown shirt.  Thank you for your

11       time.

12                       THE COURT:  Mr. Kaplan.

13                       MR. KAPLAN:  Thank you, your Honor.

14                          REBUTTAL ARGUMENT

15    BY MR. KAPLAN:

16                       We started off in the opening statement

17       yesterday when the Defense says the video is the key

18       evidence.  You remember Mr. Sheikh said there's an outdoor

19       video, and they didn't check it.  Then some of you might

20       have been thinking oh, that could be a key piece of

21       evidence.  As you'll notice, there was no outdoor video.

22       So, you have to wonder about the reliability of that

23       opening statement.

24                       In brief response to my capable friend's

25       closing argument, number one, he says there's a new

162

1    prosecutor in town, and that somehow has affected this

2    case.  I don't know, that new prosecutor was elected in

3    November of 2004.  This is more than half way through his

4    term, do you see him in the courtroom watching this case?

5    Do you see any video cameras here?  This is a case, as

6    every other case.  And it's really insulting for the Shelby

7    Township police department and the Prosecutor's Office to

8    say this case was brought because there was a newly-elected

9    prosecutor.  I'm not sure of the logic there.

10                      Next point, he said, well, they're pointing

11    at the local car thief.  He is the local car thief, we know

12    that.  Car thefts stopped after he was locked up, but he's

13    more than a local car thief, he's the local car thief found

14    in the stolen vehicle, six hours and forty-five minutes

15    later.  So, I don't know how that somehow is unfair for the

16    police to possibly suspect him of being the carjacker.  And

17    not only is he the local car thief who just happens to be

18    in a stolen vehicle, but he has no explanation for that or

19    no alibi.  But still, I guess we're going after the wrong

20    guy according to the defense.  The fingerprint evidence is

21    right here.  You know, we didn't have to present

22    fingerprint evidence, they didn't even fingerprint that

23    vehicle.  And you know why?  Because the Defendant was

24    apprehended in that vehicle.  So, does it make any sense to

25    lift fingerprints from a vehicle when he's the last guy in

163

1        the vehicle?  No.  But they did it anyway.  And if they had

2        not attempted to lift prints from that vehicle, you know

3        that the capable Mr. Sheikh would be arguing they should

4        have.  So they did.  And, what did they find?  They find

5        five possible latent prints, either fingerprints or palm

6        prints.  Now you heard the officer say that not every

7        surface is capable of retaining a fingerprint.  In fact,

8        unlike T.V., with Horatio from CSI Miami, prints are rarely

9        found.  But the prints that are found, guess to whom they

10       belong?  The only person is the Defendant.  Now, could the

11       other identifiable print belong to one of the three Doens?

12       Of course.  We didn't send them in, Detective Hogan did not

13       send their prints to the lab.  But, notice what parts of

14       the car the prints were found on, the rearview mirror and

15       the sliding door.  Mr. Sheikh indirectly touches upon how

16       was she injured?  Did she fall out, was she pushed out, or

17       did she jump out.  Regardless of how it happened, and the

18       best evidence in the case is she was pushed out, because

19       that's what she says at first.  But if she fell out while

20       trying to jump out, it's the same case.  Because you have a

21       kidnapping, abduction, and she's tried to escape.  The

22       carjacker is just as responsible for her death if she

23       jumped out or fell out as opposed to being pushed out.  But

24       the reasonable explanation here is she is pushed out of the

25       vehicle.

164

1              Mr. Sheikh says they brought in all these

2       witnesses to inflame your passions, I don't know about

3       that.  I don't think anybody's inflamed from hearing from

4       numerous police officers from Detroit and Shelby Township.

5       In actuality, we could have tried this case with one

6       witness, Detective Hogan.  Because the Defense would have

7       stipulated cause of death, injury.  He probably would have

8       stipulated to the other car thefts.  That Defendant was

9       arrested in Detroit.  Where the car was found.  We could

10      have presented this case with one witness.  Oh, that would

11      be very exciting, that would be lack-luster.  You, as a

12      community, deserve to know the steps that were taken in

13      this investigation, and that there were real victims, real

14      victims, rather than just hearing about some names.  There

15      is more than one victim in this case.  It involves all

16      these other car thefts.  Then he says, why didn't they list

17      Michelle on the witness list?  Well, that's interesting.

18      You've heard that she was only recently interviewed, and if

19      he wants to bring it up, I'll respond to it.  We do have

20      rules in terms of witness lists, when witness lists could

21      be amended, and it's a 30-day rule.  But, they could call

22      Michelle, he could call a witness.  Why didn't he call

23      Michelle?  Michelle is a former girlfriend of the

24      Defendant.  Why not ask the Judge for a recess if he needs

25      it to call Michelle.  Ask yourself why he didn't call

165

Michelle, because Michelle is associated with the Defendant
not with us.  I didn't bring it up by the way, it came up
on redirect when Mr. Sheikh asked about this purse, or
whatever it is.  Then I asked the Detective if he tried to
determine ownership and he told me Michelle.   Mr. Sheikh
says there's an injustice, the wrong guy being charged.
There is an injustice, that we have a dead woman who should
be here with us.  That's the injustice.  Do you think
Shelby Township would willingly and knowingly pursue the
wrong guy?  Do you think that this police force, you've met
many honorable people from this force, do you think they
want to prosecute a person who didn't do it when the real
carjacker is out there?  No, no.  They did what they could,
and finally the Defendant had an opportunity to tell us
what happened on September 6 and September 8 and he didn't.
His silence is defining, his silence speaks a thousand
words.  His silence in refusing to say from where he made
the call, how he obtained the vehicle, and who he was with
during the important times.  That's like a thunderbolt from
the sky.  In other words, he's saying, I did it.  Because
if I didn't do it, I'll tell you why.  And by the way, here
we are, six months and 16 days since the incident.  And
have you been presented with an alibi witness for the
Defendant?  No.  Not one.  Not one who can say he or she
was with the Defendant, 5:00, 6:00, 7:00, 8:00.  Not one.

166

1       And what does that tell you?  Tells you nobody was with

2       him.  You know, his mother was willing to lie for him on

3       December 3 of 2002, when Officer Gammicchia arrived at the

4       door.  He said, hey, where's Joseph Hendrix (indicating)?

5       He's not here.  She's not willing to lie under oath.  And

6       the last question is, is this Defendant capable of

7       violence?  Well, he is.  Think back to December 3, 2002,

8       when somebody gets in his way, what does he do?  He almost

9       caused serious injury to the truck owner at the Gathering

10      Place bar.  He almost cost serious injury to Officer

11      Gammicchia.  And finally, he did cause a serious injury on

12      September 5, 2006, and that is the death of Mrs. Doen.

13      Thank you.

14                  THE COURT:  All right.  What we are going to

15      do is this:  We're going to take about a ten-minute break,

16      and then I'm going to read the final instructions to you.

17      But, before I let you go, I just want to clarify when

18      Mr. Kaplan says silence is deafening, lack of an

19      explanation, he is not referring to at the trial, because

20      we know, and you are instructed, he has a right to testify

21      or not testify, and that cannot be held against him.  That

22      was Mr. Kaplan's argument about during the question when he

23      was in custody, okay?  That's the only thing you are to

24      take that for.  You are in no way to hold it against him if

25      he has not testified.  That's a right that I would have,

167

```
1      and you would have, that anyone would have, so stay away

2      from that, okay?

3                  Now, I'm going to give you ten minutes.  Do

4      what you need to do, be back here and I'll read you the

5      instructions.

6                  COURT OFFICER:  All rise for the jury.

7                  (At 3:30 p.m., court recessed.)

8                  (At 3:45 p.m., court reconvened.)

9                  MR. KAPLAN:  Your Honor, may I address the

10     Court?  Numbers 11, 26, 7, and 10, relating to transcripts

11     and other cases and court records, Mr. Sheikh and I agree

12     to redact any reference to penalties or types of crimes

13     involved.

14                 THE COURT:  Okay.

15                 MR. SHEIKH:  Your Honor, they were already

16     admitted, and we stipulate and reviewed the retractions

17     made by Mr. Kaplan, and they are agreeable.  Thank you.

18                 THE COURT:  Okay.  Now, what I intend to do

19     is instruct them.  We'll decide who the two alternates are,

20     and I have to leave early today, so I'm going to send them

21     home when I'm done with that.  We will start tomorrow at

22     9:00 a.m., okay?  We will have the normal stipulations,

23     they can see whatever exhibits they want.  I will send

24     copies of the instructions in with them.  Okay?

25                 MR. SHEIKH:  Your Honor, do you want us,
```

168

1       Mr. Kaplan and myself here at 9:00 or just accessible to

2       your clerk?

3                       THE COURT:  Accessible by cellphone.

4                       (At 3:46 p.m., jury entered the courtroom.)

5                       THE COURT:  Please be seated.  Members of

6       the jury, the evidence and arguments in this case are

7       finished, and I will now instruct you on the law.  That is,

8       I will explain the law that applies to this case.

9                       Remember that you have taken an oath to

10      return a true and just verdict, based only upon the

11      evidence and my instructions on the law.  You must not let

12      sympathy or prejudice influence your decision.

13                      As jurors, you must decide what the facts of

14      this case are.  This is your job and no one else's.  You

15      must think about all the evidence, and then decide what

16      each piece of evidence means and how important you think it

17      is.  This includes whether you believe what each of the

18      witnesses said.  What you decide about any fact in this

19      case is final.  And you are going to get three copies of

20      these instructions to take in with you, so you don't have

21      to panic that you need to take shorthand.

22                      It is my duty to instruct you on the law.

23      You must take the law as I give it to you.  If a lawyer

24      says something different about the law, follow what I say.

25      At various times, I have already given you some

169

1    instructions about the law.  You must take all my

2    instructions together as the law you are to follow.  You

3    should not pay attention to some instructions and ignore

4    others.

5            To sum up, it is your job to decide what the

6    facts of the case are, to apply the law as I give it to

7    you, and in that way to decide the case.

8            A person accused of a crime is presumed to

9    be innocent.  This means that you must start with the

10   presumption that the Defendant is innocent.  This

11   presumption continues throughout the trial and entitles the

12   Defendant to a verdict of not guilty unless you are

13   satisfied beyond a reasonable doubt that he is guilty.

14           Every crime is made up of parts called

15   elements.  The Prosecutor must prove each element of the

16   crime beyond a reasonable doubt.  The Defendant is not

17   required to prove his innocence or to do anything.  If you

18   find that the Prosecutor has not proven every element

19   beyond a reasonable doubt, then you must find the Defendant

20   not guilty.

21           A reasonable doubt is a fair, honest doubt

22   growing out of the evidence or lack of evidence.  It is not

23   merely an imaginary or possible doubt, but a doubt based

24   upon reason and common sense.  A reasonable doubt is

25   just that, a doubt that is reasonable, after a careful and

170

1    considered examination of the facts and circumstances of

2    this case.

3              Every Defendant has the absolute right not

4    to testify.  When you decide the case, you must not

5    consider the fact that he did not testify.  It must not

6    affect your verdict in any way.

7              As I said before, it is your job to decide

8    what the facts of this case are.  You must decide which

9    witnesses you believe, and how important you think their

10   testimony is.  You do not have to accept or reject

11   everything a witness said.  You are free to believe all,

12   none, or part of any person's testimony.

13             In deciding which testimony you believe, you

14   should rely on your own common sense and everyday

15   experience.  However, in deciding whether you believe a

16   witness's testimony, you must set aside any bias or

17   prejudice you may have based upon the race, gender, or

18   national origin of the witness.

19             There is no fixed set of rules for judging

20   whether you believe a witness, but it may help you to think

21   about these questions:  Was the witness able to see or hear

22   clearly?  How long was the witness watching or listening?

23   Was anything else going on that might have distracted the

24   witness?  Did the witness seem to have a good memory?  How

25   did the witness look and act while testifying?  Did the

171

1       witness seem to be making an honest effort to tell the

2       truth, or did the witness seem to evade the questions or

3       argue with the lawyers?  Does the witness's age and

4       maturity affect how you judge his or her testimony?  Does

5       the witness have any bias, prejudice, or personal interest

6       in how this case is decided?  Have there been any promises,

7       threats, suggestions, or other influences that affected how

8       the witness testified?  In general, does the witness have

9       any special reason to tell the truth, or any special reason

10      to lie?  All in all, how reasonable does the witness's

11      testimony seem when you think about all the other evidence

12      in the case?

13           Sometimes the testimony of different

14      witnesses will not agree, and you must decide which

15      testimony you accept.  You should think about whether the

16      disagreement involves something important or not, and

17      whether you think someone is lying or is simply mistaken.

18      People see and hear things differently, and witnesses may

19      testify honestly, but simply be wrong about what they

20      thought they saw or remembered.  It is also a good idea to

21      think about which testimony agrees best with the other

22      evidence in the case.

23           However, you may conclude that a witness

24      deliberately lied about something that is important to how

25      you decide the case.  If so, you may choose not to accept

172

1           anything that witness said.  On the other hand, if you

2           think the witness lied about some things but told the truth

3           about others, you may simply accept the part you think is

4           true and ignore the rest.

5                         When you've discussed the case and decide

6           upon your verdict, you may only consider the evidence that

7           has been properly admitted in this case.  Therefore, it is

8           important for you to understand what is evidence and what

9           is not evidence.  Evidence includes only the sworn

10          testimony of witnesses, the exhibits admitted into

11          evidence, and anything else I told you to consider as

12          evidence.  Many things are not evidence, and you must be

13          careful not to consider them as such.  I will now describe

14          some of the things that are not evidence.  The fact that

15          the Defendant's charged with a crime and is on trial is not

16          evidence.  Likewise, the fact that he is charged with more

17          than one crime is not evidence.  The lawyers' statements

18          and arguments are not evidence.  They are only meant to

19          help you understand the evidence and each side's legal

20          theories.  The lawyers' questions to witnesses are also not

21          evidence.  You should consider these questions only as they

22          give meaning to the witnesses' answers.  You should only

23          accept things the lawyers say that are supported by the

24          evidence or by your own common sense and general knowledge.

25                        My comments, rulings, questions, and

173

1      instructions are also not evidence.  It is my duty to see

2      that the trial is conducted according to the law, and to

3      tell you the law that applies to this case.  However, when

4      I make a comment or give an instruction, I am not trying to

5      influence your vote or express a personal opinion about the

6      case.  If you believe that I have an opinion about how you

7      should decide this case, you must pay no attention to that

8      opinion.  You are the only judges of the facts, and you

9      should decide this case from the evidence.

10                  At times during the trial, I have excluded

11     evidence that was offered or stricken testimony that was

12     heard.  Do not consider those things in deciding the case.

13     Make your decision only on the evidence that I have let in

14     and nothing else.

15                  Your decision should be based on all the

16     evidence, regardless of which party produced it.

17                  You should use your own common sense and

18     general knowledge in weighing and judging the evidence, but

19     you should not use any personal knowledge you may have

20     about a place, person or event.  To repeat once more, you

21     must decide this case based only on the evidence admitted

22     during this trial.

23                  You have heard evidence that was introduced

24     to show that the Defendant may have committed three other

25     vehicle thefts, for which he is not facing charges in this

174

1      trial.  You must be very careful only to consider evidence

2      of other vehicle thefts for certain purposes.  You may only

3      think about whether this evidence tends to show:  a) that

4      the Defendant previously used a plan, system, or

5      characteristic scheme with respect to the charges that he

6      is facing in this trial, and/or b) the identity of the

7      person who committed the carjacking and other charges

8      lodged against the Defendant in this trial.  You must not

9      consider evidence of other vehicle thefts for any other

10     purpose.  For example, you must not decide that it shows

11     that the Defendant is a bad person or that he is likely to

12     commit crimes.  You must not convict the Defendant here

13     because you think he's guilty of other bad conduct.

14             You've heard evidence that was introduced to

15     show that the Defendant might have intended to purchase

16     drugs in the City of Detroit on September 5, 2006, the date

17     of the alleged crimes as well as on August 31, 2006, and

18     September 3rd, 2006.  If you believe this evidence, you

19     must be very careful only to consider it for certain

20     purposes.  You may only think about whether this evidence

21     tends to show that the Defendant had a motive to steal a

22     motor vehicle.  You must not consider this evidence for any

23     other purpose.  For example, you must not decide that it

24     shows that the Defendant is a bad person or that he is

25     likely to commit crimes.  You must not convict the

175

1    Defendant here because you think he is guilty of other bad

2    conduct.

3              You should not decide this case based on

4    which side presented more witnesses.  Instead, you should

5    think about each witness and each piece of evidence and

6    whether you believe them.  Then you must decide whether the

7    testimony and evidence you believe proves beyond a

8    reasonable doubt that that Defendant is guilty.

9              The Defendant is charged with first degree

10   felony murder.  To prove this charge, the Prosecutor must

11   prove the following three elements beyond a reasonable

12   doubt.  First, that the Defendant caused the death of

13   Evangeline Doen.  That is, she died as a result of the

14   Defendant's actions.  Second, that the Defendant had one of

15   these three states of mind:  He intended to kill, or he

16   intended to do great bodily harm to Evangeline Doen, or he

17   knowingly created a very high risk of death or great bodily

18   harm knowing that death or such harm would be the likely

19   result of his actions.  Third, that when he did the act

20   that caused the death of Evangeline Doen, the Defendant was

21   committing or attempting to commit the crime of carjacking,

22   which I will define for you later in these instructions.

23              As to Count 1, first-degree felony murder,

24   you may also consider the lesser charge second-degree

25   murder.  To prove this charge, the Prosecutor must prove

176

1     each of the following two elements beyond a reasonable

2     doubt.  First, that the Defendant caused the death of

3     Evangeline Doen.  That is, she died as a result of the

4     Defendant's actions.  Second, the Defendant had one of

5     these three states of mind:  He intended to kill, or he

6     intended to do great bodily harm to Evangeline Doen, or he

7     knowingly created a very high risk of death or great bodily

8     harm knowing that death or such harm would be the likely

9     result of his actions.

10                    As to Count 1, felony murder, you may also

11     consider the less serious offense of involuntary

12     manslaughter.  To prove this charge, the Prosecutor must

13     prove each of the following elements beyond a reasonable

14     doubt.  First, that the Defendant caused the death of

15     Evangeline Doen.  That is, she died as a result of the

16     Defendant's actions.  Second, in doing the act that caused

17     Mrs. Doen's death, the Defendant acted in a grossly

18     negligent manner.  I will now define the legal term gross

19     negligence for you.

20                    Gross negligence means more than

21     carelessness, it means willfully disregarding the results

22     to others that might follow from an act or failure to act.

23     In order to find that the Defendant was grossly negligent,

24     you must find each of the following three things beyond a

25     reasonable doubt.  First, that the Defendant knew of the

177

1      danger to another.  That is, he knew there was a situation

2      that required him to take ordinary care to avoid injuring

3      another.  Second, that the Defendant could have avoided

4      injuring another by using ordinary care.  Third, that the

5      Defendant failed to use ordinary care to prevent injuring

6      another when, to a reasonable person, it must have been

7      apparent that the result was likely to be serious injury.

8                  The Defendant is charged with the offense of

9      carjacking.  To prove this charge, the Prosecutor must

10     prove each of the following three elements beyond a

11     reasonable doubt.  First, the Defendant used any kind of

12     force or violence or threatened the use of any kind of

13     force or violence against Evangeline Doen, or he placed her

14     in fear of suffering any kind of injury.  Second, the

15     Defendant did so while he was in the course of committing a

16     larceny of a motor vehicle.

17                 Larceny is the taking and movement of

18     someone else's motor vehicle with the intent either to take

19     it away from that person permanently or to withhold the

20     vehicle for a period of time so that the person loses a

21     significant part of its value, use, or benefit.  Or to

22     dispose of the property in such a way that it is unlikely

23     that the owner will get back the vehicle.  In the course of

24     committing a larceny of a motor vehicle, includes acts that

25     occur in an attempt to commit the larceny or during

178

1   commission of the larceny, or in flight or attempted flight

2   after the commission of the larceny, or in an attempt to

3   retain possession of the motor vehicle.  Third, when the

4   Defendant attempted to take the motor vehicle, Evangeline

5   Doen was lawfully a passenger or occupant of the vehicle,

6   or otherwise lawfully in possession of the vehicle.

7           The Defendant also is charged with the crime

8   of unlawfully driving away a motor vehicle.  To prove this

9   charge, the Prosecutor must prove the following four

10  elements beyond a reasonable doubt.  First, the vehicle

11  belonged to someone else.  Second, the Defendant took

12  possession of the vehicle and drove it way.  Third, that

13  these acts were done without the owner's permission.

14  Fourth, that the Defendant intended to take possession of

15  the vehicle and drive it away.  It does not matter whether

16  the Defendant intended to keep the vehicle.

17          When you go to the jury room, you should

18  first choose a foreperson.  The foreperson should see to it

19  that your discussions are carried on in a business-like way

20  and that everyone has a fair chance to be heard.

21          During your deliberations, please turn off

22  your cell phones or other communications equipment until we

23  recess.

24          A verdict in a criminal case must be

25  unanimous.  In order to return a verdict, it is necessary

179

1    that each of you agrees on that verdict.  In the jury room

2    you will discuss the case amongst yourselves, but

3    ultimately each of you will have to make up your own mind.

4    Any verdict must represent the individual, considered

5    judgment of each juror.

6              It is your duty as jurors to talk to each

7    other and make every reasonable effort to reach agreement.

8    Express your opinions and the reasons for them, but keep an

9    open mind as you listen to your fellow jurors.  Rethink

10   your opinions, and do not hesitate to change your mind if

11   you decide you were wrong.  Try your best to work out your

12   differences.

13             However, although you should try to reach

14   agreement, none of you should give up your honest opinion

15   about the case just because other jurors disagree with you

16   or just for the sake of reaching a verdict.  In the end,

17   your vote must be your own, and you must vote honestly and

18   in good conscience.

19             Possible penalty should not influence your

20   decision.  It is the duty of the judge to fix the penalty

21   within the limits provided by law.

22             If you want to communicate with me while you

23   are in the jury room, please have your foreperson write a

24   note and give it to the bailiff.  It is not proper for you

25   to talk directly with the judge, lawyers, court officers,

180

1    or other people involved in the case.

2              As you discuss the case, you must not let

3    anyone, even me, know how your voting stands.  Therefore,

4    until you return with a unanimous verdict, do not reveal

5    this to anyone outside the jury room.

6              If you want to look at any or all of the

7    exhibits that have been admitted, just ask for them.

8              When you go to the jury room, you will be

9    given a written copy of the instructions you have just

10   heard.  As you discuss the case, you should think about all

11   my instructions together as the law you are to follow.

12             Now, we've prepared a verdict form listing

13   the possible verdicts.  It has the title of the case up

14   here with these captions, all that stuff.  And it says, we,

15   the jurors, make the following findings of fact:  Count 1,

16   carjacking.  He's either guilty of carjacking or not

17   guilty, you mark one box, when you are determined on that

18   count.

19             Count 2, felony murder.  It could be guilty

20   of felony murder or not guilty, or there's two other

21   options in between.  Guilty of the less serious crime of

22   second-degree murder, guilty of the less serious crime of

23   involuntary manslaughter, lesser included offenses to

24   felony murder, all right?  So, you have four options there.

25   You choose only one.

181

1              And Count 3, unlawfully driving away of a

2       motor vehicle, either guilty or not guilty.

3              When you are all done with all those three,

4       you mark three X's, you sign it, and knock on that door,

5       okay?

6              Now, at this point, we've seated 14.  We

7       have to get down to 12, we're going to draw two numbers.

8              COURT CLERK:  Juror in seat 6, which is

9       Juror 97, and juror in seat 5, Juror Number 53.

10             MR. KAPLAN:  Your Honor, may we approach?

11             THE COURT:  Sure.

12             (Brief pause.)

13             THE COURT:  One correction to the

14      instructions.  As to Count 1, the Defendant is charged with

15      felony murder.  To prove this charge, the Prosecutor must

16      prove each of the following three elements beyond a

17      reasonable doubt.  First, that the Defendant caused the

18      death of Evangeline Doen.  That is, she died as a result of

19      the Defendant's actions.  Second, that the Defendant had

20      one of these three states of mind:  He either intended to

21      kill, or he intended to do great bodily harm to Evangeline

22      Doen, or he knowingly created a very high risk of death or

23      great bodily harm knowing that death or such harm would be

24      the likely result of his actions.  Third, that when he did

25      the act that eventually caused the death of Evangeline

182

1    Doen, the Defendant was committing or attempting to commit

2    either the crime of carjacking or the crime of larceny of a

3    motor vehicle.

4              We'll make a copy of that and make sure the

5    instructions are all set.

6              All right.  The two alternates, you will

7    take to my chambers.

8              (Court officer sworn.)

9              COURT OFFICER:  All rise for the jury.

10             THE COURT:  All right.  We are all set.

11             (At 4:07 p.m., court recessed.)

12                    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

183

## CERTIFICATE

STATE OF MICHIGAN      )

                       ) SS.

COUNTY OF MACOMB       )

     I, Linda L. Brazzel, a Notary Public duly commissioned in and for the County of Macomb, State of Michigan, do hereby certify that I reported in shorthand the proceedings had in the above-entitled cause at the time and place hereinbefore set forth; that the same was thereafter reduced to typewritten form under my supervision and the foregoing transcript is a full, true, and correct transcript of my said shorthand notes.


LINDA L. BRAZZEL - (CSR-4704)
Notary Public
Macomb County, Michigan
My Commission Expires: 5-28-14


DATED: October 1      , 2007
     Mount Clemens, Michigan