## STATE OF MICHIGAN
## COURT OF APPEALS

People of the State of Michigan,
        *Plaintiff-Appellee,*

                                        COA No.  277919

v

                                        Case No.  2007-000056-FC

JOSEPH HENDRIX,
        *Defendant-Appellant.*

---

Mary Jo Diegel (P35617)                  Michael Skinner (P62564)
Macomb County Prosecutor                 Law Offices of Michael B. Skinner
1 South Main Street, Fl 3                27 East Flint Street
Mount Clemens, Michigan 48043            Lake Orion, MI 48362-3222
(586) 469-7291                           (248) 693-4100
*Attorney for Plaintiff-Appellee*         *Attorney for Defendant-Appellant*

---

# APPELLANT'S BRIEF ON APPEAL
# ORAL ARGUMENT REQUESTED



# Table of Contents

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Statement of Questions Involved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    It was error to admit statements allegedly made by
           Mr. Hendrix where Mr. Hendrix had, on separate
           occasions, invoked his right to counsel,  to remain
           silent, and had made an invalid *Miranda* waiver . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    The prosecution committed misconduct by using
           Mr Hendrix's alleged statements against him and
           by misstating the substance of those statements,
           thus providing him of his due process right to a
           fair trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      C.    Mr. Hendrix was denied the effective assistance
           of his attorney where his counsel failed to object
           to the introduction of Mr. Hendrix's statements
           or the prosecutorial misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      D.    The trial court erred in permitting the
           introduction of other acts evidence to prove Mr.
           Hendrix's identity where there was insufficient
           similarity between the other acts and the crime in
           this case, thus violating Mr. Hendrix's due process
           right to a fair trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      E.    There was insufficient evidence to support
           Mr. Hendrix's convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

V.    Relief Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# Index of Authorities

**Cases**

*Arizona v Roberson,*
486 US 675, 108 S Ct 2093, 100 L Ed 2d 704 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Berger v. United States,*
295 US 78; 55 S Ct 629; 79 L Ed 1314, 1321 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Cooper v Sowders,*
837 F2d 284 (CA 6 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Doyle v Ohio,*
426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Edwards v Arizona,*
451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19

*Estelle v Williams,*
425 US 501, 504, 96 S Ct 1691, 48 L Ed 2d 126 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Fuller v Anderson,*
662 F2d 420, 424 (CA6 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Goodwin v Balkcom,*
684 F2d 794 (CA 11 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Jackson v Virginia,*
43 US 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*McKinney v Rees,*
993 F2d 1378, 1380 (CA 9, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Michelson v United States,*
335 US 469, 475-6; 69 S Ct 213, 218-219; 93 L Ed 168 (1948) . . . . . . . . . . . . . . . . . . . . . . 27

*Minnick v Mississippi,*
498 US 147, 111 S Ct 487, 112 L Ed 2d 489 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v Bahoda,*
448 Mich 261, 282; 531 NW2d 659 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v Carbin,*
463 Mich 590, 599-600; 623 NW2d 884 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v Carines,*
460 Mich 750; 597 NW2d 130 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 26

*People v Cipriano,*
431 Mich 315 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v Crawford,*
458 Mich 376, 582 NW2d 785 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*People v Davis,*
102 Mich App 403 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*People v Ellison,*
133 Mich App 814, 820; 350 NW2d 812 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v Engelman,*
434 Mich 204, 453 NW2d 656 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v Ewoldt,*
7 Cal 4th 380, 867 P2d 757, 27 Cal Rptr 2d 646 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v Gallon,*
121 Mich App 183, 187 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v Ginther,*
390 Mich 436 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20, 25

*People v Golochowicz,*
413 Mich 298, 319 NW2d 518 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30

*People v Grant,*
445 Mich 535; 520 NW2d 123 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v Griffin,*
235 Mich App 27, 597 NW2d 176 at 31, 180 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v Hampton,*
407 Mich 354 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v Hoag,*
460 Mich 1, 6; 594 NW2d 57 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v Holt,*
207 Mich App 113, 122; 523 NW2d 856 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v Killingsworth,*
80 Mich App 45; 263 NW2d 278 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*People v Legrone,*
205 Mich App 77, 82-83; 517 NW2d 270 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v McReavy,*
436 Mich 197, 207 fn. 2; 462 NW2d 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v Paintman,*
412 Mich 518 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*People v Patterson,*
428 Mich 502, 514 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v Pickens,*
446 Mich 298, 302-03; 521 NW2d 797 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v Sabin,*
463 Mich 43, 614 NW2d 888 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v Snyder,*
462 Mich 38, 609 NW2d 831 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v Stanaway,*
446 Mich 643, 687; 521 NW2d 557 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v Starr,*
457 Mich 490, 577 NW2d 673 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v Swan,*
56 Mich App 22, 35; 223 NW2d 346 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v Thomas,*
184 Mich App 480, 481 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*People v VanderVliet,*
444 Mich 52, 508 NW2d 114 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*People v Williams,*
240 Mich App 316, 614 NW2d 647 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v Wolfe,*
441 Mich 501, 514, 489 NW2d 748, 751 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Powell v Alabama,*
287 US 45, 71; 53 S Ct 55; 77 L Ed 158 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Smith v Dugger,*
911 F2d 494 (CA 11 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Smith v Phillips,*
455 US 209; 102 S Ct 940; 71 L Ed 2d 78 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Strickland v Washington,*
466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v Carter,*
236 F3d 777, 786 (CA 5 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v Daniels,*
248 US App DC 198, 205; 770 F2d 1111 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v Lail,*
846 F2d 1299, 1301 (CA 11 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v Merriweather,*
78 F3d 1070 (CA6 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v Myers,*
550 F2d 1036, 1045 (CA 5 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v Olano,*
507 US 725; 113 S Ct 1770; 123 L Ed 2d 508 (1993). . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v Villabona-Garnica,*
63 F3d 1051, 1058 (CA11 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

v

*Washington v Hofbauer,*
228 F3d 689 (CA 6 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23


**Constitutional Provisions, Statutes, and Court Rules**

Const 1963, art 1, § 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 32

Const 1963, art 1, § 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

MCR 7.203(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MRE 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

MRE 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

MRE 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 28, 31, 32, 34

US Const, Am V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

US Const, Am VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

US Const, Am XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

## I. Statement of Jurisdiction

This Court has jurisdiction pursuant to MCR 7.203(A) as an appeal of right from a judgment of sentence entered in the Macomb County Circuit Court, the Honorable Matthew Switalski presiding, on April 19, 2007, on convictions for felony murder, carjacking, and UDAA. A claim of appeal was filed on May 4, 2007.

## II. Statement of Questions Involved

1.    Whether it was error to admit statements allegedly made by Mr. Hendrix where Mr. Hendrix had, on separate occasions, invoked his right to counsel, to remain silent, and had made an invalid *Miranda* waiver.

2.    Whether the prosecution committed misconduct by using Mr Hendrix's alleged statements against him and by misstating the substance of those statements, thus providing him of his due process right to a fair trial.

3.    Whether Mr. Hendrix was denied the effective assistance of his attorney where his counsel failed to object to the introduction of Mr. Hendrix's statements or the prosecutorial misconduct.

4.    Whether the trial court erred in permitting the introduction of other acts evidence to prove Mr. Hendrix's identity where there was insufficient similarity between the other acts and the crime in this case, thus violating Mr. Hendrix's due process right to a fair trial.

5.    Whether there was insufficient evidence to support Mr. Hendrix's convictions.

### III. Statement of Facts

Defendant-Appellant, Joseph Hendrix, was convicted by a jury in the Macomb County Circuit Court, the Honorable Matthew Switalski presiding, of felony murder, carjacking, and UDAA. The trial court sentenced Mr. Hendrix to a mandatory non-parolable life term on April 19, 2007.

This case arose from the death of Evangeline Doen, after the car that she was a passenger in was stolen from the parking lot of a strip mall. Gina Doen, Evangeline's daughter, drove Evangeline in a minivan to the local dry cleaners, and she left Evangeline in the car while she ran in to drop off some clothes for cleaning. When Gina came out, the minivan was gone, and Evangeline was lying in the middle of the parking lot with a head injury. There was no video surveillance of the area. There were no witnesses. Evangeline herself identified the perpetrator as a tall blonde man with glasses – a description that did not match Mr. Hendrix. However, because Mr. Hendrix was arrested six hours later alone in the minivan, he was the prime suspect. Because Mr. Hendrix was arrested in a crack dealing area of Detroit, the prosecution's theory was that Mr. Hendrix stole the car in order to get to Detroit to get drugs. Because even the police witnesses testified that stolen cars will often exchange hands multiple times between drug users and drug dealers within hours of being stolen, the prosecution introduced 404(b) evidence of other car thefts involving Mr. Hendrix to prove his identity as the car thief in this incident. Unfortunately, ten days after the theft of the minivan, Evangeline Doen died in the hospital.

At trial, the Prosecution called its first witness, Lee Doen, Evangeline's son (T 3/20, p. 85 – 87). Evangeline, died on September 15, 2006 (T 3/20, p. 87 – 88).

The Prosecution called Maureen Scott, one of the 404(b) witnesses. On August 31, 2006, she drove a 2006 Explorer and someone stole it in front of a Little Caesar's Pizza on 22 and Van

Dyke (T 3/20, p. 93 – 95). She left her keys in the car, in the ignition, with the car unlocked and no one else in the car (T 3/20, p. 95 – 96).

The Prosecution called Officer Brian Kirk[1]. He was involved in the recovery of a 2006 Ford Explorer that was taken from a Little Caesar's parking lot on August 31, 2006, and when he inspected the vehicle and found "two inmate bracelets, an arraignment sheet from 41-A District Court, and a cell phone with no battery" (T 3/20, p. 176 – 178). The bracelets and arraignment sheet said they belonged to Joseph Hendrix, the Defendant (T 3/20, p. 180-81).

The next witness was Louie George, another 404(b) witness. On September 3, 2006, he was at 7-11 at Auburn and Ryan (about a mile from where Mrs. Scott's vehicle was taken) when his 2005 Dodge Ram was stolen while parked in front of the store with the keys inside and the doors unlocked (T 3/20, p. 99 – 102). Mr. George called the police and his truck was eventually found in Detroit (T 3/20, p. 103).

The Prosecution called Jeffrey Piontkowski, another 404(b) witness. On December 3, 2002, he drove a 1985 GMC to a restaurant on Van Dyke between 21 and 22 Mile Roads where it was stolen from where he parked it; the keys were underneath the seat and the doors unlocked (T 3/20, p. 104 – 107). Mr. Piontkowski saw a white man driving his vehicle when he exited the restaurant (T 3/20, p 107 – 108). Mr. Piontkowski tried to get in his car as it was being taken and he got one hand and one foot in the door but then the vehicle drove off onto Van Dyke and "threw [him] out in the center lane" (T 3/20, p. 108). Mr. Piontkowski then contacted the police, and Mr. Piontkowski got his vehicle back the next day (T 3/20, p. 108 – 109).

The court admitted exhibits evidencing Mr. Hendrix's plea and conviction for stealing Mr.

_____

[1] Appellant is placing some testimony out of chronological order because it makes more sense to keep the 404(b) testimony together.

4

Piontkowski's truck (T 3/20, p. 110-11).

The Prosecution called Officer James Osterland, who was working on September 5, 2006, in Shelby Township and was dispatched to the Vineyards strip mall on a UDAA (T 3/20, p. 111 – 113). Officer Osterland said he arrived at the mall at around 7:50 p.m. and that he arrived simultaneously with Officer Wathen (T 3/20, p. 113 -114). When he arrived, EMS was treating Evangeline on the pavement(T 3/20, p. 114 – 115). Evangeline was taken to Troy Beaumont Hospital (T 3/20, p. 118). Officer Osterland stood at the foot of her hospital bed (T 3/20, p. 118 – 119). Evangeline told the nurse "that a man got into the vehicle that she was in and pushed her out" (T 3/20, p. 119).

On cross-examination, he testified that the decedent said that "the male that pushed her out could possibly have been wearing glasses, could possibly have been wearing a brown T-shirt" and he thought she said he had brown, not blonde, hair but he didn't have his report to check (T 3/20, p. 122).

On redirect, he testified the decedent indicated that she was sitting in the front seat of the minivan when a white man maybe with glasses and maybe in a brown t-shirt got in the car. She told him he had the wrong car and he told her to get out. As she was struggling with her seatbelt, he started backing up and pushed her out of the vehicle (T 3/20, p. 125).

Detroit Police Officer Kyle Bryent testified that on September 6, 2006, the day after the day in question, at approximately 1:30 am he came across a 2003 burgundy Dodge Caravan that was speeding in Detroit (T 3/20, p. 138 – 140). The minivan was stopped at a gas station when Officer Bryent approached the driver and initiated an investigation; thiswas in a neighborhood where it is common to find crack cocaine houses (T 3/20, p. 142). Mr. Hendrix was driving and didn't give any reason why he was in possession of the minivan when the Officer approached him, but Officer

5

Bryent had arrested the Defendant before in that same area (T 3/20, p. 146).

On cross-examination, he testified that there were no glasses found in the vehicle (T3/20, p. 147 -148). It is common for people who smoke crack to exchange vehicles for crack or rides and common for people from the suburbs to go to that area for crack, exchange their car for some, and then falsely report it stolen (T 3/20, p. 148 -149). It is also common for any stolen vehicle, not just those stolen by crack addicts, to be passed around to several individuals prior to it being recovered (T 3/20, p. 149). Officer Bryent said the Defendant had brown hair on the date in question (T 3/20, p. 152).

Officer Jason Zuk testified that he lifted latent prints from the minivan (T 3/20, p. 158). The latent prints he took from the rearview mirror and sliding door were identified as being made by the right hand palm of the Defendant (T 3/20, p 166).

On cross-examination, he testified that he lifted five more fingerprints but they were not matched to the Defendant or Ms. Doen (T 3/20, p. 171).

The Prosecution called Gina Doen, the daughter of the decedent (T 3/20, p. 185 – 186). On the date in question Ms. Gina Doen picked up the decedent at 4:00 pm in her 2003 red Caravan and her daughter, Alissa, was in the car with them (T 3/20, p. 188- 189). On the way back to Gina's house they stopped at the Vineyard's strip mall and she and her daughter went into Q Cleaners while the decedent stayed in the Caravan (T 3/20, p. 189 – 190). Gina left the keys to the car in the ignition, and the doors were unlocked (T 3/20, p. 191 – 192). Gina was in the cleaners for about five minutes and as she walked out, she caught a glimpse of Evangeline lying on the ground (T3/20, p. 192). Gina ran to her mother because she thought she was hurt and then noticed that her minivan was gone (T3/20, p. 193). Gina called the police on her cell phone and it took them about five minutes to arrive (T3/20, p. 194). The decedent was in intensive care for ten days and died on

6

September 15, 2006 (T 3/20, p. 195).

On cross-examination, she testified that when she got the van back she found a makeup bag, a couple hats that were not hers, and she thought a rag also (T 3/20, p. 196 – 197). She gave those items to the police and told them they were not hers and then agreed with the Defense counsel that the items were a black and beige baseball-style hat, a black knit hat, a white do-rag, and a watermelon-style makeup bag (T 3/20, p. 197).

On redirect examination, Gina testified that she did not know a woman named Michelle Zlatevski and didn't talk to the Defendant about the fact that this woman may be his ex-girlfriend and these items might be hers (T 3/20, p. 198).

On recross-examination, she testified that she has never heard the name Michelle Zlatevski before today (t 3/20, p. 198 – 199).

The Prosecution called Officer Matthew Lashbrook. He was the officer who first saw the Explorer that belonged to Ms. Scott as it was crashed into a telephone pole shortly after his shift started at midnight on September 1, 2006 (T 3/21, p. 7 – 9). Officer Lashbrook noted that this Explorer was found about two blocks from where the Caravan was found, and the other vehicle that was stopped on September 3, 2006, was also close to where the Caravan was found (T 3/21, p.11). Officer Lashbrook classified the area where these cars were found as "poor" and full of "drug houses" (T 3/21, p. 12).

On direct examination, Officer Rufus Stewart testified that he effected a traffic stop on a burgundy Dodge Ram in Detroit on September 3, 2006, and Mr. Hendrix was alone inside. After running a check, he found that the vehicle was stolen so he took Mr. Hendrix into custody (T 3/21, p. 12 – 14). Officer Stewart noted that this Dodge Ram was found two blocks from where the August 31st vehicle was found (T 3/21, p. 16 – 17). The area where it was found is "a known

7

narcotics area" (T 3/21, p. 17).

On cross-examination, he acknowledged that drug addicts trade cars for sex, drugs, and other things in this area (T 3/21, p. 17 – 18).

The Prosecution called Dr. Brent Todd, who worked at Beaumont Hospital in Troy and was involved in the treatment of the decedent, Evangeline Doen, between September 5th and 15th (T 3/21, p. 19 – 20). The decedent suffered from a subdural hematoma or bleeding within the skull around the brain which can cause death from the pressure that puts on the brain (T 3/21, p. 20 – 21).

On cross-examination, Dr. Todd testified that he could not tell how she got the injury (T 3/21, p. 26).

The Prosecution called Shelby Township Police Officer Andrew Gammicchia. On December 3, 2006, at 5:50 p.m., he saw a GMC truck driving "very reckless[ly]" and at a high rate of speed, learned that it was stolen, so he turned on his overhead lights (T 3/21, p. 27 – 30). The driver of the truck did not stop but instead circled around and accelerated back towards the Officer (T 3/21, p. 30 – 31). The driver then stopped the truck before reaching the main road, Van Dyke, and jumped out of the truck and fled between houses. His footprints in the fresh snow lead directly to a house on Paxton that was Mr. Hendrix's house, but when the Officer knocked on the door, his mother said he wasn't there (T 3/21, p. 32 – 33).

The Prosecution called Lieutenant Dan Heythaler, who was employed with the Macomb County Sheriff's Office and was an undercover officer for two years in the drug enforcement unit (T 3/21, p. 37). It is common for drug addicts to steal cars so they can get to the area where the drugs are and so that they have a car to exchange for drugs once they get there; those stolen cars are really "crimes of opportunity" (T 3/21, p. 38 – 39). A person who steals cars for profit, as part of a car theft ring where orders are taken for specific cars is more likely to steal from an area other then

8

where he lives or works whereas a person who is stealing a car and dumping the car, just to have transportation so that he can get drugs, usually steals it from someplace close to his home or work (T 3/21,p 40 – 41).

On cross-examination, he testified that it is a viable scenario that a crack addict would find an abandoned vehicle that was previously involved in a serious crime and not knowing that, take the vehicle for the purpose of going to get his crack (T 3/21,p .52 – 53).

The prosecution called Dr. Bernardino Pacris who preformed the autopsy on the decedent on September 15, 2006, and found that her death was caused by "blunt force head trauma with complications, contributory to the cause of death is hypertensive and arteriosclerotic cardiovascular disease" (T 3/21, p. 62). The Doctor described where the injury to the head was exactly and noted that to cause that type of injury to the subcutaneous tissue of the skull it would have had to have been a "decent fall like from the back of your head with the concrete" (T 3/21, p. 63). Her injuries were consistent with being pushed or falling from a minivan (T 3/21,p. 63 – 64).

The Prosecution called Shelby Township Sergeant Brad Ferguson (T 3/21, p. 73- 74). Sergeant Ferguson and Sergeant Muszynski took the Defendant into custody on September 6, 2006. While they were driving in the scout car, he was read his Miranda Rights and acknowledged his rights, so Sergeant Muszynski questioned him about how he gained possession of the 2003 Dodge Caravan (T3/21,p. 75- 76). Mr. Hendrix stated that he didn't know how he got the Caravan and that he didn't know what to say (T 3/21,p. 76 – 77). In Sergeant Ferguson's seventeen years of experience he would have expected the Mr. Hendrix to give some explanation as to how he got the vehicle but he got none and he noted that the Mr. Hendrix appeared "very nervous" (T 3/21, p. 77 – 78).

On cross-examination, he testified that when he picked up the Defendant, the Sergeant was

9

aware that the decedent was injured and she was "critical" and at Beaumont Hospital (T 3/21, p. 78 – 79).  The Sergeant reviewed the report filed by his partner on the night in question to refresh him memory then continued that he still didn't remember a part of the conversation where Mr. Hendrix said he didn't know what to say because the Detroit PD had said there may be other charges (T 3/21, p. 80 – 82).

The Prosecution called, Shelby Township Detective Terrence Hogan (T 3/21,p. 84).  Det. Hogan interviewed Mr. Hendrix about a possible alibi at the Macomb County Jail (T 3/21,p. 88). Mr. Hendrix did not want to tell the Detective where he was on September 5, 2006, at about 6:50 pm[2] but did eventually say he was in Sterling Heights and made a phone call from a 7-11 (T 3/21,p. 90).  Det. Hogan took Mr. Hendrix's unwillingness to tell him where he was during the carjack to mean that he was afraid to say he was the one who pushed the decedent and stole the car, and even in a general sense not telling one's whereabouts to clear oneself of such serious assault and potential homicide charges was unexpected (t 3/21,p. 92 – 93).  There were three car thefts between August 31st and September 5th and there had been none since September, or since the Mr. Hendrix has been in custody, with that modus operandi, i.e. unlocked with the keys inside (t 3/21,p. 96).  Det. Hogan would say the same person committed the four car thefts at issue given their similarities (T 3/21,p. 97).

Before the jury was brought in after lunch the Defense objected to the Detective's answer that the Defendant had been in custody since the 6th and that there had been no more such car thefts (T 3/21,p. 99- 100).  The court denied the motion (T3/21,p. 101 – 102).

On cross-examination, Det. Hogan testified that Mr. Hendrix told him that the video would

---

[2]6:50 pm was not the time of the incident.  The incident happened at approximately 7:45 pm.  Therefore, the discussion regarding the 6:50 pm phone call was not an "alibi" discussion.

clear him but he didn't know why Mr. Hendrix thought there would be a video (T 3/21,p . 104 –
105). Mr. Hendrix didn't indicate where he was going when he was arrested in the minivan or give
any information about his residence and basically denied everything and didn't give any information
(T 3/21,p. 105). A beige and white cap, a black knit hat, a white do-rag, and a make up bag were
all retrieved from the 2003 Caravan and there were no prints retrieved from the makeup bag and the
report on the other three items has not come back yet (T 3/21,p. 105 – 106). There were no
indications that there was a telephone call from the pay phones around the Vineyards market to Mr.
Hendrix's grandmother's house (T 3/21,p. 109). Mr. Hendrix's grandmother said she remembered
a phone call from Mr. Hendrix on the date in question, but the Detective could not verify that that
call was made from the Vineyards or the 7-11 at Auburn and Ryan (T3/21,p. 109 – 110). The
Detective remembered that the decedent described the car thief as a "tall, thin, white male with
possible glasses, and … possible blonde hair .. and some mention about a brown shirt" (T 3/21,p.
111 – 112).

On redirect-examination he testified that the Defendant said, "I don't think I'm going to say
anymore, because I don't want to get into anymore trouble" or something to that effect (T 3/21,p
.116 -117). Mr. Hendrix wouldn't tell the Detective what 7-11 he called from in Sterling Heights
but if he had been told he could have followed up on that information (T 3/21,p .117 – 118). The
Detective talked to Michelle Zlatevski, the Defendant's girlfriend, and she said that there was a
"very strong likelihood" that the purse in the car was hers (T 3/21,p .121).

On recross-examination he stated that he was convinced the purse was Ms. Zalatski's after
he talked to her because she described the bag before he told her a description of the bag they had
(T 3/21, p. 122 – 123).

The jury found Mr. Hendrix guilty of carjacking, guilty of felony murder, guilty of

11

unlawfully driving away a motor vehicle (T 3/22, p. 12 – 13).

Mr. Hendrix now appeals by right to this Court.

# IV.  Argument

**A.**   **It was error to admit statements allegedly made by Mr. Hendrix where Mr. Hendrix had, on separate occasions, invoked his right to counsel,  to remain silent, and had made an invalid *Miranda* waiver.**

<u>Standard of Review and Issue Preservation</u>

This issue was not preserved.  Mr. Hendrix is raising  as a separate issue that his counsel was ineffective for his failure to raise this issue, and Mr. Hendrix requests a remand for an evidentiary hearing and *Ginther* hearing, as necessary.  *People v Ginther*, 390 Mich 436 (1973).

If there was no trial objection review is by the standard for unpreserved constitutional errors, namely, plain error.  *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999).  The defendant must show a plain error that affected substantial rights.  The reviewing court should reverse when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.  *People v Grant*, 445 Mich 535; 520 NW2d 123 (1994); *United States v Olano*, 507 US 725; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

<u>Discussion</u>

This issue was not preserved for appellate review, and it is the subject of a separate ineffective assistance of counsel claim as described below, Also, Appellant is requesting a remand for an evidentiary hearing and a *Ginther* hearing on this issue, as necessary.  As an offer of proof, Mr. Hendrix submits with this brief the police report of Detective Terrance Hogan dated September 6, 2006, in which Detective Hogan states:

> At approx 7:30 a.m. I escorted Hendrix from the Shelby Twp cell block to the interview room.  I advised Hendrix of his rights off the Shelby Twp advise [sic] of rights forms.  Hendrix refused to speak with me until he had the opportunity to speak with an attorney.  I returned Hendrix to the cell block without any further questioning.

*See* Exhibit A.   In addition, the advice of rights form from that same interview indicates that Mr.

13

Hendrix requested an attorney. *See* Exhibit B.

Nevertheless, at trial, the prosecution introduced a separate advice of rights form from two days later indicating that Mr. Hendrix had been advised of his rights but refused to acknowledge them. *See* Exhibit C. In his supplemental police report, Detective Hogan states that he apparently ignored Mr. Hendrix's request for counsel in initiating this September 8th interrogation: "On 9/8/06 myself and D/Sgt. Muszynski again tried to interview suspect Joseph Hendrix." *See* Exhibit D. Detective Hogan testified about Mr. Hendrix's alleged statements to him during this in-custody (at the Macomb County Jail) interrogation, despite the fact that Mr. Hendrix had requested counsel two days earlier. *See generally* T 3/21, p. 84-123.

And the prosecution battered Mr. Hendrix with his statement (or lack thereof) in closing argument. *See* Exhibit E, closing argument, and Exhibit F, rebuttal closing argument. For example, the prosecution stated:

> What's more important now is Detective Hogan's interview with him on September 8 at the Macomb County Jail. Detective Hogan says a woman was badly injured, pushed out of that minivan and she might die, and this is your opportunity to tell what happened. In other words, maybe not verbalize precisely as follows goes like this:
>
> Tell me where you were, give me an alibi, who were you with, and how did you obtain the vehicle? Because if you can give me that information, then I can investigate it, and I can clear you. There's no question to fourteen of you that if Defendant had an alibi for his whereabouts say between 6:00 p.m., 7:30 p.m., he wouldn't have been charged. The alibi would have been investigated, and if true, he wouldn't be charged with this carjacking. Where was he? Ask yourselves where was he? We're not asking where he was from 3:00 a.m. to 5:00 a.m., where he might have been sleeping alone where nobody knows. Everybody knows where he was and where she was two days earlier, or three days earlier, during the evening, everybody knows that. Now, he's in the County Jail, knows he's been arrested for a crime in connection with this car theft, carjacking, yet, and he's had time to think about it too, and here comes Terry Hogan. Now, the defense, not Mr. Sheikh, he's a great guy, but the Defendant

14

might be thinking well, Hogan is my enemy, Hogan just wants to frame me. But, Hogan wants to find out who did this. This is a serious case where a woman might die. And she did die. Hogan wants to know who did it. The Defendant has the alibi, and the alibi can be verified. Alibis easily can be verified. For example, what if Defendant were at home and engaged in a long telephone call: The telephone bills would support that, that he was on the phone from say six to eight p.m., or if he went to a restaurant, saw him use a credit card, that could be verified. If he's at a friend's house, a relative's house, that all could be verified. The point is if he had an alibi, he would have told Detective Hogan. But, there is no alibi. And you know why there's no alibi? Because there is no alibi. He has none. He has none. There is no doubt in this world that if had an explanation for where he was at that time, on that day, we would know it. He would have told Sergeant Ferguson, and if not Sergeant Ferguson, he would have told Detective Hogan. When he can't tell he where he is, what does that mean? Because he wasn't anywhere other than Vineyard's parking lot at around 6:50 p.m. Committing his thefts by his unique modus operandi. . . He's not some 16 year old kid, somebody facing his first trouble with the law. He's been around. He knows the drill. And he has heard from Detective Hogan that the woman might die. Now, ask yourselves, would anybody with any intelligence know that he's about to face a very serious charge, carjacking, and felony murder if the woman dies. If your not the person who took the car at Vineyards, your going to be clambering, be wailing. Detective, let me tell you what happened. This is how I got the car, Detective. I didn't want to say anything before, but here's how it happened. Never. Not one word. He says, oh, I don't want to say anything more, because it will get me into trouble. He tells Sgt. Ferguson, I don't know how I got the minivan. He knows, he's the thief.

T 3/21/07 p. 141-44.

They [the police] did what they could, and finally the Defendant had an opportunity to tell us what happened on September 6 and September 8, and he didn't. His silence is defining, his silence speaks a thousand words. His silence in refusing to say from where he made the call, how he obtained the vehicle, and who he was with during the important times. That's like a thunderbolt from the sky. In other words, he's saying, I did it. Because if I didn't do it, I'll tell you why. And by the way here we are, six months and 16 days since the incident. And have you been presented with an alibi witness for the Defendant? No. Not one. Not one who can say he or she was with the Defendant, 5:00, 6:00, 7:00, 8:00. Not one. And what does

15

that tell you?  It tells you nobody was with him.  You know, his mother was willing to lie for him on December 3 of 2002 when Officer Gammicchia arrived at her door.  He said, hey, where's Joseph Hendrix (indicating)?  He's not here.  She's not willing to lie under oath.

T 3/21/07 p. 165-66.

The trial court, to its credit, made an effort to *sua sponte* correct the prosecutor's misconduct in using Mr. Hendrix's silence against him by informing the jury directly following the prosecutor's rebuttal that the jury could not draw any adverse inference from the fact that Mr. Hendrix chose not to testify at trial; however, the trial court specifically drew a distinction between Mr. Hendrix's silence in court and his silence while in custody, instructing the jury that it could draw an adverse inference from his in-custody silence.  T 3/21/07 p. 166.  Because Mr. Hendrix had invoked his right to counsel and his right to silence, this was improper and the jury should not have been allowed to hear of Mr. Hendrix's alleged statement, let alone draw an adverse inference from it.

Under *Edwards v Arizona*, 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981); and *People v Paintman*, 412 Mich 518 (1982), once an in-custody suspect requests counsel during an interrogation, the police must immediately cease questioning and may not resume questioning unless the suspect initiates the renewed questioning.  When the police do renew the questioning after a request for counsel, admission of any statement by the suspect, even if there has been a *Miranda* waiver, violates the Fifth Amendment.  As *Edwards* held, "[A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85.

In *Edwards*, the accused was arrested and questioned while in custody.  After waiving his *Miranda* rights and answering some initial questions, he stated that he wanted to speak to an

16

attorney. At that point, the interrogation ceased. The next day, two other police officers came to see Mr. Edwards. After he first told them he didn't want to speak to them, they persisted, again reading to him his *Miranda* rights. Mr. Edwards at that time agreed to speak to the officers, and made an oral waiver of his right to counsel. His confession was later admitted at trial.

On review, the United States Supreme Court held the purported waiver of the right to counsel at the second interrogation was constitutionally invalid. Citing to language in *Miranda* to the effect that once the accused asserts the right to silence or to counsel, all questioning must cease until an attorney is present, the Court found this requirement cannot be overcome by an argument that the accused later agreed to speak without counsel:

> We now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that cannot be established by showing only that he responded to further police-initiated custodial interrogation **even if he has been advised of his rights**. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 US at 484-485 (emphasis added).

This purported waiver is what happened in Mr. Hendrix's case. Mr. Hendrix refused to sign the waiver form given to him on September 8, 2006. *See* Exhibit C. Everything about Mr. Hendrix's discussions with the police indicates a man who did not want to talk to the police about the incident. He told them that he wanted an attorney. He told them that he didn't want to talk because he didn't want to get into more trouble. Mr. Hendrix's case is stronger than even those defendants who have purportedly waived their *Miranda* rights following a request for counsel because Mr. Hendrix did not waive those rights. Nevertheless, even after a request for counsel and a *lack* of waiver, the police continued to interrogate him, and the prosecution introduced that

17

statement at trial.

The *Edwards* rule has been upheld and expanded in several subsequent decisions from the United States Supreme Court. In *Arizona v Roberson*, 486 US 675, 108 S Ct 2093, 100 L Ed 2d 704 (1988), the Court held that no exception to *Edwards* exists where the police want to re-interrogate an accused about an offense different than the offense in question during the initial interrogation. The Court in *Roberson* extolled the value of the bright-line rule expressed in *Edwards*, and commented:

> The bright-line, prophylactic *Edwards* rule benefits the accused and the State alike. **It protects against the inherently compelling pressures of custodial interrogation suspects who feel incapable of undergoing such questioning without the advice of counsel, by creating a presumption that any subsequent waiver of the right to counsel at the authorities' behest was coercive and not purely voluntary**. Moreover, it provides clear and unequivocal guidelines that inform police and prosecutors with specificity what they may do in conducting custodial interrogation, and that inform courts under what circumstances statements obtained during such interrogation are not admissible.

486 US at 681 (emphasis added).

In *Minnick v Mississippi*, 498 US 147, 111 S Ct 487, 112 L Ed 2d 489 (1990), the Court held that the mere fact an attorney has been appointed and has consulted with the accused does not permit the police to reinitiate contact with the accused, outside the presence of the attorney, and seek to get a *Miranda* waiver. After a thorough review of *Edwards* and its subsequent cases, the *Minnick* Court ruled:

> These descriptions of *Edwards'* holding are consistent with our statement that preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny. . . . Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

498 US at 153.

18

In Michigan, the *Edwards* ruling has been consistently applied to bar admission of custodial statements where the police did not honor a request for counsel. In *People v Paintman*, 412 Mich 518 (1982), the accused asserted their respective rights to counsel, but were later interrogated without having an opportunity to consult with any attorney. The Supreme Court found the subsequent *Miranda* waivers invalid, under *Edwards* and *Miranda*. In neither situation did the accused initiate further contact with the police, or seek to revoke the prior assertion of the right to counsel until again approached by the police. The *Paintman* Court stated:

> Of what significance is invocation of a cherished constitutional right if it is ignored by the hearer and, in fact, only seems to exacerbate the defendant's plight? . . . *Miranda* becomes meaningless rhetoric in the face of a request for counsel that matures only in form but not in substance.

412 Mich at 529-530.

In addition to the September 8th statement, the September 6th statement is also in question. While that statement was not as significant, there was testimony that the police asked Mr. Hendrix where he got the stolen car and he said that he didn't know. *See* T 3/21 p. 74-78. However, the prosecution's theory was that Mr. Hendrix stole the car to go to Detroit to get drugs, and the police testified that Mr. Hendrix was apprehended in the car at 1:30 in the morning in a crack area of Detroit. *See e.g.*, T 3/20 p. 138-42. This raises the question of Mr. Hendrix's state of mind at the time that he allegedly waived his *Miranda* rights and made this September 6th statement. If he was under the influence of narcotics, his waiver could be invalid, thus rendering his statement inadmissible. In *People v Cheatham*, 453 Mich 1, 27 (1996), the Court re-affirmed that "[t]he burden is on the state to prove by a preponderance of the evidence that the suspect properly waived his rights." In addition, proof of a waiver requires "evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel,

19

and that the state could use what he said in a later trial against him." *Id*, p 29. In *People v Cipriano*, 431 Mich 315 (1988), the Court identified intoxication as a factor in determining whether a *Miranda* waiver is valid. *Id.* at 334.

Because these statements were admitted in violation of Mr. Hendrix's constitutional rights, Mr. Hendrix prays that this Court reverse and remand for a new trial or, in the alternative, remand for an evidentiary and *Ginther* hearing as described in the third issue below. *People v Ginther,* 390 Mich 436 (1973).

**B.** **The prosecution committed misconduct by using Mr Hendrix's alleged statements against him and by misstating the substance of those statements, thus providing him of his due process right to a fair trial.**

<u>Standard of Review and Issue Preservation</u>

When reviewing a claim of prosecutorial misconduct in argument, "this Court examines the pertinent portion of the record and evaluates the prosecutor's remarks in context in order to determine whether the defendant was denied a fair and impartial trial." *People v Legrone*, 205 Mich App 77, 82-83; 517 NW2d 270 (1994).

Defense counsel did not object to the prosecutor's arguments. Where no objection was made, an appellate court will review the error "if a curative instruction could not have eliminated the prejudicial effect" or if failure to review "would result in a miscarriage of justice" or "manifest injustice." *People v Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994); *People v Holt,* 207 Mich App 113, 122; 523 NW2d 856 (1994).

The Fifth and Fourteenth Amendments of the United States Constitution and Article 1, § 17 of Michigan's Constitution provide that an individual shall not be deprived of due process of law. Improper prosecution tactics can violate this fundamental protection for the accused, and prosecutors

20

are to refrain from tactics which result in wrongful convictions, and to remain equitable and honest in their presentation of cases. *Berger v. United States*, 295 US 78; 55 S Ct 629; 79 L Ed 1314, 1321 (1935). The touchstone of due process analysis in cases where prosecutorial misconduct is alleged is the fairness of the trial rather than the culpability of the prosecutor. *Smith v Phillips*, 455 US 209; 102 S Ct 940; 71 L Ed 2d 78 (1982).

<u>Discussion</u>

The introduction of Mr. Hendrix's statements itself violates his constitutional rights, but, in addition, the way in which the prosecution misused his statements is a separate issue, both as an impermissible comment on his exercise of his rights and a misstatement of fact. As already detailed above, the prosecution argued extensively regarding Mr. Hendrix's failure to give the police an alibi. A recurring issue was the fact that there was a collect phone call made to Mr. Hendrix's grandmother at 6:50 p.m.– approximately an hour before the incident. Detective Hogan testified that, on questioning, Mr. Hendrix agreed that he made a collect phone call to his grandmother, but declined to give him any details. The prosecution used this testimony to support its attack on Mr. Hendrix's failure to provide an alibi. Mr. Hendrix's whereabouts *an hour before the incident* is only minutely more relevant than his whereabouts a day or two days or ten days before. The prosecution tried to twist this into Mr. Hendrix's failure to provide an alibi when it had nothing to do with an alibi defense.

Both the United States Supreme Court and Michigan law forbid any comment on a defendant's post-arrest exercise of the right to silence. Informing the jury that Defendant was silent, exercising his rights under the Fifth Amendment, was a direct and intentional violation of this Defendant's Fifth and Fourteenth Amendment rights. US Const, Ams V, XIV.

21

While some cases have broadened the use prosecutors can make of pre-trial silence of the accused, the law is still firm that no adverse inference can be raised as to the exercise of post-arrest silence. *See People v McReavy*, 436 Mich 197, 207 fn. 2; 462 NW2d 1 (1990); *Doyle v Ohio*, 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976). Permitting the use of custodial silence to infer guilt would "place an impermissible penalty on the exercise of the accused's right against self-incrimination." *People v Gallon*, 121 Mich App 183, 187 (1982). Prosecutors and police officers have long been presumed to know this rule, and to take careful steps to avoid revealing to jurors the defendant's exercise of silence. *See People v Swan*, 56 Mich App 22, 35; 223 NW2d 346 (1974).

The role of a prosecutor, as a public official, is to see that justice is done and that defendants receive fair trials, not to obtain convictions. *Berger v United States*, 295 US 78, 88-89; 55 S Ct 629; 79 L Ed 1314 (1935). "[A prosecutor] may prosecute with earnestness and vigor," indeed, he should do so. But, "while he may strike hard blows, he is not at liberty to strike foul ones." *Berger*, 295 US at 88.

The prosecutor may only comment on facts in evidence or proper inferences arising from those facts. *People v Ellison*, 133 Mich App 814, 820; 350 NW2d 812 (1984); *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Likewise the prosecutor may not introduce "facts that were never admitted into evidence" because doing so "may mislead a jury in a prejudicial way." *Washington v Hofbauer*, 228 F3d 689, 700 (CA 6 2000) (citing *Berger v United States,* 295 US 78). When the prosecutor misrepresents the evidence it can have a profoundly negative effect on the fairness of trial. This is because "a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *Hofbauer,* 228 F3d at 700. A prosecutor denies the accused a fair trial by making a statement of fact unsupported by the evidence. *United States v Carter*, 236 F3d 777, 786 (CA 5 2001).

The Sixth Circuit disapproved of a prosecutor's mischaracterization of witness testimony when, during closing arguments, the prosecutor stated, "nowhere for the most part based on what happened, has [complainant's] story changed." *Washington v Hofbauer,* 228 F3d 689 (CA 6 2000). The Court held, "the prosecutor engaged in serious misconduct when he characterized [complainant's] story has having been consistent over time when there was no evidence supporting that factual assertion." *Id.*, at 700, 701. While the prosecutor did not overtly bolster the complainant's testimony, the court nonetheless found it "clear that the prosecutor's purpose was to enhance [complainant's] credibility in the eyes of the jury." *Id.* at 701.

The prosecution in this case obviously used Mr. Hendrix's statements and his silence against him. Repeatedly, the prosecution argued to the jury that Mr. Hendrix's failure to provide an explanation to the police was evidence of his guilt. In addition, the prosecution also used the 6:50 p.m. phone call to Mr. Hendrix's grandmother against him as if Mr. Hendrix was claiming this as an alibi that he did not substantiate. This is a misstatement of the facts. First, Mr. Hendrix did not advance the phone call as an alibi. Detective Hogan asked Mr. Hendrix about the phone call, and according to Detective Hogan, Mr. Hendrix responded that he did, in fact, call his grandmother approximately and hour before the incident. This is not an alibi. An alibi is an accounting of one's whereabouts during the commission of a crime. Mr. Hendrix was not advancing an alibi to the police when he explained that he called his grandmother an hour before the incident. He was simply answering the Detective's question. It was a misstatement of the facts and improper for the prosecution to argue to the jury that Mr. Hendrix was claiming an alibi by telling the police about the phone call but then not giving any information about it. It made it seem as though Mr. Hendrix was providing a false alibi that he could not substantiate, when he was not advancing an alibi at all.

Because the prosecution introduced Mr. Hendrix's statements and then misused those

23

statements, Mr. Hendrix prays that this Court reverse and remand for a new trial.

**C.**    **Mr. Hendrix was denied the effective assistance of his attorney where his counsel failed to object to the introduction of Mr. Hendrix's statements or the prosecutorial misconduct.**

<u>Standard of Review and Issue Preservation</u>

An accused's fundament right to representation by counsel includes the constitutional right to effective assistance of counsel. US Const, Am VI & XIV, Const 1963, art 1, §§ 17 & 20; *Powell v Alabama*, 287 US 45, 71; 53 S Ct 55; 77 L Ed 158 (1932); *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The standard of review for ineffective assistance of counsel was set forth in *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001):

> To justify reversal under either the federal or state constitution, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington*, 446 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *See, People v Pickens*, 446 Mich 298, 302-03; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, *supra* at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. *See, People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

<u>Discussion</u>

It has been consistently held that defense counsel's failure to take the proper and evident

24

steps to protect his client's constitutional rights during criminal prosecution constitutes ineffective assistance. *See eg, Smith v Dugger*, 911 F2d 494 (CA 11 1990) (trial counsel's failure to move to suppress defendant's confession constituted ineffective assistance of counsel); *Goodwin v Balkcom*, 684 F2d 794 (CA 11 1982) (trial counsel's failure to move to suppress confession constitute ineffective assistance of counsel where law provided avenue to suppress confession); *People v Thomas*, 184 Mich App 480, 481 (1990) (ineffective assistance to fail to challenge the statement made after what was revealed at the preliminary examination to be an illegal arrest); *People v Davis*, 102 Mich App 403 (1980) (defense counsel's failure to move for a *Walker* hearing was a serious mistake where there was evidence that defendant was so intoxicated he could not effectively waive his *Miranda* rights; remanded for a determination of the seriousness of the error).

Appellant will not reiterate here the arguments made in the previous sections. The error was obvious – the introduction of Mr. Hendrix's statement despite his invocation of his right to counsel and right to remain silent. Also, Mr Hendrix's attorney failed to challenge the introduction of the September 6th statement to the police despite questions regarding Mr. Hendrix's waiver of his *Miranda* rights. In addition, the prosecution hammered Mr. Hendrix again and again with his statements and non-disclosures as substantive evidence of his guilt. It became so egregious that the trial court, *sua sponte*, instructed the jury that it could not consider Mr. Hendrix's failure to testify at trial, but the trial court affirmatively informed the jury that it could consider Mr. Hendrix's silence while in custody. Trial counsel neither moved pretrial nor during trial to suppress the statements nor did he object to the prosecution's tactics.

Mr. Hendrix prays that this Court reverse and remand for a new trial or, in the alternative, remand for a hearing pursuant to *People v Ginther*, 390 Mich 436 (1973).

25

**D.     The trial court erred in permitting the introduction of other acts evidence to prove Mr. Hendrix's identity where there was insufficient similarity between the other acts and the crime in this case, thus violating Mr. Hendrix's due process right to a fair trial.**

<u>Standard of Review and Issue Preservation</u>

The decision whether to admit prior acts evidence under MRE 404(b) is reviewed for an abuse of discretion. *People v Crawford,* 458 Mich 376, 582 NW2d 785 (1998).  While this is the general standard for reviewing evidentiary determinations, the Michigan Supreme Court cautioned that evidentiary issues containing preliminary questions of law are determined *de novo. People v Snyder,* 462 Mich 38, 609 NW2d 831 (2000).  Application of this particular rule requires both factual and legal findings, however, and Michigan courts have not specifically addressed how to handle the various parts of the rule.

The Sixth Circuit's articulation of a multi-part standard of review proves helpful. Under this standard, a trial court's factual conclusion that the other acts occurred is reviewed for clear error. The legal determination that the evidence was admissible for a legitimate purpose is reviewed *de novo*. Lastly, the determination whether the probative value of the other acts evidence outweighs the unfair prejudicial effect is reviewed for abuse of discretion. *United States v Merriweather,* 78 F3d 1070 (CA6 1996).

In addition, as will be discussed below, because the other acts evidence in this case was so pervasive and so prejudicial, the admission of this evidence violated Mr. Hendrix's due process right to a fair trial.  *Cooper v Sowders,* 837 F2d 284 (CA 6 1988).  For this preserved constitutional error, the prosecutor must establish that the error was harmless beyond a reasonable doubt.  *People v Carines,* 460 Mich 750, 774; 597 NW2d 130 (1999).

This issue is preserved for review by trial counsel's objection.  *See* generally 2/3/07 Hearing.

26

## Discussion

Errors which so infect a trial as to render it fundamentally unfair violate the right to due process of law. US Const, Am XIV; Const 1963, art 1, § 17; *McKinney v Rees*, 993 F2d 1378, 1380 (CA 9 1993). *See also Michelson v United States*, 335 US 469, 475-6; 69 S Ct 213, 218-219; 93 L Ed 168 (1948). In *Crawford*, the Michigan Supreme Court emphasized that the ban on character evidence is one which is "deeply rooted in our jurisprudence" and which "'gives meaning to the central precept of our system of criminal justice, the presumption of innocence.'" *Crawford* 384 (quoting *United States v Daniels*, 248 US App DC 198, 205; 770 F2d 1111 (1985)). To that end, it is the prosecution's burden to articulate a proper non-character purpose for the proposed evidence. *Crawford* at 386-7. The court cautioned that "courts must vigilantly weed out character evidence that is disguised as something else." *Id.* at 388.

Michigan uses two frameworks to determine the admissibility of 404(b) evidence; the applicable test depends on the purpose for which the evidence is being offered. *People v VanderVliet,* 444 Mich 52, 508 NW2d 114 (1993); *People v Golochowicz,* 413 Mich 298, 319 NW2d 518 (1982). *VanderVliet* requires:

> (1) that the evidence be offered for a proper purpose under MRE 404(b),(2) is relevant under MRE 302, and (3) its probative value is not outweighed by unfair prejudice under MRE 403.

The *Golochowicz* test is:

> (1) there must be substantial evidence that the defendant actually perpetrated the bad act sought to be introduced; (2) there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act and, in light of the slightly different language of MRE 404(b) we add, opportunity, preparation and knowledge; (3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the

evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice.

Generally speaking, the *VanderVliet* test supplanted the previous, four-part test enunciated by the *Golochowicz* court, at the same time ending the long-standing policy of exclusion relating to similar acts evidence. Nonetheless, Michigan courts still employ the more stringent *Golochowicz* method of analysis when the prosecution seeks to establish identity.[3] The *VanderVliet* court did not overturn *Golochowicz* (as it continues to be cited in Michigan opinions), but rather limited its application: "*Golochowicz* specifically limited its similarity requirement to identity cases." *VanderVliet,* 444 Mich at 70, 508 NW2d at 124. This Court, in *People v Smith,* 243 Mich App 657; 625 NW2d 46 (2000), confirmed this approach by applying the *Golochowicz* test to determine whether modus operandi evidence is admissible.

Traditionally, the scope of the common scheme or plan doctrine ("modus operandi") was limited to situations where the other act evidence tended to demonstrate a single, overall design leading up to the charged offense. *People v Engelman,* 434 Mich 204, 453 NW2d 656 (1990). Each piece of evidence was a step in executing a larger plan. A typical plan case would cover evidence of a series of transactions leading up to an arrest for drug possession with intent to deliver. *People v Williams,* 240 Mich App 316, 614 NW2d 647 (2000).

In *People v Sabin,* 463 Mich 43, 614 NW2d 888 (2000), the court broadened the plan doctrine in holding that "evidence of similar misconduct is logically relevant to show that the

---

[3] Requiring a stricter standard in identity cases is common practice throughout jurisdictions. *United States v Lail*, 846 F2d 1299, 1301 (CA 11 1988) ("The standard for evaluating 404(b) evidence offered to establish identity is particularly stringent"); *United States v Myers,* 550 F2d 1036, 1045 (CA 5 1977) ("a much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove state of mind.")

charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Id*. at 63, 614 NW2d at 899. In endorsing this view, the court noted California's recent expansion of the doctrine, which likewise allows the occurrence of similar acts to be admitted if the common features indicate the existence of a plan rather than a series of spontaneous acts. *Id*. (citing *People v Ewoldt*, 7 Cal 4th 380, 867 P2d 757, 27 Cal Rptr 2d 646 (1994)). But at the same time, the court noted a significant limitation. Throughout the entire opinion, the court emphasized that "evidence of other crimes offered as parts of a plan…is proper only when used to show that the act was in fact done or not done"– when neither criminal intent nor the identity of the actor is in issue. *Ewoldt*, 867 P2d at 764. The *Sabin* court echoed this restriction of plan evidence to cases where "the very act is the object of proof." *Sabin*, 463 Mich at 65, 614 NW2d 900. Thus, in *People v Starr*, 457 Mich 490, 577 NW2d 673 (1998), the other act evidence was admitted to show a scheme in order to prove the charged act was committed. There, it was alleged that the defendant targeted numerous victims and subsequently denied the act.

Michigan courts consistently stress the importance of applying the correct test in admitting other acts evidence. *Smith*, 243 Mich App at 670-672, 625 NW2d at 54. Since the underlying purpose was to prove Mr. Hendrix's identity as having committed the acts, *Golochowicz* is the applicable test.

Under *Golochowicz*, admission of the evidence was error because there was no special quality shared between the thefts. More importantly, perhaps, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice – a principal requirement of both tests.

For introduction of modus operandi evidence, courts unanimously agree the focus should be

29

on uniqueness and that "much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The commonality of circumstances must be so unusual and distinctive as to be like a signature." *Golochowicz,* 413 Mich at 310, 319 NW2d at 522.

In the instant case, the crimes were not similar enough, and the other acts do not show a signature trait. The prosecution argued that the other acts were similar enough because they involved taking cars from the same general vicinity, while unlocked, and with the keys in the ignition. The problem is that this does not establish the type of uniqueness necessary under the case law. As the police testified in this case, there are more professional type car thefts in which the thieves target particular cars and then there are "crimes of opportunity" thefts, like those involved in this case. What the prosecution established at best was that Mr. Hendrix was in the second half of car thieves – an opportunist. It did not establish that he had any special signature or modus operandi.

Finally, the testimony regarding the other acts was more prejudicial than probative. The evidence against Mr. Hendrix was already weak. Mr. Hendrix was arrested in the minivan, but even the police testified that stolen cars, especially amongst drug users and dealers, exchange hands multiple times within hours of being stolen. The decedent's description of the perpetrator did not match Mr. Hendrix. In this context, introduction of the evidence that Mr. Hendrix had previously stolen other vehicles would tend to focus the jury on Mr. Hendrix's past actions rather than the evidence against him in this case.

## The "In-Custody" 404(b) Testimony

There was a portion of the 404(b) testimony that deserves special attention. When Det. Hogan was testifying, he stated that since the September 5th incident, there had been no similar car thefts because Mr. Hendrix was in custody. T 3/21 p. 96. Outside the presence of the jury, defense

counsel objected, but the trial court overruled.  T 3/21 p. 99-102.

First, the Supreme Court in *Estelle v Williams*, 425 US 501, 504, 96 S Ct 1691, 48 L Ed 2d 126 (1976), held that the Constitution forbids states from compelling the accused in a criminal trial from appearing before the jury in prison clothing "because of the possible impairment of the presumption [of innocence] so basic to the adversary system."  Generally, the rule of *Estelle* does not apply to every "utterance of the words [jail, prison, or arrest]," without reference to context or circumstances. *United States v Villabona-Garnica,* 63 F3d 1051, 1058 (CA11 1995) (internal quotation marks omitted).

However, in Mr. Hendrix's case, Det. Hogan's statement was not simply a passing statement as part of a larger story – it was a statement *with a point*.  The prosecution and Det. Hogan were using the fact of Mr. Hendrix's incarceration as evidence to be used against him by the jury.  This distinguishes its use from the passing reference that has been found not to be error in other cases.

In addition, it runs afoul of other evidentiary rules.  It is not proper 404(b) evidence because it is not an act of Mr. Hendrix.  Det. Hogan was testifying about something that Mr. Hendrix *didn't* do.  It is not relevant because there are too many unknown reasons why there would not be other thefts – including the fact that the true thief would be afraid to take the risk after having injured Ms. Doen.  Because of the numerous reasons, and because of the prejudice associated with informing the jury that Mr. Hendrix was in custody, introducing such testimony was also more prejudicial than probative.

For these reasons, Mr. Hendrix prays that this Court reverse and remand for a new trial.

**E.**     **There was insufficient evidence to support Mr. Hendrix's convictions.**

<u>Standard of Review and Issue Preservation</u>

"The sufficient evidence requirement is a part of every criminal defendant's due process

31

rights." *People v Wolfe*, 441 Mich 501, 514, 489 NW2d 748, 751 (1992); US Const, Am V; Const 1963 art 1, § 17. "When reviewing the sufficiency of the evidence in a criminal case, this Court must view the evidence of record in the light most favorable to the prosecution to determine whether a rational trier of fact could find that each element of the crime was proved beyond a reasonable doubt." *People v Griffin*, 235 Mich App 27, 597 NW2d 176 at 31, 180 (1999). Preservation of this issue is not required. *People v Patterson*, 428 Mich 502, 514 (1987).

### Discussion

Evidence must be *sufficient* for a conviction; merely logical inferences cannot alone sustain a conviction. An inference may be logical and not satisfy a rational trier of fact beyond a reasonable doubt. In *People v Killingsworth*, 80 Mich App 45; 263 NW2d 278 (1978), this Court considered certain inferences necessary to find defendant Killingsworth guilty but concluded that making the inferences only demonstrated "how far removed the evidence was from legally sufficient proof of the defendant's guilt." *Id.* at 49. The inferences were *possible*, but insufficient. The Sixth Circuit has also addressed speculative but insufficient evidence:

> This suggests . . . that the petitioner may have been acting as a lookout for Meadows. **It is reasonable speculation.** But could a rational jury find it to be proof beyond a reasonable doubt? No evidence was presented that the petitioner intended to burn the Turner home. The evidence that he knew what Zerious Meadows planned to do is simply too meager to support conviction.

*Fuller v Anderson*, 662 F2d 420, 424 (CA6 1981) (quoting district court opinion) (emphasis added).

Evidence is not sufficient to prove guilt beyond a reasonable doubt simply because there is "some evidence" from which to infer guilt. The United States Supreme Court in *Jackson v Virginia*, 443 Us 307 (1979), and the Michigan Supreme Court in *People v Hampton*, 407 Mich 354 (1979), rejected as inconsistent with the due process rule that as long as there is "some

evidence" from which to infer guilt, a conviction may be sustained:

> The fact that some evidence is introduced does not necessarily mean that the evidence is sufficient to raise a jury issue. Because there is no requirement that the evidence be sufficient to support a conviction to be admissible, it does not necessarily follow that merely because some evidence is admitted, the evidence is sufficient to raise a jury issue. In quantitative terms, the fact that a piece of evidence has some tendency to make a fact more probable, or less probable, does not necessarily mean that the evidence would justify a reasonable juror in reasonably concluding the existence of that fact beyond a reasonable doubt.

*Jackson*, 443 US at 316; *Hampton*, 407 Mich at 368.

The standard criminal jury instructions state that a reasonable doubt cannot be based on a mere possibility of innocence. CJI2d 3.2. That principle applies even more strongly to the quantum of proof necessary to convict. If a mere possibility of innocence is insufficient to create a reasonable doubt, then the mere possibility that the defendant committed the offense is insufficient to prove guilt beyond a reasonable doubt as well.

No one identified Mr. Hendrix as the perpetrator. Evangeline Doen described a blonde man with glasses – not a description matching Mr. Hendrix. There was no video surveillance of the area. The only piece of circumstantial evidence linking Mr. Hendrix to the crime was the fact that he was found in the car six hours later. Yet, the police testified that stolen cars transfer hands multiple times within hours of being stolen. The 404(b) evidence, as discussed aboved, lacked the signature quality that could tie Mr. Hendrix to the crime. With nothing more than Mr. Hendrix's presence in the vehicle, the evidence was insufficient to convict him.

For these reasons, Mr. Hendrix prays that this Court vacate his convictions and remand for dismissal.

## V. Relief Requested

For all thse reasons, Mr. Hendrix prays that this Court grant him the following relief:

(1) Vacate his convictions and remand for dismissal, or, in the alternative,

(2) reverse and remand for a new trial, or, in the alternative,

(3) remand for an evidentiary and *Ginther* hearing. *People v Ginther*, 390 Mich 436 (1973).

Respectfully submitted,

Michael Skinner (P62564)
Law Offices of Michael Skinner
27 E. Flint Street
Lake Orion, MI 48362
(248) 693-4100
*Attorney for Defendant-Appellant*

DATED:          March 26, 2008

34

| lby Township Police Department | | | | PO # | | | | |
|---|---|---|---|---|---|---|---|---|
| 00 Van Dyke, Shelby Twp, MI 48316-3572 | | | | NARRATIVE REPORT | SUPPRESS NO | RPTTYPE SUPPLEMENTAL | PAGE 1 OF 2 | |

| DATE | DAY | SHIFT | PLAT | BADGE 1 | BADGE 2 | INCIDENT STATUS ☐CLR ARREST ☐UNF ☒CLR EXCEPT ☐INACT | CRIME CLASS | INCIDENT # |
|---|---|---|---|---|---|---|---|---|
| 09/06/06 | WED | 01 | 01 | 0532 | | | 0710 | 06-0020751 |

ADDITIONAL INFORMATION REGARDING COMPLAINT NUMBER 06-0020751.

ON 9/6/06 AT APPROX. 4:00AM WRITER WAS CONTACTED BY SGT. FERGUSON AND ADVISED THAT A SUSPECT WAS ARRESTED IN THIS CASE, AND THAT WE NEEDED TO GO TO DETROIT POLICE DEPARTMENT AND PICK HIM UP AS SOON AS POSSIBLE.

AT APPROX. 4;30AM WRITER AND SGT. FERGUSON WENT TO THE DETROIT POLICE DEPARTMENT NORTHEAST DISTRICT TO PICK UP THE SUSPECT IN THIS CASE. WE ARRIVED AT DETROIT PD AT APPROX. 5;10AM. WRITER SPOKE WITH OFFICER BRYANT WHO ADVISED ME THAT THE SUSPECT WAS ARRESTED WHILE SITTING IN THE STOLEN VEHICLE IN THE AREA OF I-94 AND VAN DYKE, NEAR A CRACK HOUSE. HE STATED THAT THEY WERE ABLE TO SNEAK UP ON THE SUSPECT AND ARREST HIM WITHOUT INCIDENT.

SU#01 HENDRIX WAS WALKED OUT TO THE LOBBY AND TURNED OVER TO OUR CUSTODY. SUSPECT WAS CUFFED AND DOUBLE CHECKED FOR TIGHTNESS BY SGT. FERGUSON AND WALKED OUT TO THE PATROL CAR. SUSPECT WAS SECURED IN THE REAR OF THE PATROL CAR FOR TRANSPORT BACK TO SHELBY TWP POLICE DEPARTMENT.

WHILE EN ROUTE BACK TO THE POLICE DEPARTMENT, WRITER READ SU#01 HENDRIX HIS MIRANDA RIGHTS, FROM THE ADVICE OF RIGHTS FORM. WRITER READ THE FORM VERBATIM. WRITER ASKED SU#01 HENDRIX IF HE UNDERSTOOD ALL OF HIS RIGHTS THAT WERE JUST READ TO HIM. HENDRIX STATED THAT HE DID UNDERSTAND HIS RIGHTS.

WRITER ASKED SU#01 HENDRIX IF HE WANTED TO TALK TO ME REGARDING THE STOLEN VEHICLE FROM SHELBY TWP. HENDRIX STATED THAT HE WOULD TRY TO ANSWER MY QUESTIONS IF HE COULD. WRITER ASKED HENDRIX IF HE KNEW WHY HE WAS ARRESTED. HE STATED THAT DETROIT POLICE WERE TELLING HIM THAT HE WOULD BE CHARGED WITH ALL KINDS OF THINGS, BUT COULDN'T REMEMBER WHAT THEY HAD TOLD HIM. I ASKED HIM TO TELL ME HOW IT WAS THAT HE WAS IN POSSESSION OF A VEHICLE THAT WAS STOLEN FROM SHELBY TWP. HE STATED "I DON'T KNOW HOW I GOT THAT VEHICLE." HE STATED THAT HE WAS TOLD ALL KINDS OF THINGS BY DETROIT POLICE, AND DOESN'T KNOW WHAT HE SHOULD SAY. HE ASKED WHAT THE CHARGES WERE AGAINST HIM. I TOLD HIM THAT HE WAS CHARGED WITH POSSESSION OF A STOLEN VEHICLE AT THIS TIME, BUT THAT OTHER CHARGES COULD POSSIBLY COME FROM THIS INCIDENT.

HE WAS ASKED TO TELL US WHAT HE COULD ABOUT WHAT HAD HAPPENED TONIGHT. HE STATED THAT HE DIDN'T KNOW HOW HE GOT THE VEHICLE, AND WANTED TO HELP US, BUT THAT HE WAS NOT SURE WHAT HE SHOULD SAY. HE SAID THAT HE HAS TO THINK ABOUT IT. THE REST OF THE RIDE BACK TO SHELBY WE DID NOT SPEAK TO HENDRIX.

| INVESTIGATING OFFICER(S) | | REVIEWED BY | ASSIGNED TO / BADGE | ATTENTION TO |
|---|---|---|---|---|

Shelby Township Police Department

57600 Van Dyke, Shelby Twp, MI 16-3572

(46)731-2121 M2074000

PO #

SUPPRESS

## NARRATIVE REPORT

RPTTYPE SUPPLEMENTAL   PAGE 2 OF

| 01 | DATE 09/06/06 | DAY WED | SHIFT 01 | PLAT 01 | BADGE 1 0067 | BADGE 2 | INCIDENT STATUS ☐CLR ARREST ☐UNF ☐CLR EXCEPT ☐INACT | CRIME CLASS | INCIDENT # 06-0020751 |

ON 9/6/06 AT APPROX 7:00 AM, D/SGT. MUSZYNSKI REQUESTED THAT I INTERVIEW SUSPECT JOSEPH HENDRIX.  HENDRIX WAS ARRESTED IN DETROIT WHILE DRIVING THE VICTIM'S VEHICLE APPROX 6 HOURS AFTER IT WAS STOLEN.  D/SGT. MUSZYNSKI HAD TRANSPORTED HENDRIX FROM THE DETROIT POLICE DEPARTMENT TO OUR STATION AT APPROX 5:00AM.

AT APPROX 7:30 AM I ESCORTED HENDRIX FROM THE SHELBY TWP CELL BLOCK TO THE INTERVIEW ROOM.  I ADVISED HENDRIX OF HIS RIGHTS OFF THE SHELBY TWP ADVISE OF RIGHTS FORMS.  HENDRIX REFUSED TO SPEAK WITH ME UNTIL HE HAD THE OPPORTUNITY TO SPEAK WITH AN ATTORNEY.  I RETURNED HENDRIX TO THE CELL BLOCK WITHOUT ANY FURTHER QUESTIONING.

A LEIN CHECK OF HENDRIX REVEALED THAT HE WAS ALSO ARRESTED BY THE DETROIT POLICE DEPARTMENT ON 9/3/06 AT APPROX 9:05 PM WHILE DRIVING ANOTHER STOLEN VEHICLE (APPROX 12 1/2 HOURS AFTER BEING STOLEN).  THIS VEHICLE HAD ALSO BEEN STOLEN OUT OF SHELBY TWP (SEE SHELBY TWP REPORT 06-0020543.)

IN BOTH CASES THE VEHICLES WERE STOLEN FROM PARKING LOTS LESS THAN A MILE FROM HENDRIX'S HOME.  BOTH VEHICLE WERE RECOVERED APPROX A 1/2 MILE APART IN DETROIT, AND IN BOTH CASES HENDRIX WAS ARRESTED WHILE IN POSSESSION OF THE STOLEN VEHICLES.  I SPOKE WITH DETROIT POLICE OFFICER DAVID JAKEWAY ▬▬▬▬▬▬▬▬▬).  HE FAXED ME HIS REPORTS ON BOTH ARRESTS.  OFFICER JAKEWAY SAID THAT HE WOULD BE SEEKING R/C CHARGES FOR HENDRIX.

ON 8/31/06 I WAS ASSIGNED ANOTHER UDAA CASE SIMILAR TO THE OTHER TWO (SEE REPORT NUMBER 06-0020322).  THIS VEHICLE WAS RECOVERED UNOCCUPIED IN DETROIT ON 9/1/06, AND WAS IN THE SAME AREA WERE HENDRIX WAS ARRESTED DRIVING THE OTHER TWO STOLEN VEHICLES.  ON 9/6/06 THIS VEHICLE WAS PROCESSED FOR EVIDENCE BY OFFICER KIRK.  OFFICER KIRK LOCATED ONE WAYNE COUNTY JAIL PRISONER WRIST BAND, ONE MACOMB COUNTY JAIL PRISONER WRIST BAND, AND ONE SHELBY TWP 41-A DISTRICT COURT ARRAIGNMENT/BOND SHEET.  ALL WERE IN THE NAME OF SUSPECT JOSEPH HENDRIX.

AS OF 9/6/06 AT 2:00 PM VICTIM EVANGELINE DOEN REMAINS IN CRITICAL CONDITION AT ROYAL OAK BEAUMONT HOSPITAL.

14

| INVESTIGATING OFFICER(S) DET. TERRANCE HOGAN #67 | REVIEWED BY | ASSIGNED TO / BADGE | ATTENTION TO |

# SHEL[ ] OWNSHIP POLICE DEPARTMENT

## INTERROGATION: Advice of Rights

06-2075 /
(Joe Hendrix)

## YOUR RIGHTS

**PLACE:** _Interview Room_

**DATE:** _9/6/06_

**TIME:** _7 2 2 Am_

Before we ask you any questions, you must understand your rights.

JH  **1.**  You have the right to remain silent.

JH  **2.**  Anything you say can be used against you in court.

JH  **3.**  You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

JH  **4.**  If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

JH  **5.**  If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me.

**SIGNATURE:** _[signature]_        Requested Attorney

**WITNESS:** _[signature]_

**WITNESS:** _____

**TIME:** _____

# SHELBY TOWNSHIP POLICE DEPARTMENT

## INTERROGATION: Advice of Rights

06 - 20322
06 - 20751
06 - 20543

## YOUR RIGHTS

PLACE: _McJ_

DATE: _Sept 8, 2006_

TIME: _10:15_

Before we ask you any questions, you must understand your rights.

1. You have the right to remain silent.

2. Anything you say can be used against you in court.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

4. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me.

SIGNATURE: X _Refused To Sign but will Answer Questions_

WITNESS: _[signature]_

WITNESS: _[signature]_

TIME: _10:18_

47

Shelby Township Police Department
7600 Van Dyke, Shelby Twp, MI 48315
(586)731-2121 (586)807-900

**PERSON/WITNESS LIST**

| SUPPLEMENTAL | PAGE 1 OF 3 |
|---|---|

| DATE | DAY | SHIFT | PLAT | BADGE 1 | BADGE 2 | UCR | ADMIN | INCIDENT # |
|---|---|---|---|---|---|---|---|---|
| 09/15/09 | FRI | 01 | 01 | 0067 | | OPN | INV | 06-0020751 |

CODES (1)REPT'D BY (2)OWNER (3)VICT (4)PERS INTERV (5)ARREST (6)SUSP (7)MISS'G (8)WITN (9)SECUR'D BY (O)JUV ARREST (D)DRIVER (P)PASSNGR (R)RESPONSIBLE (S)SUMMONED (X)MISC
WITNESS TYPES (HW)HANDWRITING (EX)EXPERT (EY)EYEWITNESS (OF)POLICE OFFICER (CO)COMPLAINANT (CM)CHEMIST (MD)MEDICAL (VC)VICTIM (OC)OIC (RG)RES GESTAE (MS)MISC

| CODE | | VICT # | ACTUAL VICTIM (LAST, FIRST, MIDDLE, SUFFIX) | RAC | SEX | DOB | | AGE | VICTIM TO RECEIVE CVRA NOTICE |
|---|---|---|---|---|---|---|---|---|---|
| 8 | | 01 | STOBBE, DAVID | U | M | | | | |

| PE | CODE | | W-TYP | NAME (LAST, FIRST, MIDDLE, SUFFIX) (ACTUAL VICTIM'S REP) | RAC | SEX | DOB | | AGE | RELATION TO ACTUAL VICTIM |
|---|---|---|---|---|---|---|---|---|---|---|

ADDRESS (DIRECTION, STREET, SUFFIX, QUALIFIER)

| HOME PHONE | BUSINESS PHONE | STATE | DRIVER'S LICENSE # | CONN 1 3 / 2 4 | TYP | REL TO OFN # / | | INJ | V CIRC | JHC |
|---|---|---|---|---|---|---|---|---|---|---|

**COMMENTS / TESTIMONY**

OWNER OF PAY PHONE IN VINEYARDS PARKING LOT.   PROVIDED CALLED RECORDS.

| SERVICE BY |
|---|
| ☐ MAIL   ☐ PD |

| CODE | | VICT # | ACTUAL VICTIM (LAST, FIRST, MIDDLE, SUFFIX) | RAC | SEX | DOB | | AGE | VICTIM TO RECEIVE CVRA NOTICE |
|---|---|---|---|---|---|---|---|---|---|
| 8 | | 02 | QUINN, KELLY | U | F | | | | |

| PE | CODE | | W-TYP | NAME (LAST, FIRST, MIDDLE, SUFFIX) (ACTUAL VICTIM'S REP) | RAC | SEX | DOB | | AGE | RELATION TO ACTUAL VICTIM |
|---|---|---|---|---|---|---|---|---|---|---|

ADDRESS (DIRECTION, STREET, SUFFIX, QUALIFIER)

| HOME PHONE | BUSINESS PHONE | STATE | DRIVER'S LICENSE # | CONN 1 3 / 2 4 | TYP | REL TO OFN # / | | INJ | V CIRC | JHC |
|---|---|---|---|---|---|---|---|---|---|---|

**COMMENTS / TESTIMONY**

KELLY'S CELL PHONE WAS CALLED FROM THE PAY PHONE AT VINEYARDS SHORTLY BEFORE THE ASSAULT.  KELLY
STATED HER EX-BOYFRIEND, CARLO SWEENEY, USED THE PAY PHONE TO CALL HER.

| SERVICE BY |
|---|
| ☐ MAIL   ☐ PD |

| CODE | | VICT # | ACTUAL VICTIM (LAST, FIRST, MIDDLE, SUFFIX) | RAC | SEX | DOB | | AGE | VICTIM TO RECEIVE CVRA NOTICE |
|---|---|---|---|---|---|---|---|---|---|
| 8 | | 03 | SWEENEY, CARLO DUVALL | U | M | | | | |

| PE | CODE | | W-TYP | NAME (LAST, FIRST, MIDDLE, SUFFIX) (ACTUAL VICTIM'S REP) | RAC | SEX | DOB | | AGE | RELATION TO ACTUAL VICTIM |
|---|---|---|---|---|---|---|---|---|---|---|

ADDRESS (DIRECTION, STREET, SUFFIX, QUALIFIER)

| HOME PHONE | BUSINESS PHONE | STATE | DRIVER'S LICENSE # | CONN 1 3 / 2 4 | TYP | REL TO OFN # / | | INJ | V CIRC | JHC |
|---|---|---|---|---|---|---|---|---|---|---|

**COMMENTS / TESTIMONY**

| SERVICE BY |
|---|
| ☐ MAIL   ☐ PD |

| INVESTIGATING OFFICER(S) | REVIEWED BY | ATTENTION TO | I affirm the above information is true and correct. |
|---|---|---|---|
| DET. TERRANCE HOGAN #67 | | | O.I.C. Signature _____ |

Shelby Township Police Department
7600 Van Dyke, Shelby Twp, MI 48572

## NARRATIVE REPORT

| | DATE | DAY | SHIFT | PLAT | BADGE 1 | BADGE 2 | INCIDENT STATUS | | RPTTYPE SUPPLEMENTAL | PAGE 2 OF 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 09/15/09 | FRI | 01 | 01 | 0067 | | ☐CLR ARREST   ☐UNF<br>☐CLR EXCEPT   ☐INACT | CRIME CLASS | INCIDENT #<br>06-0020751 | |

ON 9/6/06 AT APPROX 8:15 AM I SPOKE WITH LINDA HENDRIX, WHO IS THE GRANDMOTHER OF SUSPECT JOSEPH HENDRIX. SHE STATED THAT HER GRANDSON HAS A SEVERE CRACK COCAINE ADDICTION, AND THAT SHE DOES NOT ALLOW HIM TO STAY AT HER HOME VERY MUCH. SHE BELIEVES JOSEPH CAME TO HER HOME ON SEPT. 1, 2006 AND STAYED ONE NIGHT. SHE DOES NOT KNOW HOW HE GOT TO HER HOME, NOR DOES SHE KNOW WHERE HE WENT WHEN HE LEFT. LINDA TOLD ME THAT SHE DID RECEIVE A COLLECT CALL ON 9/5/06. SHE WAS NOT HOME WHEN THE CALL CAME, AND THE TELEPHONE OPERATOR ONLY LEFT A MESSAGE STATING THAT "SOMEONE" WAS TRYING TO MAKE A COLLECT CALL TO HER. ALTHOUGH THE OPERATOR NEVER MENTIONED THE PERSONS NAME, SHE FELT CONFIDENT THAT IT WAS JOSEPH TRYING TO CALL HER CALL. LINDA SAID THAT THE TIME ON HER ANSWERING MACHINE IS BROKE, BUT SHE ESTIMATED THAT THE COLLECT CALL ATTEMPT CAME IN SOMETIME BETWEEN 3:00 PM AND 6:00 PM. LINDA ARRIVED HOME AT 7:00 PM AND DISCOVER THE COLLECT CALL ATTEMPT.

ON 9/6/06 I VIEWED THE SURVEILLANCE VIDEO FROM VINEYARDS PARTY STORE. THERE IS ONLY IN STORE CAMERAS. I VIEWED THE 9/5/06 VIDEO FROM 19:10 THROUGH 20:05. I DID NOT OBSERVE SUSPECT HENDRIX ON ENTER THE STORE. MANAGER SHERRY CHAPMAN WILL MAKE A COPY OF THE VIDEO FOR ME TO PLACE ON EVIDENCE.

I THEN SPOKE WITH THE OWNER OF THE PAY PHONE WHICH IS LOCATED IN THE PARKING LOT OF VINEYARDS PARTY STORE. THE PAY PHONE NUMBER IS ▓▓▓▓▓▓▓▓ THE OWNER IS DAVID STOBBE. DAVID PROVIDED ME WITH A LIST OF ALL CALLS MADE FROM HIS PAY PHONE FROM 9/2/06 THROUGH 9/7/06. THERE CALLS MADE TO TWO DIFFERENT PHONE NUMBERS NOT LONG BEFORE THE ASSAULT. THE TWO TELEPHONE NUMBERS ARE ▓▓▓▓▓▓▓, AND ▓▓▓▓▓▓. I WILL SUBPOENA RECORDS FOR THESE PHONE NUMBER. NO CALL COLLECTS WERE MADE FROM THIS PAY PHONE ON 9/5/06.

ON 9/8/06 I SUBPOENAED RECORDS FROM PHONE NUMBERS ▓▓▓▓▓▓▓▓ (VERIZON WIRELESS) AND ▓▓▓▓▓▓ (NEXTEL). ON THE SAME DATE I ALSO SUBPOENAED RECORDS FOR THE PAY PHONE LOCATED ON THE SOUTH/WEST CORNER OF MOUND AND WEST UTICA, AND FOR LINDA HENDRIX'S HOME PHONE. THIS SUBPOENA FOR THIS PAY PHONE WAS FAXED TO AT&T. THE TELEPHONE NUMBER TO THIS PAY PHONE IS ▓▓▓▓▓▓▓. THE SUBPOENA FOR LINDA HENDRIX'S HOME PHONE NUMBER ▓▓▓▓▓▓▓ WAS FAXED TO AT&T, BUT LATER RE-SUBMITTED TO TALK AMERICA, WHO IS LINDA'S PHONE CARRIER.

ON 9/9/06 I RECEIVED THE REQUESTED DOCUMENTS FROM VERIZON WIRELESS IN REGARDS TO TELEPHONE NUMBER ▓▓▓▓▓▓▓ (NUMBER CALLED FROM VINEYARDS PAY PHONE JUST BEFORE THE ASSAULT). THE PHONE SUBSCRIBER IS KELLY QUINN. I SPOKE WITH KELLY. SHE STATED THAT IT WAS HER EX-BOYFRIEND WHO CALLED HER FROM THE PAY PHONE ON 9/5/06. KELLY SAID HER EX-BOYFRIEND IS CARLO SWEENEY ▓▓▓▓▓▓▓ KELLY ALSO PROVIDED ME WITH HIS ADDRESS.

ON 9/8/06 MYSELF AND D/SGT. MUSZYNSKI AGAIN TRIED TO INTERVIEW SUSPECT JOSEPH HENDRIX. HENDRIX WAS LODGED AT THE MACOMB COUNTY JAIL. JAIL PERSONNEL ESCORTED HENDRIX INTO THE INTERVIEW ROOM. AT APPRX 10:15 AM I READ HENDRIX HIS RIGHTS VERBATIM OFF OF THE SHELBY TWP ADVISE OF RIGHTS FORM. HENDRIX REFUSED TO INITIAL NEXT TO THE RIGHTS I READ TO HIM, BUT EACH TIME HE STATED, "I KNOW MY RIGHTS." HENDRIX REUSED TO SIGN THE ADVISED OF RIGHTS FORM, BUT HE AGREED TO SPEAK WITH US.

| INVESTIGATING OFFICER(S) | REVIEWED BY | ASSIGNED TO / BADGE | ATTENTION TO |
|---|---|---|---|
| DET. TERRANCE HOGAN #67 | | | |

Shelby Township Police Department
7600 Van Dyke, Shelby Twp, MI 48316-3572

## NARRATIVE REPORT

| | DATE | DAY | SHIFT | PLAT | BADGE 1 | BADGE 2 | INCIDENT STATUS | SUPPRESS | RPTTYPE | PAGE 3 OF 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 09/15/09 | FRI | 01 | 01 | 0067 | | ☐CLR ARREST ☐UNF ☐CLR EXCEPT ☐INACT | | SUPPLEMENTAL | |
| | | | | | | | | | CRIME CLASS | INCIDENT # |
| | | | | | | | | | | 06-0020751 |

I ASKED HENDRIX QUESTIONS ABOUT THE VEHICLE THEFT REGARDING CASE NUMBERS 06-0020322 AND 06-0020543.  HE REFUSED TO TELL ME HOW OR WHERE HE GOT THE STOLEN VEHICLE'S.  HENDRIX STATED, "I JUST CAN'T TELL YOU."  I ASKED HIM IF HE KNEW BUT JUST DID NOT WANT TO TELL ME.  HENDRIX HESITATED AND STATED, "I DON'T THINK I'M GOING TO SAY."  HENDRIX THEN STATED THAT DPD "KNOWS THE TRUTH.   THEY BEEN WATCHING ME."  HENDRIX THEN TOLD ME THAT DPD HAS VIDEO.  I ASKED HENDRIX WHAT THE VIDEO MAY SHOW.  HE TOLD ME TO ASK DPD.  HENDRIX REFUSED TO TELL ME WHERE OR HOW HE GOT POSSESSION OF THE STOLEN VEHICLES.  HE WOULD EITHER STATE, "I JUST CAN'T TELL YOU", OR HE WOULD REFER ME TO DPD.  HENDRIX NEVER ADMITTED TO STEALING THE VEHICLE, BUT HE NEVER DENIED IT EITHER.

HENDRIX DID ASK IF HE WAS GOING TO BE CHARGED WITH HOMICIDE (REFERRING TO THE CAR JACKING CASE AND THE STATEMENT I HAD MADE TO HIM ON 9/6/06 ABOUT WHAT COULD HAPPEN IF THE VICTIM DIED).  I ADVISED HENDRIX THAT THE WOMEN WAS STILL ALIVE, BUT THAT I WAS NOT SURE IF HE PUSHED HER OUT OF THE VEHICLE OR IF THE WOMEN ACCIDENTALLY FELL FROM THE VEHICLE.  I ADVISED HENDRIX THAT I WAS WILLING TO LISTEN TO HIS SIDE OF THE STORY, BUT UNTIL HE TOLD ME WHAT HAPPENED I COULD ONLY ASSUME THAT THE VICTIM WAS TELLING ME THE TRUTH.  AGAIN HENDRIX TOLD ME TO CHECK WITH DPD BECAUSE "THEY KNEW THE TRUTH."  I AGAIN ASKED HENDRIX HOW HE GOT THE VEHICLE.  HE REFUSED TO ANSWER, AND STATED, "I DON'T THINK I'M GOING TO SAY ANYMORE BECAUSE I DON'T WANT TO GET INTO MORE TROUBLE.  HENDRIX REFUSED TO TELL ME WHERE HE WAS AROUND THE TIME OF THE CAR JACKING, OR AT ANYTIME THROUGH THAT DAY.  HE ADMITTED TO STAYING AT HIS GRANDMOTHER'S IN THE SHELBY TWP SPRING HILL APARTMENT ON THE Friday PRIOR.  HE REFUSED TO TELL ME HOW HE GOT TO HIS GRANDMOTHER'S HOME.  I ASKED IF HE WAS IN OR NEAR SHELBY TWP ON 9/5/06.  AGAIN HENDRIX REFUSED TO ANSWER.  I ASKED HENDRIX IF HE MADE A COLLECT CALL TO HIS GRANDMOTHER ON 9/5/06.  HE SAID THAT HE DID.  HE TOLD ME THAT HE MADE THE CALL FROM A 7-11 PARTY STORE PAY PHONE IN STERLING HGTS.  HE REFUSED TO TELL ME THE EXACT LOCATED OF THE 7-11 OR WHAT TIME HE MADE THE CALL.  HENDRIX REFUSED TO TELL ME HOW HE GOT TO THE PAY PHONE, OR HOW LONG HE HAD BEEN IN THE AREA.  HE REFUSED TO TELL ME WHAT HE DID OR WHERE HE WENT AFTER MAKING THE CALL.  HENDRIX SAID THAT HE NO LONGER WISHED TO SPEAK WITH ME, AND WALKED OUT OF THE INTERVIEW ROOM.

| INVESTIGATING OFFICER(S) | REVIEWED BY | ASSIGNED TO / BADGE | ATTENTION TO |
|---|---|---|---|
| DET. TERRANCE HOGAN #67 | | | |



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

PEOPLE OF THE STATE
OF MICHIGAN,
                                    File No. 03-1759-FH

-VS-

JOSEPH HENDRIX,

          Defendant.
_____/

JURY TRIAL

BEFORE THE HONORABLE MATTHEW S. SWITALSKI

Mount Clemens, Michigan - March 21, 2007

APPEARANCES:

For the People:            MR. STEVEN M. KAPLAN, P33036
                           Assistant Prosecuting Attorney
                           1 South Main Street
                           Mount Clemens, Michigan 48043
                           (586) 469-5350

For the Defendant:         MR. AZHAR H. SHEIKH, P52365
                           47 Crocker Boulevard
                           Mount Clemens, Michigan 48043
                           (586) 463-1160

Also present:              Detective Terrance Hogan

Reported by:               Linda Brazzel, (CSR-4704)
                           Official Court Reporter
                           (586) 469-5410

1        THE COURT:  We'll clean that up once they

2    get in here.

3        COURT OFFICER:  All rise for the jury,

4    please.

5        (At 2:38 p.m., jury entered the courtroom.)

6        THE COURT:  Please be seated.  All right,

7    first of all, Mr. Sheikh, do you care to call any

8    witnesses?

9        MR. SHEIKH:  No, your Honor.  At this point,

10   the Defense would rest.

11       THE COURT:  All right.  Obviously, there is

12   no rebuttal, Mr. Kaplan.  Just as a matter of housekeeping,

13   are there any issues in regard to exhibits.

14       MR. KAPLAN:  Your Honor, Exhibits 36 and 37,

15   various charts, I might have already moved formally to

16   introduce 37.  I move now to introduce 36 and 37.

17       MR. SHEIKH:  Your Honor, we have no

18   objection.  We stipulate to their admission at this time.

19       (Proposed Exhibit 36 was admitted.)

20       THE COURT:  With that, at this time,

21   Mr. Kaplan, you may give your closing argument.

22       MR. KAPLAN:  Thank you, your Honor.

23                CLOSING ARGUMENT

24   BY MR. KAPLAN:

25       Good afternoon, Mr. Sheikh and Judge

1    Switalski, ladies and gentlemen, you've been here less than

2    two days.  We started testimony yesterday afternoon, and we

3    finished today.  It's been a brief trial, but it probably

4    seems longer.  You have a difficult job in that it's

5    passive, you're sitting here, you can tune us out if you

6    want, it's difficult to do so, and maybe both of us, or

7    maybe yours truly is only repetitive from time to time, and

8    you might be thinking, I've already heard that.  I know

9    enough about that.  Well, we're not allowed to ask you

10   midstream, I can't say, Judge Switalski, can I ask the

11   jurors whether they want to hear more on this?  I can't do

12   that.  So, you're passive, but you have been very

13   attentive, and Mr. Sheikh and I have been around a long

14   time.  We appreciate that you've been attentive, and that

15   you care.  You could have avoided jury duty possibly, but

16   you chose to be here.

17          Well, this case all revolves around the

18   identity of a thief.  Who is it?  If Hendrix is the thief,

19   he's guilty of the three crimes.  If he's not the thief,

20   he's not guilty.  Well, how do you know who the thief is?

21   We don't have a video camera showing who did it.  And we

22   don't have a live eye witness.  If Mrs. Doen had not died,

23   and if she had not suffered a serious brain injury,

24   affecting cognitive thinking, on the witness stand, she

25   might have been able to select the Defendant, or she might

134

1    have picked him out of a line up, but we don't have that

2    benefit.  The case is what it is.  So, how do you know who

3    the thief is?  Well, there are three reasons the Defendant

4    is a thief.  The first one stems from a jury instruction

5    that the Judge will give you.  Now, this is a common sense

6    instruction, and fortunately, when juries hear cases, they

7    do not leave their common sense at home.  When you received

8    your jury summons, it didn't say please leave your common

9    sense and reasoning at home.  Come here with uncommon

10   sense, don't be reasonable.  And that's really the

11   instruction that the Judge will give you.  Because we have

12   the burden of proof, and we welcome that burden of proof as

13   prosecutors.  We have to prove to you beyond a reasonable

14   doubt that Defendant is the culprit.  But beyond a

15   reasonable doubt means a doubt based on reason, a doubt

16   based on reason and common sense.  It's not a possible

17   doubt, it's not a fanciful doubt, it's not an imaginary

18   doubt, it's not beyond a shadow of a doubt, it's beyond a

19   reasonable doubt.  And in more than 20 years as a

20   prosecutor, I never have had and never will have a case

21   where there is absolutely no doubt, because even on a case

22   where you have a video camera showing the crime and the

23   offender holding a gun against the victim's head with the

24   smoke billowing out, it's possible the video didn't capture

25   the right angle, it's possible the gun went off accidently.

135

1      So the real issue here, what is more reasonable?  Is it

2      more reasonable that the Defendant is the thief, or is it

3      more reasonable that some other guy did it?  That's a

4      defense you learn in law school, it's called SODDI, S-O-D-

5      D-I, Some Other Dude Did It.  So that's essentially what

6      he's saying.  Some other dude did it, I'm not the guy.  Is

7      that reasonable?  No, it's patently unreasonable.  Why?

8      For three reasons, number one, the Judge will read an

9      instruction to you.  And this instruction says, if you

10     determine that Defendant had possession of the Caravan, and

11     you know he did.  Approximately six hours and thirty-five

12     minutes after the carjacking, so we know he had possession,

13     and, and that the Caravan had been stolen.  Well, we know

14     it had been stolen.  Then, then you may infer that the

15     Defendant is the thief.  Now, the Judge is not going to say

16     ladies and gentlemen, because he was captured in that car,

17     six hours and forty-five minutes later, he is the thief.

18     The Judge can't tell you that.  But, the Judge will tell

19     you you can infer that he is the thief.  Now, during that

20     six hour and forty-five minutes stanza, is it possible that

21     somebody else had the car, and then turned it over to the

22     Defendant?  Yes, it's possible.  Is it reasonable?  No.

23     Why?  Because of his modus operandi, his MO.  His method of

24     operation.  His pattern, scheme, and conduct.  This is

25     Joseph Hendrix.  He lives in Shelby Township.  He doesn't

136

1    have a job.  He's addicted to drugs.  He doesn't have a

2    car.  He doesn't even have a license.  He can't buy a car.

3    He can't lease a car.  And we know that at Van Dyke and

4    Six Mile Road, there are many crack houses.  That's the

5    area where he buys his crack.  He needs locomotion.  He

6    needs a vehicle.  All four vehicles, you have the dates

7    memorized by now, you don't need my help.  December 3 of

8    '02, August 31, September 3, September 5, '06.  All four

9    vehicles taken in the same way, all four left unlocked,

10   unattended, with the keys in the ignition -- strike that.

11   The last three with the keys in the ignition.  The first

12   one in '02, keys left in the  truck.  So you might say to

13   yourself, well, sure, a vehicle left unattended, unlocked,

14   with keys in the vehicle, that vehicle's more likely to be

15   stolen than one that's locked without the keys, granted,

16   that's true.  But this is his way of stealing cars.  There

17   are many ways of stealing cars, hot wiring, using a master

18   key, towing the vehicle, all kinds of ways.  Using a screw

19   driver into the ignition.  But, this is his way, this is

20   Joseph Hendrix.  He might as well sign his name on each

21   vehicle, I was here.  He doesn't have to.  Because we know

22   that's his signature crime.

23              All right.  So, all four vehicles were taken

24   in the same area, in the same way.  But who lives in that

25   area?  The Defendant lives within a mile or less than a

1    mile of each of the four thefts, or lived in the same area

2    as each of the four vehicles stolen.  So you say to

3    yourself, okay, you know, maybe that's a coincidence, same

4    modus operandi, he happens to live in the same

5    neighborhood.  Then, where are the three vehicles taken?

6    The fourth one, meaning the first one, December 3, 2002,

7    he's captured.  He's nabbed.  So he can't drive to Detroit

8    for crack cocaine.  By the way, all four of these thefts

9    were during the day or at least when there's some light

10   out.  Remember the one at 7-Eleven, it was 8:30 in the

11   morning?  The one outside Little Caesars, was about

12   4:00 p.m.  The one outside Gathering Place bar, it's

13   5:30 p.m.  And this one, on a September day before Labor

14   Day, it's 6:50 p.m.  He's not a professional car thief.  A

15   professional car thief is not going to take a car during

16   the day.  So, we have a guy taking the same vehicles --

17   different vehicles too, which is interesting.  Not a

18   Jaguar, not a Jeep, not a Dodge Caliber, not a Town &

19   Country minivan.  No, different cars.  It doesn't matter

20   what the car is.  It could be an old truck, it could be a

21   relatively new mini-van.  But then where does he take each

22   vehicle when not apprehended at the scene?  Into to

23   Detroit.  So, you say to yourselves, okay, Detroit's a big

24   city, it's the largest city in Michigan, it's got more than

25   a million residents, used to have two million residents.

138

1       Big city.  Yeah, it is a big city.  Van Dyke and Six Mile.

2       What is there about Van Dyke and Six Mile?  Is that where

3       Comerica Park is located?  Ford Field?  Orchestra Hall?

4       Why does anybody go to that area, unless you live there.

5       Well, these are crack houses.  So think of the

6       probabilities here that some other thief, when all

7       four vehicles are taken in the same way, from the same

8       area, right here where Defendant lived, and three of the

9       vehicles are taken into Detroit?  Wow.  What a coincidence.

10      So, if Defendant isn't the thief on September 5, it means,

11      gee, some other guy did it in the identical way that

12      Defendant is stealing cars.  And you'll notice there

13      haven't been any car thefts since like that.  Oh, some

14      other dude did it.  Well, we don't know who he is. And gee,

15      he just happened to abandon the vehicle.  That poor

16      Defendant with bad luck finds the vehicle and drives it

17      into Detroit.  Sure.  We can patch it up hunky-dory.  That

18      is very likely.

19              Now, if there's anything you know, this

20      Defendant is a survivor.  He looks out for himself.  He

21      looks out for number one.  He'll do anything to avoid

22      capture, and look what he did on December 3, 2002?  You

23      know, it's a blip on the screen in terms of the universe,

24      civilization, might not amount to much in our lifetimes,

25      but think about what happened?  He's stealing a truck

139

1    outside of Gathering Place bar, and Mr. Piontkowski

2    actually came out to his truck at that moment.  It's a

3    remarkable set of events, but it happened.  And you heard,

4    he tried to protect his truck, he didn't want his truck

5    being stolen.  Unlike this Defendant, who doesn't have a

6    job.  This guy works for a living, wants his truck.  And

7    Defendant, you heard what Defendant did, in avoiding

8    capture.  Could have injured the man badly.  The guy tried

9    to climb onto the vehicle to stop it from being taken, and

10   what does Defendant do?  Does he put the car in park and

11   run away?  No.  He could have injured Mr. Piontkowski.

12   Okay.  Then a police officer tries to stop the vehicle.

13   Well, what did the Defendant do?  Does he stop, say,

14   Officer, yeah, I stole a car, I'm a young guy, not a big

15   deal.  No.  He flees the officer.  And then he drives at

16   the officer.  He'll do anything to avoid capture.  And then

17   he bails out of the vehicle right near his house.  What a

18   coincidence.  On Speedway Street.  Speeding on Speedway

19   Street.  Runs into his house.  Officer Andy Gammicchia

20   pursues him.  Then his mother says he's not here.  Yeah,

21   what an enabler.  He's not here.  Well, thanks, mom.  The

22   point is that this Defendant, look at all the efforts he

23   made to avoid capture or detection for a simple car theft

24   of December 3, 2002.  You might ask what does this have to

25   do with this case?  Well, here's what it has to do with

140

1    this case.  On September 6, 2006, at four in the morning,

2    the Defendant is being transported back from Detroit to

3    Shelby Township by Sergeant Muszynski, Sergeant Ferguson,

4    and they asked him, where did you get the Caravan.  Now,

5    what you don't know, because it's not in evidence is

6    whether Defendant at that point knew that somebody had been

7    badly injured and might not survive.  We don't know that,

8    it's not in the case.  But assume that neither officer said

9    anything to him, which is not really reasonable.  Of

10   course, they're going to say that to him.  Whether they

11   did, whether they didn't, here's his chance to avoid

12   capture or possible charges in this case.  If he had a

13   story, if he had a reasonable explanation for how he came

14   into possession of that vehicle, he would have told

15   Sergeant Ferguson and Sergeant Muszynski.  Because this man

16   is a survivor.  He looks out for himself, he is not meek.

17   That adrenaline is flowing, and testosterone is flowing

18   when he's in danger, and he's in danger now.  And he says

19   essentially I don't owe you an explanation, I don't know

20   where I got it.  Yeah, I don't know where I got it.  Sure.

21   It's not as though somebody asked you what you had for

22   lunch 29 weeks ago, where did you get the Caravan?  Now if

23   he had a reasonable explanation, he would have given it.

24   He's not shy, he's not meek, he knows how to talk.  He

25   would have said, hey, found it on the street.  Somebody

1    left it abandoned.  A friend of mine named John, gave it to

2    me.  I don't know his last name.  He was helping me out, I

3    thought it was his car.  I bought it for $200.  Where's the

4    explanation?  None.  You know why?  Because he doesn't have

5    one.  If he had one, he would have given it.  Okay.  So,

6    you say to yourselves, he's in a police car, it's September

7    6, he had been stopped earlier that morning.  What's more

8    important now is Detective Hogan's interview with him on

9    September 8 at the Macomb County Jail.  Detective Hogan

10    says a woman was badly injured, pushed out of that minivan,

11    and she might die, and this is your opportunity to tell me

12    what happened.  In other words, maybe not verbalize

13    precisely as follows goes like this:  Tell me where you

14    were, give me an alibi, who were you with, and how did you

15    obtain the vehicle?  Because if you can give me that

16    information, then I can investigate it, and I can clear

17    you.  There's no question to 14 of you that if Defendant

18    had an alibi for his whereabouts say between 6:00 p.m.,

19    7:30 p.m., he wouldn't have been charged.  The alibi would

20    have been investigated, and if true, he wouldn't be charged

21    with this carjacking.  Where was he?  Ask yourselves where

22    was he?  We're not asking where he was from 3:00 a.m. to

23    5:00 a.m., where he might have been sleeping alone where

24    nobody knows.  Everybody knows where he was and where she

25    was two days earlier, or three days earlier during the

142

1    evening, everybody knows that.  Now, he's in the County

2    Jail, knows he's been arrested for a crime in connection

3    with this car theft, carjacking, yet, and he's had time to

4    think about it too, and here comes Terry Hogan.  Now, the

5    defense, not Mr. Sheikh, he's a great guy, but the

6    Defendant might be thinking well, Hogan is my enemy, Hogan

7    just wants to frame me.  But, Hogan wants to find out who

8    did this.  This is a serious case where a woman might die.

9    And she did die.  Hogan wants to know who did it.  The

10   Defendant has the alibi, and the alibi can be verified.

11   Alibis easily can be verified.  For example, what if

12   Defendant were at home and engaged in a long telephone

13   call: The telephone bills would support that, that he was

14   on the phone from home say from six to eight p.m., or if he

15   went to a restaurant, saw him use a credit card, that could

16   be verified.  If he's at a friend's house, a relative's

17   house, that all could be verified.  The point is if he had

18   an alibi, he would have told Detective Hogan.  But, there

19   is no alibi.  And you know why there's no alibi?  Because

20   there's no alibi.  He has none.  He has none.  There is no

21   doubt in this world that if had an explanation for where he

22   was at that time, on that day, we would know it.  He would

23   have told Sergeant Ferguson, and if not Sergeant Ferguson,

24   he would have told Detective Hogan.  When he can't tell him

25   where he is, what does that mean?  Because he wasn't

144

1   dies.  If you're not the person who took the car at

2   Vineyards, you're going to be clambering, be wailing.

3   Detective, let me tell you what happened.  This is how I

4   got the car, Detective.  I didn't want to say anything

5   before, but here's how it happened.  Never.  Not one word.

6   He says, oh, I don't want to say anymore, because it will

7   get me into trouble.  He tells Sergeant Ferguson, I don't

8   know how I got the minivan.  He knows, he's the thief.

9           So, the charges before you are carjacking,

10  felony murder, and unlawfully driving away a motor vehicle.

11  As I stated in my opening statement, and Judge Switalski

12  will elaborate, carjacking.  Did Defendant use any kind of

13  force or violence, or threaten to use any kind of force or

14  violence, or place another person in fear of suffering any

15  kind of force or violence against another person.  Well,

16  Mr. Sheikh's a great lawyer, and I don't think he's going

17  to dispute the fact that somebody did that.  He's going to

18  deny that his client is that somebody.  But, somebody did

19  that.  Somebody did that while committing a larceny of a

20  motor vehicle.  And the Judge will tell you, larceny of a

21  motor vehicle means you take away another person's vehicle

22  with the intent either to keep it, or withhold it, or to

23  dispose of it.  And, ultimately, that is what happened on

24  August 31, September 3, September 5.  Did the Defendant

25  ever call the police department and say, hey, I want to

145

1    give you some anonymous information here?  There was a car

2    stolen in Shelby Township, and they're very safe, I parked

3    them in the police lot, I parked them at the fire

4    department.  I parked it at Farmer Jack.  Are you kidding?

5    He wasn't returning any of those vehicles.  To him, they're

6    disposable, like a disposable lighter.   Steal it, drive to

7    Detroit, buy your dope, get rid of the vehicle.  Well, how

8    do you know that?  Well, look at the one from August 31.

9    Parked on a side street, left behind his belongings.

10   What's that all about?  His police bracelets from our

11   county jail, and an arraignment sheet.  It just shows that

12   the man is not -- it's all about dope.  He's not thinking.

13   Because a rational person would say, hmm, I better take my

14   stuff out of the vehicle, but he didn't.  Because he's high

15   on crack, and it might be difficult for you to relate to

16   that, because you don't use drugs.  Number 3, when the

17   Defendant attempted to drive away or take the Caravan, a

18   person lawfully was occupying the Caravan, and Mr. Sheikh,

19   I can't speak for him, but I don't think he's going to say

20   that Gina Doen, excuse me, Evangeline Doen was not lawfully

21   in the vehicle and exited the vehicle.  So that's the

22   carjacking charge.

23          On the felony murder charge, as

24   Judge Switalski will tell you, means that the Defendant --

25   strike that.

1              He will tell you that Evangeline Doen died.

2        We have to show you she died, if she did die.  If she died

3        as a result of the carjacker's actions, we know that, that

4        the crime that she died during the commission of a felony,

5        whether it's carjacking or larceny of a motor vehicle.

6              And then the fourth element is the Defendant

7        intended to kill -- he didn't intend to kill, wipe that

8        out.  He didn't intend to kill anyone.  Or he intended to

9        commit great bodily harm.  You push somebody out of a

10       vehicle, moving or stationary, especially a minivan,

11       especially an older woman, on the cement, you are intending

12       to cause a serious injury.  But, you might say well, maybe

13       he wasn't, maybe he didn't intend to kill anybody.  Of

14       course, he didn't.  Maybe he didn't intend to cause a

15       serious injury.  Okay, unimportant.  Why?  Because the

16       crime is also proven if the person knowingly engaged in

17       conduct likely, likely to cause serious injury.  Now, you

18       heard from the medical examiner, Dr. Pacris.  He says an

19       older person is more likely to suffer an injury when pushed

20       out of the vehicle, and that is true.  So, whoever did

21       this, didn't want to kill anybody, didn't want to cause

22       anybody's demise, but was caught in a dilemma.  That person

23       can blame the tinted windows.  If the minivan didn't have

24       tinted windows, Mrs. Doen would be alive, because the

25       carjacker would have known she was in the vehicle.  If Gina

1    Doen had locked the car, taken the keys, Mrs. Doen would be

2    alive.  Well, we all make mistakes.  But, this carjacker,

3    once he realized somebody was in that vehicle, he took the

4    cowardly approach.  He easily could have slammed the car

5    into park and ran away.  Mrs. Evangeline Doen was not going

6    to chase him.  Did he do that?  Wouldn't a typical car

7    thief do that?  Probably.  You know, here's an older woman.

8    I have a mother, I have a grandmother the thief is

9    thinking, I don't want to hurt this person.  I'm just going

10   to get out of here.  That's what a reasonable person would

11   do.  But this person needs his dope.  He doesn't care, the

12   hell with everybody else.  I want my drugs.  She's an old

13   lady.  He could have pulled behind the building and said,

14   ma'am, please step out.  Let me open the door for you,

15   sorry, I have to do this.  He could have done that.  No, he

16   needs his dope.  He needs it now.  And what does he do

17   instead?  We don't know for sure, because we don't have an

18   eyewitness, and we don't have a video camera.  But what you

19   do know is that Mrs. Doen told the nurse when she was

20   pushed out of the moving vehicle, and consider where

21   Mrs. Doen's body is found, that means the vehicle would

22   have been moving.  Whether moving or stationary, this older

23   woman, not feeling well, ends up on the pavement.  And both

24   doctors told you the greater the velocity, the greater the

25   fall, the greater the injury.  She deserves to be here

148

1    today.  She might have lived another 20 years.  She could

2    have provided incalculable services to her grandchildren

3    and children.  She should be loving them, and they should

4    be loving her.  But instead, this man's love for dope, for

5    drugs, caused her death.  It's not fair, it's not right,

6    and he should be held accountable.  Thank you.

7                     THE COURT:  Mr. Sheikh.

8                     MR. SHEIKH:  Yes, your Honor.

9                          CLOSING ARGUMENT

10   BY MR. SHEIKH:

11                   Good afternoon, ladies and gentlemen.

12   Throughout this case, when this case first started, the

13   first thing that I think that we both, Mr. Kaplan and I,

14   made clear to you is that we wanted you folks to be very,

15   very fair, and listen to what I say, to listen to what

16   Mr. Kaplan says, to look at all the evidence, and certainly

17   to pay attention to what His Honor tells you, especially

18   when he instructs you after Mr. Kaplan gets a chance to get

19   back up here.  At this point, I'm going to ask you to do

20   something that's a little contradictory to that which is to

21   pay extra attention to me right now.  And the reason for

22   that is because under our system of justice, Mr. Kaplan, as

23   a representative of the prosecutor, has all the burden to

24   prove every element of every offense to you beyond a

25   reasonable doubt.  For that reason, because he has the

COPY

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

PEOPLE OF THE STATE
OF MICHIGAN,                                    File No. 03-1759-FH

-VS-

JOSEPH HENDRIX,

        Defendant.
_____/

JURY TRIAL

BEFORE THE HONORABLE MATTHEW S. SWITALSKI

Mount Clemens, Michigan - March 21, 2007

APPEARANCES:

For the People:              MR. STEVEN M. KAPLAN, P33036
                             Assistant Prosecuting Attorney
                             1 South Main Street
                             Mount Clemens, Michigan 48043
                             (586) 469-5350

For the Defendant:           MR. AZHAR H. SHEIKH, P52365
                             47 Crocker Boulevard
                             Mount Clemens, Michigan 48043
                             (586) 463-1160

Also present:                Detective Terrance Hogan

Reported by:                 Linda Brazzel, (CSR-4704)
                             Official Court Reporter
                             (586) 469-5410

161

1    speed.  Take those charts back there and look at them, look

2    at the circles, where it's taken.  Hey, not minimizing

3    anything, but just to tell you the attempts that are being

4    made to exploit that.  Where is this infamous Michelle, and

5    where are all these fingerprints?  Ladies and gentlemen,

6    there's more than enough doubt here, reasonable doubt to

7    find my client not guilty of the charges against him.  No

8    matter how tragic the situation is.  Hopefully, then the

9    police will concentrate in finding the tall, thin man with

10   the blonde hair and the brown shirt.  Thank you for your

11   time.

12                    THE COURT:  Mr. Kaplan.

13                    MR. KAPLAN:  Thank you, your Honor.

14                       REBUTTAL ARGUMENT

15   BY MR. KAPLAN:

16                    We started off in the opening statement

17   yesterday when the Defense says the video is the key

18   evidence.  You remember Mr. Sheikh said there's an outdoor

19   video, and they didn't check it.  Then some of you might

20   have been thinking oh, that could be a key piece of

21   evidence.  As you'll notice, there was no outdoor video.

22   So, you have to wonder about the reliability of that

23   opening statement.

24                    In brief response to my capable friend's

25   closing argument, number one, he says there's a new

1   prosecutor in town, and that somehow has affected this

2   case.  I don't know, that new prosecutor was elected in

3   November of 2004.  This is more than half way through his

4   term, do you see him in the courtroom watching this case?

5   Do you see any video cameras here?  This is a case, as

6   every other case.  And it's really insulting for the Shelby

7   Township police department and the Prosecutor's Office to

8   say this case was brought because there was a newly-elected

9   prosecutor.  I'm not sure of the logic there.

10              Next point, he said, well, they're pointing

11   at the local car thief.  He is the local car thief, we know

12   that.  Car thefts stopped after he was locked up, but he's

13   more than a local car thief, he's the local car thief found

14   in the stolen vehicle, six hours and forty-five minutes

15   later.  So, I don't know how that somehow is unfair for the

16   police to possibly suspect him of being the carjacker.  And

17   not only is he the local car thief who just happens to be

18   in a stolen vehicle, but he has no explanation for that or

19   no alibi.  But still, I guess we're going after the wrong

20   guy according to the defense.  The fingerprint evidence is

21   right here.  You know, we didn't have to present

22   fingerprint evidence, they didn't even fingerprint that

23   vehicle.  And you know why?  Because the Defendant was

24   apprehended in that vehicle.  So, does it make any sense to

25   lift fingerprints from a vehicle when he's the last guy in

163

1    the vehicle?  No.  But they did it anyway.  And if they had

2    not attempted to lift prints from that vehicle, you know

3    that the capable Mr. Sheikh would be arguing they should

4    have.  So they did.  And, what did they find?  They find

5    five possible latent prints, either fingerprints or palm

6    prints.  Now you heard the officer say that not every

7    surface is capable of retaining a fingerprint.  In fact,

8    unlike T.V., with Horatio from CSI Miami, prints are rarely

9    found.  But the prints that are found, guess to whom they

10   belong?  The only person is the Defendant.  Now, could the

11   other identifiable print belong to one of the three Doens?

12   Of course.  We didn't send them in, Detective Hogan did not

13   send their prints to the lab.  But, notice what parts of

14   the car the prints were found on, the rearview mirror and

15   the sliding door.  Mr. Sheikh indirectly touches upon how

16   was she injured?  Did she fall out, was she pushed out, or

17   did she jump out.  Regardless of how it happened, and the

18   best evidence in the case is she was pushed out, because

19   that's what she says at first.  But if she fell out while

20   trying to jump out, it's the same case.  Because you have a

21   kidnapping, abduction, and she's tried to escape.  The

22   carjacker is just as responsible for her death if she

23   jumped out or fell out as opposed to being pushed out.  But

24   the reasonable explanation here is she is pushed out of the

25   vehicle.

164

1      Mr. Sheikh says they brought in all these

2   witnesses to inflame your passions, I don't know about

3   that.  I don't think anybody's inflamed from hearing from

4   numerous police officers from Detroit and Shelby Township.

5   In actuality, we could have tried this case with one

6   witness, Detective Hogan.  Because the Defense would have

7   stipulated cause of death, injury.  He probably would have

8   stipulated to the other car thefts.  That Defendant was

9   arrested in Detroit.  Where the car was found.  We could

10  have presented this case with one witness.  Oh, that would

11  be very exciting, that would be lack-luster.  You, as a

12  community, deserve to know the steps that were taken in

13  this investigation, and that there were real victims, real

14  victims, rather than just hearing about some names.  There

15  is more than one victim in this case.  It involves all

16  these other car thefts.  Then he says, why didn't they list

17  Michelle on the witness list?  Well, that's interesting.

18  You've heard that she was only recently interviewed, and if

19  he wants to bring it up, I'll respond to it.  We do have

20  rules in terms of witness lists, when witness lists could

21  be amended, and it's a 30-day rule.  But, they could call

22  Michelle, he could call a witness.  Why didn't he call

23  Michelle?  Michelle is a former girlfriend of the

24  Defendant.  Why not ask the Judge for a recess if he needs

25  it to call Michelle.  Ask yourself why he didn't call

165

1     Michelle, because Michelle is associated with the Defendant

2     not with us.  I didn't bring it up by the way, it came up

3     on redirect when Mr. Sheikh asked about this purse, or

4     whatever it is.  Then I asked the Detective if he tried to

5     determine ownership and he told me Michelle.    Mr. Sheikh

6     says there's an injustice, the wrong guy being charged.

7     There is an injustice, that we have a dead woman who should

8     be here with us.  That's the injustice.  Do you think

9     Shelby Township would willingly and knowingly pursue the

10    wrong guy?  Do you think that this police force, you've met

11    many honorable people from this force, do you think they

12    want to prosecute a person who didn't do it when the real

13    carjacker is out there?  No, no.  They did what they could,

14    and finally the Defendant had an opportunity to tell us

15    what happened on September 6 and September 8 and he didn't.

16    His silence is defining, his silence speaks a thousand

17    words.  His silence in refusing to say from where he made

18    the call, how he obtained the vehicle, and who he was with

19    during the important times.  That's like a thunderbolt from

20    the sky.  In other words, he's saying, I did it.  Because

21    if I didn't do it, I'll tell you why.  And by the way, here

22    we are, six months and 16 days since the incident.  And

23    have you been presented with an alibi witness for the

24    Defendant?  No.  Not one.  Not one who can say he or she

25    was with the Defendant, 5:00, 6:00, 7:00, 8:00.  Not one.

166

1    And what does that tell you?  Tells you nobody was with

2    him.  You know, his mother was willing to lie for him on

3    December 3 of 2002, when Officer Gammicchia arrived at the

4    door.  He said, hey, where's Joseph Hendrix (indicating)?

5    He's not here.  She's not willing to lie under oath.  And

6    the last question is, is this Defendant capable of

7    violence?  Well, he is.  Think back to December 3, 2002,

8    when somebody gets in his way, what does he do?  He almost

9    caused serious injury to the truck owner at the Gathering

10   Place bar.  He almost cost serious injury to Officer

11   Gammicchia.  And finally, he did cause a serious injury on

12   September 5, 2006, and that is the death of Mrs. Doen.

13   Thank you.

14              THE COURT:  All right.  What we are going to

15   do is this:  We're going to take about a ten-minute break,

16   and then I'm going to read the final instructions to you.

17   But, before I let you go, I just want to clarify when

18   Mr. Kaplan says silence is deafening, lack of an

19   explanation, he is not referring to at the trial, because

20   we know, and you are instructed, he has a right to testify

21   or not testify, and that cannot be held against him.  That

22   was Mr. Kaplan's argument about during the question when he

23   was in custody, okay?  That's the only thing you are to

24   take that for.  You are in no way to hold it against him if

25   he has not testified.  That's a right that I would have,

167

1    and you would have, that anyone would have, so stay away

2    from that, okay?

3                    Now, I'm going to give you ten minutes.   Do

4    what you need to do, be back here and I'll read you the

5    instructions.

6                    COURT OFFICER:  All rise for the jury.

7                    (At 3:30 p.m., court recessed.)

8                    (At 3:45 p.m., court reconvened.)

9                    MR. KAPLAN:  Your Honor, may I address the

10   Court?  Numbers 11, 26, 7, and 10, relating to transcripts

11   and other cases and court records, Mr. Sheikh and I agree

12   to redact any reference to penalties or types of crimes

13   involved.

14                   THE COURT:  Okay.

15                   MR. SHEIKH:  Your Honor, they were already

16   admitted, and we stipulate and reviewed the retractions

17   made by Mr. Kaplan, and they are agreeable.  Thank you.

18                   THE COURT:  Okay.  Now, what I intend to do

19   is instruct them.  We'll decide who the two alternates are,

20   and I have to leave early today, so I'm going to send them

21   home when I'm done with that.  We will start tomorrow at

22   9:00 a.m., okay?  We will have the normal stipulations,

23   they can see whatever exhibits they want.  I will send

24   copies of the instructions in with them.  Okay?

25                   MR. SHEIKH:  Your Honor, do you want us,