UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH HENDRIX,

      Petitioner,

v.

      CASE NO. 2:11-CV-14659

CARMEN PALMER,

      HON. AVERN COHN

      Respondent.

      MAG. MONA K. MAJZOUB

_____

**SUPPLEMENTAL ANSWER IN OPPOSITION TO BRIEF IN
SUPPORT OF AMENDED PETITION FOR WRIT OF HABEAS
CORPUS**

# TABLE OF CONTENTS

Table of Contents......................................................................................i

Introduction ...........................................................................................1

    Statements in Compliance with Habeas Rule 5(b) ........................2

    A.   Statute of Limitations................................................2

    B.   Exhaustion................................................................2

    C.   Procedural Default....................................................2

    D.   Non-retroactivity Doctrine.......................................2

Statement of the Case .............................................................................3

    A.   Trial Facts ...............................................................3

    B.   Procedural History ...............................................23

Standard of Review Pursuant to AEDPA.................................................27

Argument ..............................................................................................34

I.    Pursuant to precedent from the United States Court of
    Appeals for the Sixth Circuit, the Michigan Court of Appeals
    adjudicated Hendrix's *Miranda* claim on its merits by
    reference to the additional exhibits he proposed adding to
    the record when it denied his motion to remand.  In any
    event, any error by the Court would be harmless on the facts
    of this case.  This Court should deny habeas relief to Hendrix
    on his *Miranda* claim. ......................................................34

    A.   The Michigan Court of Appeals adjudicated Hendrix's
        *Miranda* claim on the merits by reference to his
        proposed exhibits when it denied his motion to remand......35

    B.   The Michigan Court of Appeals denial of Hendrix's
        motion to remand, a merits adjudication of his

*Miranda* claim rendered in conjunction with his proposed exhibits, was not objectively unreasonable on the unique facts of this case. .................................38

1.  The Michigan Court of Appeals' decision ...................38

2.  Clearly established federal law regarding *Miranda* claims. ...........................................38

3.  Analysis .......................................................40

    a.  Statements made during transport from Detroit to Shelby Township ................................41

    b.  Hendrix invokes his *Miranda* right to counsel several hours later at the Shelby Police Department ................................42

    c.  Hendrix's statements to the police two days later after he invoked his *Miranda* right to counsel. ................................43

    d.  Hendrix's statements to the transport officers on September 6th were obtained in compliance with *Miranda* are were admissible at trial. ................................44

    e.  Hendrix's statements to the police on September 8th made after he requested counsel at the Shelby Township Police Department were not obtained in compliance with *Miranda* and thus were not admissible at trial. ................................45

    f.  The Michigan Court of Appeals denied the motion to remand because exclusion of Hendrix's statements made after he invoked his right to counsel were not inculpatory. ..........46

4.  Harmless error .........................................................50

Conclusion ................................................................................................ 57

Relief ........................................................................................................ 61

Certificate of Service ............................................................................... 62

## INTRODUCTION

Following the filing of the State's answer to the petition, Joseph Hendrix filed a brief in support of his amended petition for a writ of habeas corpus.  In that brief, Hendrix detailed the basis of his claim that the Michigan Court of Appeals unreasonably adjudicated his *Miranda* claim.  This brief serves both as a response to that brief and an outline of the argument that the State is going to present at the oral argument in this Court, now scheduled for Tuesday, July 26, 2016.

## STATEMENTS IN COMPLIANCE WITH HABEAS RULE 5(b)

With respect to the bars that preclude habeas review, the State asserts the following in conformance with Habeas Rule 5(b) with respect to the one claim (the *Miranda* claim) addressed in this brief:

### A.    Statute of Limitations

The State is not arguing that Hendrix's *Miranda* claim is barred by the statute of limitations.

### B.    Exhaustion

The State is not arguing that Hendrix's *Miranda* claim is barred by the failure to exhaust a claim for which a state court remedy exists.

### C.    Procedural Default

The State is not arguing that Hendrix's *Miranda* claim is procedurally defaulted.[1]

### D.    Non-retroactivity Doctrine

The State is not arguing that Hendrix's *Miranda* claim is barred by the non-retroactivity doctrine.

---

[1] This is a change from the State's original answer in this case, where the State argued that the *Miranda* claim was procedurally defaulted.

2

## STATEMENT OF THE CASE

### A.    Trial Facts

Hendrix was tried in the Macomb County Circuit Court on March 20, 21, and 22, of 2007.  The jury convicted Hendrix of carjacking, felony-murder, and unlawfully driving away a motor vehicle after less than a full day of deliberation.  The prosecution relied both on evidence that Hendrix committed other carjackings in a similar fashion and that he committed the carjacking at issue in this case–leading to Evangeline Doen's injury and death—to convict him as charged.

**The "other act" witnesses**

*The 2002 theft of the GMC truck*

On December 2, 2002, at approximately 3:30 p.m., Jeffrey Piontowski was driving his 1985 GMC truck and arrived at a restaurant/bar called "the Gathering Place."  (3/20/07 Tr., R. 19-1, Pg ID 1352.)  Piontowski parked his truck next to the front door and went inside to meet friends, leaving the keys underneath his seat.  (*Id.* at 1353-54.)  About an hour later, when Piontowski was leaving the restaurant, he noticed that his truck was gone.  (*Id.* at 1354.)

3

Piontowski then looked out at the street and saw his truck waiting to make a left-hand turn out of the restaurant's parking lot. (3/20/07 Tr., R. 19-1, Pg ID 1354.) He ran to where the truck was, opened the door, and tried to get into the truck. He had one hand and one foot in the truck, when it just "took right off" onto the street, throwing Piontowski into the center lane of the street. (*Id.* at 1355.) Piontowski called the police; a patrol unit was nearby and pursued the truck. The driver of the truck only went a short distance before he got out of the truck and fled on foot. (*Id.*)

Officer Andrew Gammichia of the Shelby Township Police Department was pulling out of a side street just across from the Gathering Place when he observed a brown GMC pickup truck pull out of the parking lot of the Gathering Place very recklessly and at a high rate of speed. Though he did not know it at the time, the pickup truck was stolen. (3/21/07 Tr., R. 13-5, Pg ID 270-71.)

Officer Gammichia activated his overhead lights, advised dispatch that he was following the truck, and dispatch advised him that a truck fitting that description had just been stolen from the Gathering Place. (3/21/07 Tr., R. 13-5, Pg ID 272.) He pursued the truck until it reached

4

the end of the street (at an apparent dead end). The truck turned around, came right at Officer Gammichia's patrol vehicle, and accelerated again to a high speed such that Officer Gammichia had to take evasive action to avoid a crash.[2] (*Id.* at 272-73.)

At that point, Officer Gammichia determined that the driver of the truck was a white male. (*Id.* at 247.) He then observed the truck come to a stop, and saw the driver jump out the truck and run away through a group of homes. (*Id.* at 274.) Officer Gammichia followed the driver's tracks in the fresh snow until he came to a home on Paxton Street, which the officer later discovered was where Hendrix's mother lived. (*Id.* at 274-75.) Officer Gammichia went up to the house and spoke with Hendrix's mother, who said that Hendrix was not there. (*Id.* at 275.)

The next day, the police asked Piontowski to look at a photo line-up. He selected an individual from the photo line-up. (3/20/07 Tr., R. 19-1, Pg ID 1356.)

---

[2] Officer Gammichia testified that other people could have been easily injured given how recklessly Hendrix was driving. (3/21/07 Tr., R. 13-5, Pg ID 277.).

The prosecution admitted as an exhibit a guilty plea transcript when Hendrix pleaded guilty to unlawfully driving away a motor vehicle, specifically Piontowski's truck.  (3/20/07 Tr., R. 19-1, Pg ID 1357.)  The prosecution also admitted as an exhibit a document showing that Hendrix had been charged and convicted of that offense.  (*Id.* at 1358.)

### *The August 31, 2006 theft of the Ford Explorer*

On August 31, 2006, Maureen Scott was going to get a pizza from Little Caesar's.  Because she planned on just grabbing the pizza and coming right back out, she parked her Ford Explorer right in front of the restaurant and left the keys in the ignition and the doors unlocked. (3/20/07 Tr., R. 19-1, Pg ID 1343.)

Scott held the restaurant door open for another customer that was just ahead of her.  She heard the other customer order pizza at which point she turned around and noticed that her SUV was driving away. She did not see who was driving it.  (3/20/07 Tr., R. 19-1, Pg ID 1344.) She had been in store for no more than four minutes.   (*Id.*)

On September 1, 2006, at approximately 12:15 a.m., Officer Matthew Lashbrook of the Detroit Police Department and his partner

6

were dispatched to the area of Erwin south of Grinnell, an area known for a lot of drug houses. (3/21/07 Tr., R. 13-5, Pg ID 248-50, 254.) When they arrived at that location, Officer Lashbrook observed a Ford Explorer crashed into a telephone pole. The driver lost control at a high rate of speed: the force of the crash uprooted the telephone pole. (*Id.* at 249, 252.) Officer Lashbrook confirmed that the Explorer was stolen out of Shelby Township and impounded it. (*Id.* at 251.)

Officer Brian Kirk of the Shelby Township Police Department first saw Scott's 2006 Ford Explorer in a tow yard in Detroit. (3/20/07 Tr., R. 19-1, Pg ID 1422). In examining the interior of the Ford Explorer, Officer Kirk, found "two inmate [intake] bracelets, an arraignment sheet from 41-A District Court, and a cell phone with no battery." (*Id.* at 1423.) The name on each of the bracelets was "Joseph Michael Hendrix." (*Id.* at 1425.) The arraignment sheet likewise had the name "Joseph Michael Hendrix" and his date of birth.[3] (*Id.* at 1427.)

---

[3] The jury later heard that Hendrix pleaded guilty in the Wayne County Circuit to possessing a stolen vehicle with respect to the Ford Explorer. (3/21/07 Tr., R. 13-5, Pg ID 340.)

_The September 3, 2006, theft of the Dodge Ram_

On September 3, 2006, at approximately 8:30 a.m., Louis George was driving his 2005 Dodge Ram and stopped at 7-Eleven convenience store to purchase some coffee prior to work.  (3/20/07 Tr., R. 19-1, Pg ID 1347-48.)  He parked his SUV right in front of the 7-Eleven convenience store, and left the keys in the ignition and the doors unlocked.  He went into the store and bought his coffee.  As he paid for his coffee, a store employee said, "isn't that your truck?" followed by "well, somebody just took it."  (_Id._ at 1439.)  George called the police.  (_Id._ at 1350.)

Officer Rufus Stewart of the Detroit Police Department made a traffic stop of a burgundy Dodge Ram in the City of Detroit on September 3, 2006.  (3/21/07 Tr., R. 13-5, Pg ID 254-55.)  After entering the license plate into the computer system which revealed that the Dodge Ram was stolen, the officers asked the sole occupant of the Ram to step out of the vehicle and placed him into custody.  (_Id._ at 256.)  Officer Stewart identified Hendrix as the occupant of the Ram.  (_Id._ at 257-58.)  The area in which the stop was made was a known narcotics area.  (_Id._ at 259.)

8

**The carjacking and injury that led to Evangeline Doen's death**

Gina Doen lived in Shelby Township and had a young daughter, who was five years old (as of the date of trial). (3/20/07 Tr., R. 19-1, Pg ID 1430.)

Gina's mother, Evangeline Doen, had immigrated to the United States in approximately 1976. (3/20/07 Tr., R. 19-1, Pg ID 1430.) She had four children, two boys and two girls. (*Id.* at 1432.) Gina was close to her mother and, in 2006, made a point of seeing her at least once a week. She tried to visit her mother on Sundays because Evangeline liked to go to church. (*Id.*) Gina's young daughter was very close to her grandmother (Evangeline). (*Id.*)

On September 5, 2006, Gina called Evangeline and made plans to see her. Gina picked up Evangeline about 4:00 p.m. in her 2003 red Caravan. (3/20/07 Tr., R. 19-1, Pg ID 1433.) After picking up Evangeline, Gina drove towards her home where they had plans of talking to some relatives in the Philippines through a webcam. (*Id.* at 1434.)

At some time between six and seven in the evening, Gina, who was driving, stopped at the Vineyards strip mall, at the corner of

9

Mound and West Utica Roads.  (3/20/07 Tr., R. 19-1, Pg ID 1434.)  Gina

and her daughter got out of the minivan and went into the "Q Cleaners"

to drop off some clothes.  (*Id*. at 1435.)  Evangeline stayed in the

minivan because she was not feeling well and because Gina told her

that she would be right back in five minutes.  (*Id*. at 1435.)  Gina left

the keys to the minivan in the ignition and left the doors unlocked.  (*Id*.

at 1436-37.)

Gina was in the cleaners for about five minutes.  (3/20/07 Tr., R.

19-1, Pg ID 1437.)  When she walked out of the cleaners, she saw

Evangeline laying on the ground.  (*Id*.)  Gina ran to Evangeline, with

her young daughter running behind her crying.  Gina then noticed that

the minivan was gone.  (*Id*. at 1439.)  Gina called the police using her

cellphone.  (*Id*.)  As she waited for the police and paramedics to arrive,

Gina put her hand underneath her mother's head and then noticed the

blood in her hand.  (*Id*. at 1439-40.)

### The investigation and aftermath of the crime

Officer James Osterland of the Shelby Township Police

Department was dispatched to the strip mall, and it took him only

about three minutes after the dispatch to arrive.  (3/20/07 Tr., R. 19-1,

10

Pg ID 1359-60.)  When he arrived, he saw Evangeline Doen laying on the ground on her back and that she was conscious.  He also noted that a firefighter was supporting her head; he told Officer Osterland that Evangeline was bleeding from the back of her head.  (*Id.* at 1362, 1367.)

Evangeline was taken to Troy Beaumont Hospital for medical treatment.  (3/20/07 Tr., R. 19-1, Pg ID 1363.)  Officer Osterland followed her and listened in on the conversation she had with medical personnel.  Officer Osterland overheard Evangeline tell medical staff that a man got into the minivan.  She told the intruder that he had the wrong car, but he told her to get out and started backing the van up. Evangeline said that, while she was struggling with her seatbelt, the intruder pushed her out of the van.  (*Id.* at 1364, 1370.)  She described the man as "possibly" wearing glasses, "possibly" wearing a brown t-shirt, and that he had brown or blonde hair.  (*Id*. at 1367.)

Officer Osterland also spoke with the victim's daughter, Gina Doen, who was "very upset."  (3/20/07 Tr., R. 19-1, Pg ID 1365.)  Gina told Officer Osterland that she pulled into a parking spot in the strip mall and took her young child with her into a store in the strip mall. (*Id.*)  She told Officer Osterland that, some five minutes later, she came

11

out of the store, saw that her van was gone, and that her mother was laying on the ground. (*Id.* at 1365-66.)

Officer Robert Wathen of the Shelby Township Police Department was an evidence technician, whose job was to evaluate and process crime scenes. (3/20/07 Tr., R. 19-1, Pg ID 1375-76.) He processed the crime scene in this case. (*Id.* at 1376.) He determined that there were no working exterior video cameras located in the strip mall. (*Id.* at 1382.)

Officer Kyle Bryent of the City of Detroit Police Department was working a shift of on the morning of September 6, 2006. (3/20/07 Tr., R. 19-1, Pg ID 1383-84.) At about 1:40 a.m., Officer Bryent saw a 2003 burgundy/red Dodge Caravan driving on Eldon Street, travelling southbound at a high rate of speed (above the speed limit).[4] (*Id.* at 1384-86.)

Officer Bryent did not need to activate his car's overhead lights to initiate a stop because the Caravan came to a stop at a gas station.

---

[4] Officer Bryent characterized the neighborhood in this area as "deserted" and that it was common to find drug houses in the neighborhood. He added that it was the kind of neighborhood where people knew to come when they wanted drugs. (3/20/07 Tr., R. 19-1, Pg ID 1387.)

(3/20/07 Tr., R. 19-1, Pg ID 1386-87.)  When Officer Bryent approached

the Caravan, he saw that it was occupied by one individual—a person

he identified as Joseph Hendrix.  (*Id.* at 1387-88.)  Officer Bryent knew

Hendrix because he had arrested him before in that area.[5]  (*Id.* at 1391.)

When Officer Bryent asked Hendrix to step out of the Caravan, Hendrix

hesitated, so he had to physically pull him out of the van. (*Id.* at 1392.)

Officer Jason Zuk of the Shelby Township Police Department

attempted to lift latent fingerprints from the 2003 Dodge Caravan.

(3/20/07 Tr., R. 19-1, Pg ID 1403, 1406.)  Officer Zuk lifted one print

from the driver's side door, two prints from the driver's side sliding

door, and one print from the rearview mirror in the interior of the

minivan.  (*Id.* at 1407-08.)  All the remaining prints he found were

smudged or non-readable.  (*Id.* at 1413, 1416.)  Officer Zuk placed the

prints in initialed and sealed envelopes for the detectives in the case to

send to the Michigan State Police Crime Lab.  (*Id.* at 1410.)  Reading a

report that had been stipulated to by the parties, Officer Zuk testified

---

[5] On cross-examination, Officer Bryent admitted that, with crack
addicts, stolen vehicles often change hands a couple of times prior to
being recovered.  In other words, he would not find it unusual "that if
person A stole the vehicle, you might recover it with person B . . . ."
(3/20/07 Tr., R. 19-1, Pg ID 1394.)

13

that two of the prints he lifted from the minivan were identified as coming from Hendrix.  (*Id.* at 1414, 1416, 1420.)

After the minivan was recovered, Gina Doen noted that there were several items in minivan that did not belong to her; specifically, a watermelon style makeup bag, a black and beige baseball style-hat, a black knit hat, and a white "do-rag."  (3/20/07 Tr., R. 19-1, Pg ID 1441-42.)

**Hendrix's statements to the police**

Sergeant Brad Ferguson of the Shelby Township Police transported Hendrix from Detroit to Shelby Township sometime after 4 a.m. on September 6, 2006.  (3/21/07 Tr., R. 13-5, Pg ID 315-16.)

While in the transport car, Sergeant Ferguson's partner (Sergeant Stan Muszynski) advised Hendrix of his *Miranda*[6] rights.  (3/21/07 Tr., R. 13-5, Pg ID 317-18.)  Hendrix acknowledged that he understood his rights.  Hendrix did not ask for a lawyer.  (*Id.* at 318.)  Sergeant Muszynski then asked Hendrix how he gained possession of Gina Doen's 2003 Dodge Caravan.  Hendrix replied that he did not know how he obtained the van and that he did not know what to say.  (*Id.* at 318-

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

14

19.)  He did not state that he found it abandoned somewhere in Detroit. (*Id.* at 319.)  Sergeant Ferguson was surprised at this, because based on his experience, people try to explain how they came into possession of what later turns out to be a stolen vehicle.  (*Id.* at 319-20.)  Sergeant Ferguson observed that Hendrix appeared to be "very nervous."  (*Id.* at 320.)

Detective Terrence Hogan of the Shelby Township Police Department testified that Hendrix had a suspended driver's license during the relevant periods of time in 2006.  (3/21/07 Tr., R. 13-5, Pg ID 327-28.)  He also discovered that Hendrix did not own any vehicles in 2006.  (*Id.* at 329.)

On September 8, 2006, Detective Hogan had a conversation with Hendrix in the Macomb County Jail.  (3/21/07 Tr., R. 13-5, Pg ID 330.) Detective Hogan testified that he read Hendrix his *Miranda* rights and that Hendrix agreed to speak with him (though Hendrix refused to sign the waiver of rights form).  (*Id.* at 331.)

Detective Hogan asked Hendrix where he was on September 5, 2006, at approximately 6:50 p.m.  Hendrix replied that he did not want to give the detective that information, though at some point he stated

15

that he was in Sterling Heights and that that he made a call from a 7-Eleven party store, but would not say where the 7-Eleven was located. (3/21/07 Tr., R. 13-5, Pg ID 332.)

At one point, Hendrix asked if he was going to be charged with murder or homicide. (3/21/07 Tr., R. 13-5, Pg ID 333.) Detective Hogan stated that Evangeline was still alive, but was in critical condition and that there was always a chance that she might die. (*Id.* at 334, 355.) At one point Hendrix told Detective Hogan to check with the Detroit Police Department because they knew "the truth" and that Detective Hogan should check their video. (*Id.* at 357.) Specifically, Hendrix said, "check with them, they have video. They've been watching me." (*Id.* at 362.) The interview ended when Hendrix said, "I don't think I'm going to say anymore . . . I don't want to get into anymore [sic] trouble." (*Id.* at 358-59.)

Detective Hogan further attempted to determine who the purse and other items found in the Caravan belonged to. In so doing, Detective Hogan spoke with a woman by the name of Michelle Zalatski, Hendrix's girlfriend. (3/21/07 Tr., R. 13-5, Pg ID 363.) Zalatski told

Detective Hogan that there was a very strong likelihood that the purse found in the Caravan belonged to her. (*Id.* at 363.)

Detective Hogan expected that if someone in Hendrix's position had an alibi, he would gladly give it to the police. (3/21/07 Tr., R. 13-5, Pg ID 334.) Hendrix also did not state how he gained possession of the Caravan; he further did not claim that he bought it from a crack addict or found it abandoned on the street. (*Id.* at 335.) In short, Detective Hogan would expect that Hendrix would have come up with *some* explanation for coming into possession of the Caravan if he were not the person who stole it. But he did not. (*Id.*)

Detective Hogan testified that, during a six-day period—from August 31, 2006, until September 5, 2006—there were three vehicle thefts involving vehicles that had been left unattended and/or running. (3/21/07 Tr., R. 13-5, Pg ID 338.) He testified that none had occurred since that time, which coincidentally was concurrent with Hendrix's in-custody status. (*Id.*)

Detective Hogan testified that all four car thefts discussed during the trial in this case had been done in such a similar fashion that it was likely the same person committed them. (3/21/07 Tr., R. 13-5, Pg ID

339.)  All were crimes of opportunity (e.g. keys left in the cars), all were committed within a very short distance of where Hendrix was living, and the three vehicles that were taken out of Shelby Township were found in the same area in Detroit.  (*Id.*)  And Detective Hogan added that it was his information that Hendrix was very familiar with the Vineyards strip mall.  (*Id.* at 339-40.)

**Evangeline's treatment, death, and autopsy**

Dr. Brett Todd, a physician at Troy Beaumont Hospital, treated Evangeline Doen in the emergency room for a head injury which ultimately led to a subdural hematoma.  (3/21/07 Tr., R. 13-5, Pg ID 261-62.)  A subdural hematoma is "bleeding within the skull around the brain, and it can be a dangerous injury from increasing cranial pressure."  (*Id.* at 262-263.)  Evangeline's injury was consistent with being pushed out of a moving vehicle and hitting her head on the pavement.  (*Id.* at 264.)  And her injury was such that Evangeline needed to be admitted to the hospital.  She needed a higher level of care than available at Troy Beaumont Hospital, so she was transferred to Beaumont Hospital in Royal Oak.  (*Id.* at 264.)

18

Lee Doen lived with his mother, Evangeline, in an apartment in Roseville, Michigan.  (3/20/07 Tr., R. 19-1, Pg ID 1336-38.)  Because he thought his mother was doing better after she had been at the hospital for a while, he left the hospital to take out the trash at his apartment.  (*Id.* at 1339-40.)  On the way back to the hospital, he received a call saying that his mother had started to bleed.  By the time he got back to the hospital, his mother had been taken into surgery—a surgery that she did not survive.  (*Id.* at 1340.)  Evangeline died on September 15, 2006.  (*Id.* at 1440.)

Dr. Benardino Pacris, a forensic pathologist with an expertise in determining cause of death, performed an autopsy on the body of Evangeline Doen.  (3/21/07 Tr., R. 13-5, Pg ID 300-03.)  He determined the cause of death to be "blunt force head trauma with complications, contributory to the cause of death is hypertensive and arteriosclerotic cardio vascular disease."  (*Id.* at 304, 308.)  Although she was 65 years-old at the time of her death and suffered from various medical problems, she could have lived into her 80s and 90s if it were not for the injury leading to her death.  (*Id.* at 305.)  He described Evangeline's injury as a "major" one.  (*Id.* at 310.)

19

Dr. Pacris believed that the blunt force trauma had to be the result of a "decent fall like from the back of your head with the concrete or [some other] unyielding surface." (3/21/07 Tr., R. 13-5, Pg ID 305.) He believed that her injury was consistent with being pushed out of a motor vehicle. (*Id.* at 306.) And he believed that the faster the vehicle was moving at the time, the more likely the likely the injury was to be severe. (*Id.*) Similarly, Dr. Pacris believed that an older person was more likely to suffer a more severe injury from such an action than a younger person. (*Id.* at 307.)

**The expert witness testimony at trial**

At trial, the State called Lieutenant Dan Heythaler to the stand as an expert in narcotics enforcement and apprehension. (3/21/07 Tr., R. 13-5, Pg ID 279-80.) The prosecutor gave Lieutenant Heythaler the following hypothetical: "[A]ssume that a particular individual, male individual, has a suspended driver's license, has a drug addiction, and does not a car. And there are crack houses in Detroit on Van Dyke Avenue and Sixth Mile Road." (*Id.* at 280-81.) When the prosecutor asked if, "in your opinion, would such a person be able to steal a car or

20

want to steal a car in order to purchase the drugs?" Lieutenant

Heythaler responded, "Yes." He explained:

> It's a crime of opportunity the majority of time, because they don't have a car because they probably sold it or [have] given it way for narcotics. They need transportation down there. No one that they know trusts them to use their case because they're probably going to exchange it for drugs, or they're going to be caught someplace down in Detroit with drugs in it. Or . . . they could get hurt, they could get robbed. They could get their car taken from them. [(3/21/07 Tr., R. 13-5, Pg ID 281.)]

Lieutenant Heythaler testified that if a person is stealing a car

just for transportation to a crack neighborhood in Detroit, he is

generally not going to care where he gets that car from (as opposed to a

car thief who is stealing the car for its value).[7] Rather, he will probably

find it close to home (or at least an area he is familiar with) and the

first one he comes across, he is going to grab. (3/21/07 Tr., R. 13-5, Pg

ID 283.)

Lieutenant Heythaler further testified that the area of Detroit

where Hendrix took three of the four vehicles he stole was "a heavy

drug area" with "a lot of drug houses in that area." (3/21/07 Tr., R. 13-5,

---

[7] Additionally, Lieutenant Heythaler testified that "[p]eople don't steal cars in broad daylight for pieces." (3/21/07 Tr., R. 13-5, Pg ID 296.)

Pg ID 284.)  He further opined that Hendrix was likely driving to this area "to purchase narcotics."  (*Id.*)

The Michigan Court of Appeals accurately summarized the facts adduced at trial as follows:

> The convictions arose out of an incident in which defendant carjacked an occupied van while it was parked at a strip mall.  Defendant pushed the lone occupant out of the van as he drove away in the stolen vehicle.  The victim suffered an injury to the back of her head when thrown from the van, eventually dying from a subdural hematoma associated with the fall.

*People v. Hendrix (On Remand)*, No. 277919, 2010 WL 673294, at *1 (Mich. Ct. App. Feb. 25, 2010), R. 13-10, Pg ID 534. This recitation of the facts is entitled to the presumption of correctness under § 2254(e)(1), and Hendrix has not demonstrated through clear and convincing evidence that this summary is incorrect.

The presumption of correctness extends to factual findings made by state appellate courts on the basis of their review of trial court records.  *Treesh v. Bagley*, 612 F.3d 424, 430 n.1 (6th Cir. 2010); *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)).

22

The State opposes any factual assertions made by Hendrix that are not directly supported by—or consistent with—the state court record, because Hendrix has failed to overcome the presumption of factual correctness under 28 U.S.C. § 2254(e)(1) or meet the requirements of 28 U.S.C. § 2254(e)(2).

### B.    Procedural History

A jury convicted Hendrix of carjacking, felony-murder, and unlawfully driving away a motor vehicle.  The trial court sentenced Hendrix to mandatory life without parole for the felony murder, life with the possibility of parole for the carjacking conviction, and 36 to 60 months for the UDAA conviction.

Following his conviction and sentence, Hendrix filed a claim of appeal in the Michigan Court of Appeals, which included the following claim:

I.    It was error to admit statements allegedly made by Mr. Hendrix where Mr. Hendrix had, on separate occasions, invoked his right to counsel, to remain silent, and had made an invalid *Miranda* waiver.

Contemporaneously with his brief on appeal, Hendrix filed a motion to remand "so that he can develop a record regarding his alleged

statements to the police and the ineffective assistance of his attorney."
(Motion to Remand, R. 13-10, Pg ID 545.)  Attached to that motion were
several documents that were not part of the lower court record.  The
Michigan Court of Appeals denied the motion "for failure to persuade
the Court of the necessity of a remand at this time."  (05/22/08 Order, R.
13-10, Pg ID 602.)

The Michigan Court of Appeals subsequently rejected Hendrix's
*Miranda* claim on plain-error review and affirmed Hendrix's conviction
in an unpublished opinion.  *People v. Hendrix*, No. 277919, 2008 WL
4604063, at *1 (Mich. Ct. App. Oct. 16, 2008), R. 13-10, Pg ID 790-91.

Hendrix then filed an application for leave to appeal in the
Michigan Supreme Court which again raised the *Miranda* claim as well
as other claims.  In lieu of granting leave to appeal, the Michigan
Supreme Court remanded the case to the Michigan Court of Appeals to
"for consideration of the issue raised by the defendant but not addressed
by that court during its initial review of this case, specifically, whether
the prosecutor presented sufficient evidence of the defendant's identity."
*People v. Hendrix*, 485 N.W.2d 1014 (Mich. 2009) (unpublished table
decision), R. 13-11, Pg ID 796.  The Court further stated that, "[i]n all

24

other respects, leave to appeal is DENIED because we are not persuaded that the remaining questions presented should be reviewed by this Court." *Id.*

On remand, the Michigan Court of Appeals issued an opinion finding that sufficient evidence of Hendrix' identity had been presented so as to sustain his conviction and again affirmed his conviction. *Hendrix (On Remand)*, 2010 WL 673294, at *2, R. 13-10, Pg ID 535-36. The Michigan Supreme Court denied Hendrix's application for leave to appeal from this opinion "because we are not persuaded that the question presented should be reviewed by this Court." *People v. Hendrix*, 785 N.W.2d 157 (Mich. 2010), R. 13-14, Pg ID 1113.

Hendrix then filed a habeas petition and a motion to hold the petition in abeyance while he pursued state collateral relief in the Michigan Courts. (Pet., R. 1, Pg ID 1-3; Mot. to Hold Pet. in Abeyance, R. 2, Pg ID 4-7.) This Court granted Hendrix's motion (01/23/12 Order, R. 4, Pg ID 9-12), and Hendrix returned to the trial court and filed a motion for relief from judgment, which contained claims not relevant to this supplemental answer (Notice, R. 5, Pg ID 13.).

After appellate proceedings on that motion, Hendrix returned to this Court and filed a motion to reopen this case and an amended petition.  (Mot. to Reopen, R. 8, Pg ID 18; Am. Pet., R. 9, Pg ID 19-22.) This Court granted Hendrix's motion to reopen the case and directed the State to respond to the amended petition.  (08/06/14 Order, R. 11, Pg ID 24-25.)

The State answered Hendrix's petition.  (Response, R. 12, Pg ID 26-124.)  In that response, the State argued that Hendrix had abandoned his claims by not sufficiently briefing them.  (Response, R. 12, Pg ID 28-29, 55-58.)  Some months later, Hendrix filed a supplemental brief, more fully setting out his habeas claims.  (Br. in Support of Am. Pet., R. 16, Pg ID 1184-1242.)

This pleading is both a response to Hendrix's supplemental brief (on the *Miranda* issue only) and a road map of the positions the State will take at the oral argument now scheduled for Tuesday, July 26, 2016.

## STANDARD OF REVIEW PURSUANT TO AEDPA

Congress mandated the standards of review in federal habeas proceedings in 1996 in the Antiterrorism and Effective Death Penalty Act (AEDPA).  Recognizing the foundational principle that "[s]tate courts are adequate forums for the vindication of federal rights," "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Burt v. Titlow*, 134 S. Ct. 10, 15, 16 (2013); 28 U.S.C. § 2254(d).

Congress has limited the availability of federal habeas corpus relief "with respect to any claim" the state courts "adjudicated on the merits."  28 U.S.C. § 2254(d).  Habeas relief may not be granted to a habeas petitioner under § 2254(d) unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

With respect to § 2254(d)(1), a state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

27

court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 n.2 (2013) (internal quotation marks and citation omitted). A state court decision involves an unreasonable application of clearly established Federal law pursuant to § 2254(d)(1) if "the state-court decision identifies the correct governing legal principle in existence at the time," but "unreasonably applies that principle to the facts of prisoner's case." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (internal quotation marks and citation omitted). Where "[n]o precedent of [the Supreme Court] clearly forecloses" a state court's ruling, it simply cannot be an unreasonable application of Supreme Court precedent. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016) (per curiam).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta," of the Supreme Court's decisions. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotations and citations omitted). "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Id.*

28

Moreover under § 2254(d)(1), the relevant Supreme Court precedent includes only the decisions in existence "as of the time the state court renders its decision." *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (internal quotation marks and emphasis omitted); *see also Pinholster*, 563 U.S. at 182 ("State-court decisions are measured against [the Supreme] Court's precedents as of the time the state court renders its decision.") (internal quotation marks omitted).

Under § 2254(d)(2), the "unreasonable determination" clause, "a state-court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 134 S. Ct. at 15 (internal quotation marks and citation omitted). "Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed." *Hardy v. Cross*, 132 S. Ct. 490, 495 (2011) (per curiam).

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted). This means that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-

29

court decision applied clearly established federal law erroneously or incorrectly." *Id.* Instead, the state court's "application must be objectively unreasonable." *Id.* That distinction creates "a substantially higher threshold" to obtain relief than de novo review. *Id.* A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Etherton*, 136 S. Ct. at 1152.

"It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). And federal court of appeals precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam) (citation omitted); *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (providing that absent a decision by the Supreme Court addressing "the specific question presented by [a] case" a federal court cannot reject a state court's assessment of claim). And, as the Supreme Court recently held,

30

where no Supreme Court cases confront "the specific question presented" by the habeas petitioner, "the state court's decision [cannot] be contrary to any holding from this Court." *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (per curiam) (internal quotation marks and citation omitted).

Further, the Supreme Court has specifically warned habeas courts that, "[b]y framing [Supreme Court] precedents at [too] high [a] level of generality, [it] could transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'" That "approach would defeat the substantial deference that AEDPA requires" be given to state-court decisions. *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (per curiam).

Moreover, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Richter*, 562 U.S. at 102. This standard protects against intrusion of federal habeas review upon "both the States' sovereign power to punish

offenders and their good-faith attempts to honor constitutional rights." *Id.* at 103 (internal quotation marks and citation omitted).

A federal court must refrain from issuing a writ "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (internal quotation marks and citation omitted). To clear the § 2254(d) hurdle, a habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

The burden of providing a petitioner a new trial "should not be imposed unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." *Wetzel v. Lambert*, 132 S. Ct. 1195, 1199 (2012).

The Supreme Court has also instructed habeas courts to apply a rebuttable presumption that a "federal claim was adjudicated on the merits" even "[w]hen a state court rejects a federal claim without expressly addressing that claim." *Johnson v. Williams*, 133 S. Ct. 1088,

32

1096 (2013). *See also Kernan v. Hinohosa*, 136 S. Ct. 1603, 1606 (2016) (per curiam) ("Containing no statement to the contrary, the Supreme Court of California's summary denial of Hinojosa's petition was therefore on the merits."). "[S]tate-court decisions [must] be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (internal quotation marks and citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunction in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (internal quotation marks and citation omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citation omitted).

Finally, the petitioner's burden is made even heavier by the fact that a federal court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

33

# ARGUMENT

**I. Pursuant to precedent from the United States Court of Appeals for the Sixth Circuit, the Michigan Court of Appeals adjudicated Hendrix's *Miranda* claim on its merits by reference to the additional exhibits he proposed adding to the record when it denied his motion to remand. In any event, any error by the Court would be harmless on the facts of this case. This Court should deny habeas relief to Hendrix on his *Miranda* claim.**

Hendrix claims that the Michigan Court of Appeals' decision rejecting his *Miranda* claim was contrary to Supreme Court law and an unreasonable determination of the facts where Hendrix "had, on separate occasions, involved his right to counsel, to remain silent, and had made an involuntary *Miranda* waiver." (Br. in Support of Am. Pet., R. 16, Pg ID 1200.) Hendrix focuses on the 2008 unpublished opinion per curiam issued by the Michigan Court of Appeals, which explicitly rejected consideration of the exhibits with which he proposed expanding the record. He claims that the state appellate court's decision in that 2008 opinion is unreasonable primarily because it would not consider those exhibits. However, Hendrix misses the mark entirely.

The Michigan Court of Appeals in fact adjudicated on the merits Hendrix's *Miranda* claim by reference to those same exhibits when it denied his motion to remand to the trial court for an evidentiary

34

hearing and expansion of the record. (05/22/08 Order, R. 13-10, Pg ID 602.) It is *that* decision, not the subsequent opinion per curiam from the Michigan Court of Appeals which is the relevant decision for purposes of analyzing Hendrix's *Miranda* claim by reference to those exhibits. And for the reasons that follow, the denial of the motion to remand was not contrary to, nor an unreasonable application of, clearly established federal law nor an unreasonable determination of the facts.

But if ultimately, this Court disagrees with the State as to which decision is the focus of the inquiry and/or disagrees that the State courts acted reasonably, and finds that some or all of Hendrix's post-*Miranda* statements should have been excluded from evidence, there was more than sufficient evidence to convict Hendrix of felony-murder, carjacking, and unlawful driving away of an automobile. In other words, any error would be harmless.

### A.   The Michigan Court of Appeals adjudicated Hendrix's *Miranda* claim on the merits by reference to his proposed exhibits when it denied his motion to remand.

After filing his claim of appeal in the Michigan Court of Appeals, Hendrix subsequently filed both an appellant's brief and a motion to

remand.  In fact, he filed both pleadings in the Court of Appeals on the same date—March 26, 2008.  Hendrix attached the same three non-record documents to each pleading:  two police reports[8] and one "advice of rights" form (the other having been admitted as an exhibit).  On May 22, 2008, the Michigan Court of Appeals issued an order denying the motion to remand "for failure to persuade the Court of the necessity of a remand at this time."  (05/22/08 Order, R. 13-10, Pg ID 602).  Sometime later, the Michigan Court of Appeals issued an opinion per curiam rejecting Hendrix's *Miranda* claim on plain-error review *without* reference to Hendrix's proposed exhibits, finding that they were not part of the trial court record. *Hendrix*, 2008 WL 4604063, at *1, R. 13-10, Pg ID 790-91.

It may appear at first glance that the merits adjudication relevant to Hendrix's claim is the discussion of the claim in the Michigan Court of Appeals' opinion per curiam issued by a panel of the court on October 16, 2008.  But it is not. *The only Michigan court* to consider

---

[8] The first police report dated September 6, 2006, is a supplemental report that includes two pages, each page drafted by a different officer. The first page was drafted by Sgt. Muszynski, and the second paged was drafted by Det. Hogan.  (09/06/06 Supplemental Report, R. 19-4, Page ID 1498-99.)

Hendrix's claim in conjunction with the exhibits he proposed to add to the record was the panel of the Michigan Court of Appeals that denied his motion to remand.  (05/22/08 Order, R. 13-10, Pg ID 602.)  As such, it is *that* panel's rejection of the claim, not the latter panel's rejection of the claim in the opinion per curiam, which should be judged when determining whether the state court unreasonably adjudicated Hendrix's *Miranda* claim.

A Michigan state court's summary denial of a motion to remand is presumed to be a decision on the merits.  *See Nali v. Phillips*, 681 F.3d 837, 852 (6th Cir. 2012); *Hawkins v. Woods*, ___ F. App'x ___, 2016 WL 2957317, at *3 (6th Cir. 2016); *Williams v. Woods*, No. 12-314, 2015 WL 5838620, at *3 (W.D. Mich. Oct. 7, 2015) (Bell, J.); *Matthews v. Warren*, No. 13-13294, 2014 WL 418978, at *9 (E.D. Mich. Aug. 22, 2014) (Rosen, J.).

Here, there is no reason to believe that the Michigan appellate court did not adjudicate Hendrix's *Miranda* claim, in conjunction with his non-record exhibits, on its merits when it denied Hendrix's motion to remand.  "[S]tate court decisions [are] given the benefit of the doubt." *Jones v. Bell*, 801 F.3d 556, 565 (6th Cir. 2015) (quoting *Woodford v.*

37

*Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  As such, AEDPA

deference indisputably applies to the state appellate court's rejection of

the *Miranda* claim in the motion to remand.  And it is indisputable that

the Michigan Court of Appeals considered Hendrix's non-record exhibits

in doing so.  *See Harrington v. Richter*, 562 U.S. 86 (2011).

**B.     The Michigan Court of Appeals denial of Hendrix's
         motion to remand, a merits adjudication of his
         *Miranda* claim rendered in conjunction with his
         proposed exhibits, was not objectively unreasonable
         on the unique facts of this case.**

**1.     The Michigan Court of Appeals' decision**

As noted above, the relevant merits adjudication of Hendrix's

*Miranda* claim occurred when the Michigan Court of Appeals denied his

motion to remand, when it necessarily had to examine the claim in

conjunction with his proposed exhibits.  (05/22/08 Order, R. 13-10, Pg

ID 602.)  This decision, for the reasons stated below, was not objectively

unreasonable.

**2.     Clearly established federal law regarding
         *Miranda* claims.**

The Fifth Amendment of the United States Constitution provides

that no person "shall be compelled in any criminal case to be a witness

against himself."  In *Miranda v. Arizona*, 384 U.S. 436, 461 (1966), the Supreme Court held that the privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from "informal compulsion exerted by law-enforcement officers during in-custody questioning."  In order to protect that right, the Supreme Court determined that "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990).  Unless the suspect knowingly, voluntarily, and intelligently waives these rights, any incriminating responses to the questioning will be excluded.  *Id.* at 589.

Once *Miranda* warnings have been given, if the accused indicates that he wishes to remain silent, the interrogation must cease.  If he requests counsel, the interrogation must cease until an attorney is present.  *Edwards v. Arizona*, 451 US 477, 482 (1981)(citing *Miranda v. Arizona*, 384 U.S. at 474).

In *Edwards v. Arizona*, the Supreme Court specifically held that "an accused,[], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-485. Moreover, "[o]nce a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (citing *Arizona v. Roberson*, 486 U.S. 675 (1988)).

### 3.    Analysis

By necessity, the Michigan Court of Appeals had to consider Hendrix's non-record evidence when denying his motion for remand, and in so doing reasonably rejected Hendrix's *Miranda* claim as a basis for relief. It is helpful to categorize Hendrix's statements to the police based on when and where they were made.

### a.   Statements made during transport from Detroit to Shelby Township

Here, there is no doubt that, as the officers were transporting Hendrix from Detroit to Shelby Township in the very early morning hours of September 6, 2006 (sometime after 4:00 a.m.), one of the officers (Sgt. Muszynski) read Hendrix his *Miranda* rights.  (3/21/07 Tr., R. 13-5, Page ID 317-18.)  It is undisputed that he did not ask for a lawyer or otherwise indicate an unwillingness to speak to the officers at that time.  (*Id.* at 318.)  Hendrix proceeded to make what the Michigan Court of Appeals properly characterized as "minimal comments" to the officers.  *Hendrix*, 2008 WL 4604063, at *1, R. 13-10, Pg ID 790.  Those statements from a "very nervous" Hendrix were that he did not know how he obtained possession of the Caravan and that he did not know what to say.  (*Id.* at 790-91; 3/21/07 Tr., R. 13-5, Pg ID 318-19.)  The first non-record police report referenced by Hendrix (found as Hendrix's Brief Exhibit, R. 19-4, Pg ID 1498) does nothing more than confirm this record evidence.[9]

---

[9] All this report does is confirm that Sgt. Ferguson testified accurately about what occurred when he and Sgt. Muszynski transported Hendrix from the Detroit Police Department to the Shelby Township Police Department.  The report indicates that Hendrix waived his *Miranda*

**b.    Hendrix invokes his *Miranda* right to counsel several hours later at the Shelby Police Department**

Next, pursuant to the second page of the first non-record police report (also found in Hendrix's Brief Exhibits, R. 19-4, Pg ID 1499), Detective Terrance Hogan attempted to question Hendrix after he arrived at the Shelby Township Police Department.  Detective Hogan writes that, at approximately 7:30 a.m., he escorted Hendrix from his cell block to the interview room.  Per the narrative, he advised Hendrix of his *Miranda* rights from an advice of rights form.  The narrative continues: "Hendrix refused to speak to me until he had the opportunity to speak with an attorney."  (*Id.*)  In the report, Detective Hogan states that he then returned Hendrix to his cell block without any further questioning.  No one questions that Detective Hogan properly terminated the interview of Hendrix at that time.

Another non-record document that Hendrix attached to that brief is a "Shelby Township Police Department Interrogation: Advice of

---

rights after Sgt. Muszynski read them to him verbatim from an advice of rights form.  The narrative report confirms that the officers properly took statements from Hendrix as they transported him from Detroit to Shelby Township.

42

Rights" form dated September 6, 2006.  (09/06/06 Advice of Rights, R. 19-4, Pg ID 1500.)  This form confirms the content of Detective Hogan's September 6, 2006 report as someone (presumably Detective Hogan) handwrote the phrase "Requested Attorney" next to where the suspect would normally sign his name.  Detective Hogan signed the document on the line designated for a witness.  *Id.*

### c.   Hendrix's statements to the police two days later after he invoked his *Miranda* right to counsel.

The record reveals that two days later, on September 8, 2006, Detective Hogan approached Hendrix and again read him his *Miranda* rights.[10]  Hendrix refused to sign or initial the waiver of rights form, but indicated he was otherwise willing to talk.  (3/21/07 Tr., R. 13-5, Pg ID 89-90.)  During the interview that followed, Hendrix would not state

---

[10] The State speculates that Detective Hogan incorrectly believed that because he intended to interview Hendrix about another "crime" that he was not barred by Hendrix's prior request for counsel.  However, Supreme Court precedent, as described earlier, holds that a request for an attorney under *Miranda* prevents all further attempts to interview the suspect until after he has consulted with counsel, irrespective of whether the crime the officer wishes to interview the suspect about is different than the one that prompted his *Miranda* request for counsel. The State believes that Detective Hogan's mistake was one based on a misunderstanding of law, and not borne of maliciousness.

43

where he was at the time of the Doen carjacking or how he came to

possess the Caravan.  (3/21/07 Tr., R. 13-5, Pg ID 332, 335.)  Instead, he

stated that he did not want to get into any more trouble and that the

Detroit police know the truth, and that at some point on the day in

question he was at a 7-Eleven store in Sterling Heights where he called

his grandmother.  (Id. at 332, 357, 358-59, 362, 365-66.)

Detective Hogan's other non-record police report (Brief Exhibit, R.

19-4, Pg ID 1502-04) confirms the details of the record evidence.

Moreover, the second advice of rights form (which was in fact admitted

into evidence at trial as People's Exhibit 28) also confirms the testimony

and report of the officers.[11]

> ### d.   Hendrix's statements to the transport officers on September 6th were obtained in compliance with *Miranda* are were admissible at trial.

There can be no dispute that, as the officers transported Hendrix

from Detroit to Shelby Township, Hendrix validly waived his *Miranda*

---

[11]  On this form (also found as one of Hendrix's Brief Exhibits, R. 19-4, Pg ID 1501), which is dated 9/8/06, at 10:15, there is a handwritten notation that Hendrix "Refused to sign but will Answer Questions." This form is witnessed by Detective Hogan and another police officer (presumably Sergeant Muszynski) (at 10:18).

44

rights and answered the officers' questions.  These statements were

thus obtained in compliance with *Miranda* and were legally admissible

at trial.

> **e.     Hendrix's statements to the police on
> September 8th made after he requested
> counsel at the Shelby Township Police
> Department were not obtained in
> compliance with *Miranda* and thus were not
> admissible at trial.**

Based on the non-record material that the Michigan Court of

Appeals considered when it denied Hendrix's motion to remand,

Hendrix requested counsel in response to a recitation of his *Miranda*

warnings some hours after his arrival at the Shelby Township Police

Department.  Pursuant to the Supreme Court's decisions in *McNeil* and

*Roberson*, the police were required to cease all interrogation of Hendrix

until such time as he was provided—and consulted with—counsel.  But

the officers did not do so.  In an apparent misunderstanding regarding

Supreme Court law, the officers approached Hendrix before he had

consulted with counsel, again read him his *Miranda* rights, obtained a

waiver, and re-interviewed Hendrix.  The results of that interview—

mostly Hendrix's continued refusal to cooperate with the officers by

failing to say where he was at the time of the carjacking that led to
Evangeline Doen's death or how he obtained possession of the Caravan,
coupled with a claim that he called his grandmother from a 7-Eleven in
Sterling Heights on the day of the carjacking, his proclamation that the
Detroit Police Department knew the truth and had a video, and which
ended when Hendrix said "I don't think I'm going to say anymore . . . I
don't want to get into anymore [sic] trouble"—should have been
suppressed. None of those statements should have been used at trial.

> **f.** **The Michigan Court of Appeals denied the
> motion to remand because exclusion of
> Hendrix's statements made after he invoked
> his right to counsel were not inculpatory.**

The question becomes: if Hendrix's statements to the police after
he invoked his *Miranda* right to counsel (those obtained on September
8, 2006) were not properly obtained and should not have been used at
trial, why did the Michigan Court of Appeals deny Hendrix's motion to
remand? The answer lies in the Supreme Court's *Richter* decision and
in an examination of the statements that Hendrix made on September
8, 2006.

Again, the Michigan Court of Appeals adjudicated Hendrix's *Miranda* claim on its merits when it denied his motion to remand "for failure to persuade the Court of the necessity of a remand at this time." (05/22/08 Order, R. 13-10, Pg ID 602).   And, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  *Richter*, 562 U.S. at 102.

Here, the statements obtained by the police from Hendrix after his invocation of his *Miranda* right to counsel were equivocal, defensive, and largely cumulative to those he gave prior to his invocation of this right to counsel, and at points seemingly exculpatory.  Certainly, *none* of the statements obtained from Hendrix were *inculpatory*.  He did not admit or concede anything.  In other words, they were virtually – if not completely – useless in convicting Hendrix.  Thus reasonable jurists could deny the motion for remand for the simple reason that Hendrix's improperly obtained September 8, 2006 statement to the police was simply not worth a remand.  In other words, suppression of the

47

September 8, 2006, statement would not have made a difference in the outcome of this trial, and the motion panel wisely discerned this fact.

While this Court may not necessarily agree with such a theory why the Michigan Court of Appeals would have denied the motion to remand, that is not the question. The question is whether *reasonable jurists* could disagree that such an argument or theory is inconsistent with the holding of a prior decision of the Supreme Court. And clearly reasonable jurists could disagree.

It is likely Hendrix will point to the prosecutor's comments and arguments at trial for the point that *this* prosecutor nonetheless managed to make substantial use of Hendrix's September 8th statements to the police. Such an argument would be a red herring because the prosecutor could have made the *same arguments* (and actually did so) simply by referring to Hendrix's statements made to the police during his transport from Detroit to Shelby Township on September 6, 2006.[12]

---

[12] In fact, the prosecutor stated in his closing argument that Hendrix "had an opportunity to tell us what happened on *September 6 and September 8* and he didn't. His silence in refusing to say from where he made the call, how he obtained the vehicle, and who he was with during the important times. That's like a thunderbolt from the sky. In other

Finally, Hendrix suggests, as he did in the Michigan Court of Appeals that, because he was apprehended in an area of Detroit known for crack houses, it "raises the question of Mr. Hendrix's statement of mind at the time that he allegedly waived his *Miranda* rights and made [the] September 6th statement.  If he was under the influence of narcotics, his waiver could be invalid, thus rendering his statement inadmissible."  (Br. in Support of Am. Pet., R. 16, Pg ID 1208.)

There was absolutely no evidence on the record that even suggests that Hendrix was under the influence of narcotics at the time he waived his *Miranda* rights during the early morning hours of September 6, 2006.  Moreover, Hendrix's coy use of the word "*if*" effectively strips the claim of any credibility and reveals it to be nothing more than another red herring.

In sum, the Michigan Court of Appeals adjudicated Hendrix's *Miranda* claim with respect to his proposed non-record exhibits on its merits when it denied his motion to remand.  And while there is a problem with the statements obtained from Hendrix on September 8,

---

words, he's saying he did it."  (3/21/07 Tr., R. 13-5, Pg ID 407 (emphasis added).)

2006, Hendrix has not shown that, where those statements were equivocal, defensive, as well as cumulative to those properly obtained on September 6, 2006, the Michigan Court of Appeals unreasonably denied that motion.  Habeas relief should be denied.

### 4.    Harmless error

Even were this Court to find that the Michigan Court of Appeals erred in denying Hendrix's motion to remand and thereby unreasonably adjudicated the *Miranda* claim contained therein, or unreasonably adjudicated the *Miranda* claim when it issued its opinion per curiam in 2008, Hendrix would not be entitled to habeas relief because any such error would be harmless.

A habeas petitioner is not entitled to relief based on State trial-court error unless he demonstrates that the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993).  This is so even where the state appellate court did not recognize the error and review the claim for harmlessness.  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

A showing of "substantial and injurious effect or influence" means "actual prejudice."  *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301,

1307 (11th Cir. 2012) (citing *Brecht*, 507 U.S. at 637). *See also Davis v. Ayala*, 135 S. Ct. 2187, 2197-98 (2015). This means that the habeas court is left in "grave doubt" over a matter so "evenly balanced" that the court concludes it is in a "virtual equipoise" as to the harmlessness of the error. *Forensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007).

The only statements that would be excluded if this Court were to find that the Michigan Court of Appeals unreasonably adjudicated Hendrix's *Miranda* claim would be the statements that Hendrix made to the police on September 8, 2016. If those statements were excluded from the evidence used to convict Hendrix, there would be more than sufficient remaining evidence to find Hendrix guilty of felony-murder, carjacking, and UDAA.[13]

The remaining untainted evidence includes:

- Hendrix was in possession of the stolen Caravan from which Evangeline Doen was roughly ejected from some six hours after it was stolen in an area of Detroit known for drug dealing and drug houses. As he was being transported from Detroit to Shelby Township during the very early morning hours of September 6, 2006, Hendrix told the police that he did not

---

[13] It is true that "confessions" typically have a "profound" and "dramatic effect on the course of a trial." *Arizona v. Fulminante*, 499 U.S. 279, 296, 312 (1991). But Hendrix did not "confess" to anything. Rather, his statements on September 8th were equivocal, defensive, and largely cumulative. They are actually the antithesis of a "confession."

51

know how he came into possession of the Caravan, a statement so incredulous that it incriminated him.

- Hendrix's fingerprints/palm print were found both inside and outside the Caravan.

- Before she died, Evangeline Doen described the person who carjacked her as a male with brown/blonde hair.  Hendrix was a white male whose hair appeared to be brown/blonde.

- A purse that Hendrix's girlfriend later claimed was hers was found inside the Caravan.

- Hendrix's modus operandi was to *steal* vehicles that had the keys left in them and appeared to be left unlocked/unattended.  Evidence presented at trial demonstrated that Hendrix had stolen three other vehicles besides the Caravan in this fashion.

- All four vehicles, including the Caravan, were stolen in an area approximately a mile away from where Hendrix lived or formerly lived.

- All three of the vehicles taken to Detroit (the fourth was recovered very close to where it had been stolen when the police immediately pursued it) were found within a half-mile of each other, in an area known for drug dealing and drug houses.

- Three of the four vehicle thefts occurred on August 31, September 3, and September 5, 2006.  No similar vehicle thefts occurred in Shelby Township after Hendrix was arrested.

Notably, Hendrix does not argue that, without his statements, he would have defended against the charges differently.  Moreover, given how little the statements added to the case either for the prosecution or the defense, with—or without—the statements, the jury was confronted

52

with deciding the same question:  whether the prosecution had

sufficiently proven that *he* was the individual who carjacked the

Caravan and caused the death of Evangeline Doen.  *See Bachynski v.*

*Stewart*, 813 F.3d 241, 250 (6th Cir. 2015).

Some insight into the jury's thinking is revealed by examining the

questions it asked of the trial court during its deliberations.  It asked

the following questions during its first morning of deliberation:

1. Could the jury have access to transcripts of the witnesses' testimony?

2. Could the jury obtain details on the testimony regarding the fingerprints?

3. Could it have details on the physical and mental state of the victim when interviewed by the medical staff and daughter of the victim?  [(3/22/07 Tr., R. 13-6, Pg ID 430-32.)]

After it received answers to these questions, the jury continued

deliberating and, later that afternoon, indicated it had two additional

questions:

1. Read back the testimony of Officer Jason Zuk, specifically the locations on the vehicle where the finger and palm prints were found.

2. Read back the testimony of Officer James Osterland, specifically can you hear the dialogue that Officer Osterland had with the paramedics at the scene of the

crime and with the nurse and medical staff at the hospital
emergency room?  [(3/22/07 Tr., R. 13-6, Pg ID 435.)]

Shortly after the jury was read back the relevant testimony of Officers

Zuk and Osterland, it came back with its verdict of guilty as charged.

(3/22/07 Tr., R. 13-6, Pg ID 437-38.)

Notably, not a single question by the jury during its deliberations

involved any of Hendrix's statements.  Clearly, the jury was focused like

a laser beam on the physical evidence (the fingerprints) and what the

victim herself said before she died.  The jury's questions are consistent

with having given little or no weight to Hendrix's statements on

September 8th.  Clearly, the jury was focus was elsewhere—on the

evidence that really mattered.

Additionally, one of the issues Hendrix presented to the court on

direct appeal was the sufficiency of the evidence to convict him of

carjacking, felony murder, and UDAA.  Notably, in summarizing the

evidence against Hendrix, the state appellate court *made no reference* to

any of Hendrix's statements to the police on September 8, 2006:

> Defendant argues that there was insufficient evidence
> to support the convictions, where no one identified him as
> the perpetrator, the victim's description of the perpetrator
> did not match defendant, there was no video surveillance
> showing that defendant committed the crimes, and where

54

the only link between defendant and the crimes was circumstantial evidence that he was later found in the car six hours after the crimes were committed, which evidence was tenuous and insufficient to infer guilt.  We disagree.

* * *

The record reflects that, approximately six hours after the crimes were committed, the police pulled defendant over as he was driving the stolen vehicle.  Defendant incredulously told police that he did not know how he came to be in possession of the van.  Further, as indicated in our first opinion, there was admissible MRE 404(b) evidence on the issue of identity, showing that defendant had engaged in a recent pattern of stealing vehicles in the area of the instant crimes and that the thefts occurred under similar circumstances, establishing a modus operandi.  As previously held, the prior bad acts were sufficiently unique, constituting defendant's signature under *People v. Golochowicz,* 413 Mich. 298, 319, 319 N.W.2d 518 (1982). There were no more similar thefts of vehicles following defendant's apprehension, thereby further supporting a conclusion that defendant was the culprit. Additionally, the fingerprints in the van that the police were able to check for a match belonged solely to defendant, and the testimony suggested that items found in the stolen van had been claimed by defendant's girlfriend. Viewing all of this evidence in a light most favorable to the prosecution, resolving any and all evidentiary conflicts in favor of the prosecution, and recognizing that circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the crimes, we hold that the evidence was sufficient to establish that defendant was indeed the perpetrator. It was up to the jury to determine what inferences could be fairly drawn from the evidence and to determine the weight to be accorded those inferences, and we find no basis in the record to interfere with the jury's role

55

and its verdict. [*Hendrix (On Remand)*, 2010 WL 673294, at *1-2, R. 13-10, Pg ID 535-36.]

For all these reasons, if this Court finds any relevant decision by the Michigan Court of Appeals to be unreasonable such that the statements made by Hendrix to the police on September 8th should have been admitted, such an error would be harmless beyond a reasonable doubt. With—or without—these statements, the evidence presented by the prosecution was more than sufficient to convict Hendrix of the carjacking and UDAA of the Caravan and the senseless murder of Evangeline Doen. Habeas relief should be denied.

## CONCLUSION

The state courts' rejection of Hendrix's *Miranda* claim did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts. Hendrix was "entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953); *see also United States v. Hajal*, 555 F.2d 558, 569 (6th Cir. 1977) ("[W]e have yet to review a perfect jury trial."). The state-court decision in this case was not "so lacking in justification" that they resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The formidable threshold for granting habeas relief has not been met because fairminded jurists could disagree on the correctness of the state court's decision. *Yarborough*, 541 U.S. at 664. Consequently, habeas relief should be denied.

Additionally, the State opposes any requests for bond, oral argument, or any other relief, including a certificate of appealability. And the State asserts that Hendrix is not entitled to habeas relief because he has not established that the alleged errors had a substantial

and injurious effect on the verdict in this matter.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

The State also contends that Hendrix has not demonstrated entitlement to discovery.  Unlike typical civil litigants, "[h]abeas petitioners have no right to automatic discovery."  *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).  Rule 6(a) permits district courts to authorize discovery in habeas corpus proceedings under the Federal Rules of Civil Procedure only "for good cause."  R. Governing 2254 Cases in the U.S. Dist. Cts. 6(a).  "Rule 6 embodies the principle that a court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'"  *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)).  "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'"  *Williams*, 380 F.3d at 974 (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)); Habeas Rule 6(a).  "Conclusory allegations are not enough to warrant discovery under Rule 6; the petitioner must set forth specific allegations of fact."  *Williams*, 380 F.3d

at 974 (internal quotation marks and citation omitted).  Hendrix has not met this burden.

If this Court denies the petition, the State asserts that Hendrix is also not entitled to a certificate of appealability (COA) so as to proceed further.  In order to obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the petitioner is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further.  *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'") (citations omitted).

When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable

jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack*, 529 U.S. at 483-84. Likewise, when a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claims, a COA should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* at 484.

When a plain procedural bar is present, and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. *Id.*

## RELIEF

For the reasons stated above, this Court should deny the petition.

The Court should also deny Hendrix any requested discovery,

evidentiary hearings, bond, oral argument, and any other relief he

seeks in this action, including a certificate of appealability.

Respectfully submitted,

Bill Schuette
Attorney General

s/John S. Pallas

Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
pallasj@michigan.gov
[P42512]

Dated: July 15, 2016
AG #2012-0004802A/Hendrix, Joseph/Supp Answer

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2016, I electronically filed the

foregoing papers with the Clerk of the Court using the ECF system

which will send notification of such filing to the following:

HONORABLE AVERN COHN
MAGISTRATE JUDGE MONA K. MAJZOUB
ATTORNEY FOR PETITIONER MICHAEL B. SKINNER

Respectfully submitted,

Bill Schuette
Attorney General

s/John S. Pallas

Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
pallasj@michigan.gov
[P42512]